# DECISIONS

—— OF THE ——

# SUPREME COURT OF FLORIDA.

## JANUARY TERM, A. D. 1894.

MARTIN H. SULLIVAN, AS EXECUTOR, ET AL., AP-
PELLANTS, VS. WILLIAM RICHARDSON, AS TRUSTEE,
APPELLEE.

1. A written instrument offered in evidence as an original Spanish
   title made by Ramirez, Intendant of the Army, Sub-delegate
   of Royal Exchequer of Cuba and the Floridas, etc., to Vicente
   S. Pintado, December 17th, 1817, and purporting to grant, *inter
   alia*, the water front below high-water-mark outwards about
   1800 feet, from Bayou Chico to Bayou Texar, in Pensacola
   Bay, and including the water front of the city of Pensacola,
   held to purport to be an original, and to bear no evidence of
   being a copy, nor any of having been mutilated.
2. A copy of the original of a grant of land in West Florida from
   the Spanish authorities of that province while a colony of
   Spain, duly certified by the official custodian of the original, is
   not the only legal evidence of title that the grantee was en-
   titled to have. The possession of a royal title in form, regis-
   tered in the records of the government office, is legal evidence
   of such title.
3. Ancient papers found in the year 1859 or 1860, in an old trunk,
   with a Spanish grant, or royal title in form, which trunk con-
   tained papers of the agent of the grantee, were offered in evi-
   dence as auxiliary to the admission of such grant or title, and
   were objected to severally on the ground of their irrelevancy.

Those which connect themselves with or refer to the title or any of the premises granted by it are held to be admissible as against the stated objection; and as to the others no opinion is expressed, in view of the disposition made of the case rendering an opinion unnecessary.

4. A paper purporting to be an ancient deed—a Spanish grant of property in West Florida, made December 17th, 1817, at Havana, Cuba—and other ancient documents referring to such title deed were found in Pensacola, Florida, in 1859 or 1860, in an old trunk which contained a lot of papers belonging to the estate of one who in his life was agent of the grantee of Pensacola; the papers in the trunk including papers and title grants belonging to the estates of others for whom he was agent in his lifetime. This agent died in 1832, and the papers then came into the hands of his executrix, and she dying in 1843, they came into the possession of her executor, from whom the trunk was obtained by the person finding the ancient documents in it. The only objections made to the introduction of the Spanish grant or title, and not going to the legal effect of its terms or to the power of the officer who executed it to make a grant of the property involved in the action, were that it purported to be a copy and was not duly certified, and that it was not a duly certified copy made by the lawful custodian of the original, and the only objection to the other ancient documents were their irrelevancy to the grant: *Held,* That (however deficient this testimony, adduced by the plaintiff, might be as against an objection, made at the proper time in the trial court, to the effect that it was not sufficient to do away with the necessity of proof of the execution of the title, and that the title, its execution not having been proved, should not be read in evidence), the evidence was in fact treated by the defendant as sufficient to the end indicated and its insufficiency waived by urging objections of another character as indicated; and that in the absence of the proper objection in the trial court, the point of the want of proof of the execution of the grant could not be entertained on appeal; and further, that the restriction of the objection to the other papers to the ground of irrelevancy was a waiver of all other objections to their admission in evidence.

5. On December 17th, 1817, Don Alexander Ramirez, Intendant of the Army and Superintendent-General, Sub-delegate of the Royal Exchequer of the Island of Cuba and both Floridas, President of the Tribunal of Accounts, Superintendent of the Branch of the Crusade, etc., executed a title in form whereby

he granted to Don Vicente Sebastian Pintado several distinct tracts of land in West Florida. This title purported also to make a grant as follows:

"The lands designated by the letter C are an extension or tract of the Bay of Pensacola, whose superfices of water is equal to an area of 718¼ arpents superficial occupying between the eastern point of the mouth of the creek of Casa Blanca, commonly called Bayou Chico, and the western point of the mouth of the rivulet or creek of Texar, commonly called Bayou Texar, and a line drawn in the direction of southeast of the needle, 95 perches of Paris within the sea, from the aforesaid first point, and the other line of 100 of said perches in length, counted from the second point mentioned within the sea, also from the same point of southeast of the needle which embraces the whole of the front from the one to the other mouth of the creeks of Casa Blanca and Texar, between which is the town of Pensacola, the whole conforming and according to the plan annexed, made for the greater clearness and understanding in which is represented the figure which the said land forms in the water and the limits within the Bay of Pensacola, being that part of the land and beach which is found between the said two points of the mouths of the mentioned creeks, the curve which the shore of the water of the sea at the highest tide in calm weather makes, and with the depth from the surface of the water as far as ten feet English below the actual bottom, or towards the centre of the earth, in the whole, the space which the figure represented in the said plan C embraces, considering it as a solid, since it has the three dimensions of longitude, latitude and depth; but with the exclusion of that part which was granted him by the same title as the said lots, which is figured in it, and that which is occupied by the wharf of Messrs. Forbes & Co., also represented in said plan, and of which they have been in possession for many years. The whole in full property and for the purpose of constructing wharves and houses for bathing, reserving and saving not only the right of His Majesty, but also that of the public, at all times whenever it becomes convenient, and it be designed to construct wharves with whatsoever funds, municipal or common, intending the exclusion only with respect to particular individuals."

The general granting words of the title paper of December 17th are:"I grant * * gratuitously" to Pintado "the 10,000 superficial arpents of land and water contained and marked in the

six figurative plans which in duplicate he presented, and under the lines, termini and confines natural and artificial which in them are denominated and set forth, and I transfer to him absolute dominion, for that as his own, he may hold to his own use, enjoy or alienate them at his own pleasure without prejudice to a third, who holds a better right, nor of the' sovereign privileges according to what is provided in the annexed decree and the clauses expressed:" *Held,*

(a) The purpose and meaning of the grant of such water front was not to grant the land and water as such within the described limits, but the right to use the same, within such limits and to the depth stated below the surface of the soil, for the purpose of constructing wharves and houses for bathing, such right of use being to the exclusion of any similar right of use in any other individuals, and subordinate to the right of the King and the public to construct wharves with municipal or common funds within such limits;

(b) Though it is not denied that the King of Spain in the exercise of his great power could have made such a grant to Pintado, yet such a grant would have been contrary to his laws then in force in West Florida, and a case of special exception from their effect;

(c) Ramirez had no authority to make the grant, and it vested no title in the grantee, but is void.

Mabry, J., (*concurring*) agreed that the water front was granted to the extent of the uses and purposes mentioned, but was not satisfied that the grant did not undertake to vest in the grantee a greater estate than shown by the construction adopted.

### STATEMENT.

This cause is an action of ejectment brought by the appellee against the appellants, and involves to a certain extent the Spanish grant familiarly known in Pensacola as the Pintado grant. The trial resulted in a verdict and judgment for the plaintiff.

The original grant or title, in the Spanish language, as translated, and excluding the accompanying plans of the premises granted, is as follows :

Sullivan, Exr., et al. v. Richardson, Trustee.—Statement of Case.

UN QUARTILLO.

*Sello Quarto, Un Quartillo: Years 1816 & 1817.*

Don Vicente Sebastain Pintado, Captain of Infantry, Surveyor-General of West Florida acting in this city for the adjustment of royal lands of this Island of Cuba and the two Floridas by order of Senor Don Alexandro Ramirez, Intendant of the Army, Superintendent-General Sub-delegate of the same Island and Provinces by the condescension of the most excellent Captain-General of the same. Inasmuch as the Superintendent-General, Sub-delegate, has held it well to accede to my request of the 19th November last, and granted the favor under his Lordship by his superior decree of the 7th of that month, in conformity with that expressed in my favor the 1st day of the same by Senor Auditor and Honorary Fiscal of the royal property, granting me six of the lots which, in the year 1813, it was ordered to be drafted by the Ayuntamiento, which sat in Pensacola, indicated by the numbers 11, 13, 14, 15, 16, 18; another parcel of land of 204 feet English, and 2 inches of front on the Plaza, which is named of Seville, and afterwards of Ferdinand VII., with the depth as far as the sea, and prolongation within the bay as far as the extreme of the place or bank of sand, conformably to the plan which I presented at the same date with my application, besides 10,000 arpents superficial of the royal lands of West Florida in the places which are designated and conform to the description which I shall make, and figurative plans which I shall present, commanding to be delivered to me the title of the lots and space referred to, according to the plan presented, and

that of the 10,000 arpents, when I shall present those that I had offered. Forasmuch: For that, there should be delivered to me the title in form, according to the rule and precept and the tenor and effect of my petition, I show: That the aforesaid 10,000 arpents superficial are contained in six different tracts of land and water, conforming to the six plans which in duplicate accompany, whose situations, lines, boundaries, natural and artificial, extensions, and area of each terminus are as follows:

Eleven hundred and eighty-one arpents superficial in the Western part of the Island of St. Rosa, beginning in the most Western part of the point on that side named Point Siguenza, at the entrance of the Port of Pensacola, and extending to the East four miles (statute) English, and terminating at the end of them by a line which crosses said island from sea to sea in the direction north and south of the globe, with all that is contained within that arid and sterile space bounded by the waters of the sea north, south and west; in all the aforesaid distance of four miles (statute) English, and with the small and variable breadth which the island has about the said part only, containing 1,181 arpents superficial without exactness, the limits being arcifinios or nearly arcifinios, the whole conforming to the annexed plan designated with the letter A.

Nineteen arpents superficial in another tract situated at the extreme west of the population or town of Pensacola, fronting on the bay of the same name by which it is bounded on the south, passing within the tract is the rivulet of the Aguada or of the Washerwomen, from its mouth in the sea as far as the land conceded or sold to Don Pedro Reggio, with which, and the others of the Messrs. Forbes & Co., the said land

bounds on the north, on the west bounding with the lands of Senor Brigadier de Francisco Maximiliano San Maxent, and a portion of the second rivulet of the Aguada, which serves as the natural limit for a short distance from its inner mouth, and on the side which looks to the east, bounding with the aforesaid extreme western part of the town of Pensacola, leaving, however, between that and the land, the necessary passages and streets, as is now clearly shown by the plan accompanying, designated with the letter B, upon which will be seen figured the land mentioned, the dimensions of its sides in feet and inches English, being the measure used for the lots and streets of said town, the direction of its limits according to the compass, the declinations northeast of that, and all the other sides, boundaries, and confines, natural and artificial.

An extension or space of the Bay of Pensacola, whose superficies of water is equal to an area of $718\frac{1}{2}$ arpents superficial between the eastern point of the mouth of the Creek of Casa Blanca, commonly called Bayou Chico, and the western point of the mouth of the rivulet or creek of Texar, vulgarly called Bayou Texar, and a line drawn in the direction of southeast of the needle 95 perches of Paris within the sea from the aforesaid first point, and another line of 100 of said perches in length, beginning from the second point mentioned within the sea, also from the same point of southeast of the needle; the which includes all the front from one to the other mouth of the creeks of Casa Blanca and and Texar, between which is found the town of Pensacola, the whole conformably and according to the plan presented, designated by the letter C, formed for greater clearness and better understanding, in which is represented the figure which the said lands form in the water and the limits within

the Bay of Pensacola, being those of the part of land
and shore which makes between the said two points of
the mouths of the two mentioned creeks, the curve
which the edge of the water of the sea at the highest
tide in calm weather makes, and with the depth from
the surface of the water of the sea as far as ten feet
English below the actual bottom or toward the center
of the earth, in the whole, the space which the figure
represented in said plan C embraces, considering it as
a solid, since it has the three dimensions of latitude,
longitude, and depth; but with exclusion of that part
which was conceded to me by the title of the lots and
which is figured in the annexed plan C; and that
which the wharf of Messrs. Forbes & Co. occupies,
also represented in the plan, and of which they have
been in possession for many years; the whole in full
property and for the purpose of constructing wharves
and houses for bathing, reserving and saving not only
the right of His Majesty, but also that of the public,
whenever it becomes convenient, and it be designed to
construct wharves with whatsoever funds, municipal
or common, intending the exclusion alone with respect
to particular individuals.

A parcel of land, 2,281½ arpents superficial, situated
upon the eastern margin of the River Escambia, or
more certainly on its east branch, which forms the is-
land named Antonio, granted formerly by the Sub-del-
egation of Pensacola to Don Francisco Bonal, and
about sixteen miles from the mouth of said river, in
the Bay of Escambia, a continuation of that of Pensa-
cola, and twenty-two miles in a line north-northwest of
the town Pensacola, bounded north and east by royal
lands, south by lands recently conceded to Don Tomas
Villaseca by the Senor Sub-delegate of that province,

Sullivan. Exr., et al. v. Richardson, Trustee.—Statement of Case.

and on the west confined by the aforesaid arm of the River Escambia, as is more clearly shown by the fore-going plan D.

Another tract of land of 5,000 arpents superficial, sit-uated on the western margin of the said River Escam-bia between it and the creek named Pine Barren, and about thirty-one miles in a line northwest, one-quarter north, of the town of Pensacola, bounded on one side with the same River Escambia, with 1,300 perches, Paris, front on said river, according to the course which it holds above or upward, reckoning from its confluence with the aforementioned creek, Pine Bar-ren, with which it is bounded on the other side, and for the rest by the royal lands as will be more clearly shown by plan E, in which is figured the land, and with the exclusion of the part overflowed.

Another tract of land 800 arpents superficial, the complement of the 10,000 which has been conceded me, situated on the eastern margin of the aforesaid River Escambia, 36 to 38 miles, English, north-northwest of the town, fronting the lands which have been selected by Juan Malagoza to petition for, and which are at the place known as Turbin's Bluff.

The 10,000 arpents referred to are of those used until now in that province, and which will be until some other rule is established, and each arpent is composed of 100 square perches of plane superfices, and the lineal perch is eighteen feet of Paris, according to the field custom of the retroceded province of Louisiana; from thence it passed to West Florida, when it was conquered by the Spanish arms.

HAVANA, DECEMBER, 12, 1817.

VICENTE SEBASTIAN PINTADO.

The foregoing plans and documents remain regis-tered from the folio 2 and onward as far as turning of

Sullivan, Exr., et al. v. Richardson, Trustee.—Statement of Case.

folio 5 of book M. M., used for that purpose, meanwhile it is installed in the office in a convenient place and declared of the archives.

VICENTE SEBASTIAN PINTADO.

 SELLO TERCERO.

*Two Reals.    Years of 1816 & 1817..*

DON ALEXANDER RAMIREZ, INTENDANT OF THE ARMY AND SUPERINTENDENT-GENERAL, SUB-DELEGATE OF ROYAL EXCHEQUER OF THE ISLAND OF CUBA AND BOTH FLORIDAS, PRESIDENT OF THE TRIBUNAL OF ACCOUNTS AND OF THE BOARD OF TITHES, SUPERINTENDENT OF THE BRANCH OF THE CRUSADE,. ETC.

WHEREAS, Don Vicente Sebastian Pintado, Captain of the Infantry and Surveyor-General of West Florida, has presented his petition to this Intendancy General Sub-delegate on the 19th November last, showing the considerable expenses which arose to him from his removal to this city, by my order with advice of the most excellent Captain-General, for matters of interest to the service of His Majesty, whom God preserve, and having to take his family from there, and sacrificing his property, prays, by way of indemnification, that there be conceded to him in full property six royal lots in the town of Pensacola of those which were drawn in the year 1813 by order of the Ayuntamiento, which was had there, situated between the

Plazas, which in the general order which was delivered in the year 1808, were named, the one Ferdinand VII., and the other Seville, designated in the plan which was made with the numbers 11, 13, 14, 15, 16, 18, and the space of ground which measures between the said Plaza of Seville and the shore of the sea, marked by the high tide in calm weather; the corner of Beltran Souchet, Tomas Villaseca, and the lands reserved for a hospital; presenting to that effect the figurative plan with the necessary indications; besides 10,000 arpents superficial of vacant lands in West Florida in those plans which are to be marked out, and in conformity with the figurative plans which he has to present and the description which he may make of them, and having given examination of them to Senor the Auditor Fiscal of Royal Exchequer by decree of the 20th of said November, he satisfied of the certainty of that set forth by the said Surveyor, of his well-known merits and obligations which he contracted by his removal with his family to this city in which he expresses it to be impossible that he can subsist with the scanty salary he enjoys, gave his consent that his petition should be granted. In consequence of which, I made a decree on the 7th instant of the following tenor: "Visto. In conformity with the Senor Fiscal, and in consideration of the merits and good services of Captain Don Vicente Sebastian Pintado, I grant him the six lots and the 10,000 arpents royal lands which he seeks in West Florida, without prejudice to a third, and with the condition to build on the ones and cultivate or improve the others in the most convenient manner; according to the disposition of the matter for the peopling of that Province, which is given me in charge by His Majesty. Let title be delivered for the lots according to the plan presented and for the lands immediately

that he presents the plan which he offers with its description, under his responsibility in that respect as Surveyor-General, which he is of the same Province, to the Sub-delegate and Minister of Royal Exchequer, and let there be delivered the orders necessary."

In consequence of which, on the 10th instant, there was dispatched to him the title for the six lots, and the space of land referred to; and with date of 12th instant he presented in duplicate the figurative plans of the 10,000 arpents superfices of land, with the corresponding description designated in six different portions, whose situations, lines, boundaries and confines, natural and artificial extensions, and area of each explain themselves after the manner following:

The first plan, designated with the letter A, embraces 1,181 arpents superfices of land, situated on the west part of the Island of Santa Rosa, beginning on the most western of its points, on the side named Point of Siguenza, at the entrance of the port of Pensacola, and extending toward the east four miles English, and terminating at the end of them by a line which traverses said island from sea to sea; from north, south, and west, in the whole, the aforesaid distance of four miles English, which with the small and variable width which the island has at that point, only contains the 1,181 arpents superficial, without precision, the limits being arcifinios, or nearly arcifinios.

The second, designated by the letter B, contains 19 arpents superficial in a tract, situated at the extreme west of the town of Pensacola, fronting on the bay of the same name, by which it is bounded on the south, passing through the tract is the rivulet of the Aguada, or of the Washerwomen, from its embouchure in the sea as far as the land granted or sold to Don Pedro

Sulliuan, Exr., et al. v. Richardson, Trustee.—Statement of Case.

Reggio, with which and others of the Messrs. Forbes
& Co., the said lands are bounded on the north, on the
west bounded by the lands of Senor Brigadier Don
Francisco Maximiliano de Maxent, and a part of the
second rivulet of the Aguada, which serves as the nat-
uaral limits for a short distance from its inner mouth,
and on the side which looks to the east it is bounded
by the aforesaid extreme western part of the town of
Pensacola, leaving, however, between that and the
land the necessary passages and streets, as is more
clearly shown by the plan referred to, and in which is
shown the land, noting the dimensions of its sides in
feet and inches English, by that measure used for the lots
and streets of that town, the directions of the compass,
the declination northeast, and all the other termini
and boundaries, natural and artificial.

The lands designated by the letter C are an exten-
sion or tract of the Bay of Pensacola, whose superfices
of water is equal to an area of 718½ arpents superficial
occupying between the eastern point of the mouth of
the creek of Casa Blanca, commonly called Bayou
Chico, and the western point of the mouth of the rivu-
let or creek of Texar, commonly called Bayou Texar,
and a line drawn in the direction of southeast of the
needle, 95 perches of Paris within the sea, from the
aforesaid first point, and the other line of 100 of said
perches in length, counted from the second point men-
tioned within the sea, also from the same point of
southeast of the needle, which embraces the whole of
the front from the one to the other mouth of the creeks
of Casa Blanca and Texar, between which is the town
of Pensacola, the whole conforming and according to
the plan annexed, made for the greater clearness and
understanding in which is represented the figure which
the said land forms in the water and the limits within

the Bay of Pensacola, being that part of the land and beach which is found between the said two points of the mouths of the mentioned creeks, the curve which the shore of the water of the sea at the highest tide in calm weather makes, and with the depth from the surface of the water as far as ten feet English below the actual bottom, or towards the centre of the earth, in the whole, the space which the figure represented in the said plan C embraces, considering it as a solid, since it has the three dimensions of longitude, latitude and depth; but with the exclusion of that part which was granted him by the same title as the said lots, which is figured in it, and that which is occupied by the wharf of Messrs. Forbes & Co., also represented in said plan, and of which they have been in possession for many years. The whole in full property and for the purpose of constructing wharves and houses for bathing, reserving and saving not only the right of His Majesty, but also that of the public, at all times whenever it becomes convenient, and it be designed to construct wharves with whatsoever funds, municipal or common, intending the exclusion only with respect to particular individuals.

The fourth, designated by the letter D, is a tract of 2,281½ superficial arpents, situated upon the eastern margin of the River Escambia, or rather eastern branch, which forms the island named Antonio, granted formerly by the Sub-delegation of Pensacola to Don Francisco Bonal, about sixteen miles from the entrance of said river into the Bay of Escambia, a continuation of the Bay of Pensacola, and more than twenty-two miles toward the north-northwest of that place, bounded on the western and eastern front by royal lands, south with lands lately granted to Tomas Villaseca by the Sub-delegate of that Province, and on the west con-

Sullivan, Exr., et al. v. Richardson, Trustee.—Statement of Case.

fined by the aforesaid arm of the River Escambia, as will be more clearly demonstrated in the indicated plan.

The fifth, marked by the letter E, is a tract of 5,000 superficial arpents situated upon the western margin of the said River Escambia, between it and the creek called Pine Barren, about 31 miles English toward the northwest quarter north of the town of Pensacola; bounded on one side with the same River Escambia, with 1,300 perches Paris of front upon it, according to the course which it holds, counting toward above from its confluence with the said creek (Pine Barren) which bounds the tract on the other side, with the exclusion of the worthless part, and for the rest by royal lands, as more clearly appears in said plan, in which are figured its limits, natural and artificial.

The sixth and last is other land, marked with the letter F, of 800 superficial arpents, situated on the eastern margin of the referred to River Escambia, about 36 or 38 miles English north-northwest of the town, in front of that which has been chosen by James Malagoza to solicit for it, being in the place known as Turbin's Bluff, with which he completes the 10,000 superficial arpents of land of which mention is made, measured by the lineal perch of Paris of 18 feet, and of 100 perches square to each arpent, according to the field custom of the retroceded province of Louisiana, and that of West Florida since its reconquest by the arms of His Majesty.

Therefore, in the exercise of the power which the King, Our Lord (whom God preserve), has conferred upon me, I grant, in his royal name, gratuitously, to the designated Captain and Surveyor-General, Don Vicente Sebastian Pintado, the 10,000 superficial arpents of land and water contained and marked in the

six figurative plans which, in duplicate, he presented, and, under the lines, termini, and confines natural and artificial, which in them are denominated and set forth; and I transfer to him absolute dominion, for that as his own, he may hold to his own use, enjoy or alienate them at his own pleasure without prejudice to a third, who holds a better right, nor of the sovereign privileges according to what is provided in the annexed decree and the clauses expressed. In faith of which I have ordered the present title to be dispatched, signed with my hand, sealed with the escutcheon of the royal arms in the service of this Secretary, and countersigned by the Senor Commissary of War, Honorary Don Pedro Carambot, Secretary of His Majesty, of this Intendancy of the Army and Superintendency-General Sub-delegate, in whose office let it remain registered and an annotation be taken; let there be affixed to this title, the duplicate of the six figurative plans and descriptions of the same.

Given in Havana, the 17th day of December, 1817.

[Seal.]                ALEXANDER RAMIREZ,
                         PETER CARAMBOT.

This receipt taken of the foregoing title and registered in the book appointed for that purpose in the Secretary's office under my charge.

                                CARAMBOT.

Havana, Dec. 17, 1817.

               

### UN QUARTILLO.

*Sello Quarto, Un Quartillo: Years 1816 & 1817.*

The plaintiff's offer in evidence of this original title in the Spanish language, and the six plans or maps.

there referred to, was accompanied by an offer also of a certified copy of an alleged power of attorney from Pintado to one John de la Rua, in the Spanish language, together with translations of the said title and power. The plaintiff also offered in connection with said grant the testimony of one Peter Knowles, who being sworn and examined said: That he knew from old records that John de la Rua had been the agent of V. S. Pintado, and that he must have had the grant to Pintado. He therefore appled to F. E. de la Rua for his father's papers, and obtained from him the trunk containing them. That he discovered the Spanish grant among the papers of John de la Rua which were found in an old trunk belonging to said de la Rua, an old fashioned round top trunk with the top broken in; that he got this trunk from Mr. F. E. de la Rua, about 1859 or 1861, and that the papers have been ever since in the custody of the witness. That the witness at that time had, and has ever since had, an interest in the property described in the grant. That quite a number of other papers were in the trunk with the grant. The witness, the bill of exceptions states, produced some other papers which he stated were so found; the other papers in the trunk were papers relating to the business of John de la Rua and others for whom he seemed to be agent, and that these papers were selected by counsel for the plaintiff.

The plaintiff then examined Mr. F. E. de la Rua who testified that John de la Rua, who was witness' father, died in 1832, his wife becoming his executor. She died in 1843, and witness and Benjamin D. Wright became her executors. That when witness' father died, his papers came into witness' mother's hands, and after she died they came to witness and

18 SUPREME COURT.

Sullivan. Exr., et al. v. Richardson, Trustee.—Statement of Case.

Benjamin D. Wright, the other executor. Witness having been asked to say from whom he got the papers which Mr. Knowles had testified were in the trunk, stated that they were a lot of old papers belonging to his father's estate; that he never examined the papers very particularly, and could not tell what the trunk contained, excepting papers belonging to his father's estate, and papers and title grants belonging to the estates of others, for many of whom his father in his lifetime was agent. That he did not now have the trunk, and did not know whether he would recognize any of the papers in the trunk, but knows that they were his father's papers. That he did not know if all of his father's papers were there; that witness was quite young at the time, and did not consider the papers of any value. That he has no positive recollection of giving the trunk to Mr. Knowles. Mr. Knowles applied to him for the trunk before the war, but he can not recollect giving it to him, but he must have, for otherwise Knowles could not have got it. That he did not remember that anyone applied to him for the Pintado grant, or for anything connected with it. He did not know Pintado, who, though witness was an old man, was before his time.

Plaintiff then "offered in connection with said grant some of the other papers in said trunk." Each of the defendants objected to the admission of the said pretended grant upon the following grounds:

1st. It purported to be a copy and was not duly certified; and, 2nd. Because by its terms it did not purport to grant the *locus in quo*, or such property therein as would authorize an action of ejectment therefor; 3rd. That said grant, so called, as far as the *locus in quo* was concerned, was a mere license to said Pintado to use the property in a particular way; 4th. Be-

Sullivan, Exr., et al. v. Richardson, Trustee.—Statement of Case.

cause the reservation of said grant in favor of the sovereign and the public for the erection and maintenance of wharves, authorized the railroad company to occupy the same with a public wharf in connection with its business as a common carrier; 5th. The said grant contained conditions precedent which had not been complied with; 6th. That the said grant was not an exclusive grant of the property occupied by the defendants; 7th. That it was not one which was validated or recognized by the treaty between the United States and Spain; 8th. That the grant had not been perfected by a survey and location; 9th. That the document was not a duly certified copy made by the lawful custodian of the original. The translation was also objected to on the same ground. The court, however, overruled these objections, and permitted the grant to be read in evidence; to which ruling the defendants severally excepted.

It may be well to note here that the translation so offered of the grant is one of a certified copy of such grant made March 29th, 1875, by F. E. de la Rua, Keeper of the Public Archives of West Florida, at Pensacola, from Record Book A, pp. 209–217. This certified copy as translated contains three certificates, each made at Havana, one by Mauricio Porras Pito, Notary of War, and one of the same date by Jose Numo de Cueto, Santiago Jose de Tubieta and Miguel Garcia de Alayets, and one by John Mountain, Vice-Commercial Agent of the United States, at Havana, which, as stated by Mr. de la Rua, as such Keeper of the Archives, in a subsequent certificate of January 7th, 1887, do not appear on the original. Pito's certificate bears date October 18th, 1821, and is as follows: "This conforms to the original, which being rubricated, I return to the interested party, and to which I refer:

and I certify that the six plans affixed at the head of those proceedings are conformable with their original, which I also rubricate and correct, and to them reference is made; and in compliance with the command of the most excellent Captain-General, in the decree of this day, I write the present." The certificate of Cueto, Tubieta and Alayets, is of the same date, and is to the official character and credit of Pito as "Notary and Proprietario of War of this city and province, as he styles himself." That of Mountain bears date October 20th, 1821, and is that full faith and credit are to be given in and out of court to the signatures and signets of the four other parties.

The power of attorney, in the Spanish language, appears as translated to be a copy of an original purporting to have been executed at Havana, Cuba, on August 9th, 1821, by Vicente Sebastain Pintado, Captain of Infantry of the National Army of this vicinity, and grants and confers "his power of attorney, ample, full, suficient and as much as by law is required and is necessary, to Mr. John de la Rua, a citizen of Pensacola, in West Florida, special so that in his name and representing his proper person, rights and actions, he proceed to the sale of the properties belonging to the grantor in the said town of Pensacola and its vicinity, consisting in lots, land and water as per titles of domain, and the instructions that I may communicate by my letters, doing to that end such acts and formalities as may be necessary in the offices and tribunals of the government of the United States to whom now belongs that province;" authorizing Mr. de la Rua, for the "trades and sales he may make," to execute the necessary deeds and receipts. It also authorizes him to perform any other business or matter that Pintado may specially request him to do, includ-

ing the power to submit to arbitration and to go to law. The original, it would seem, was executed in the presence of three "present neighbors," whose names are given, and before Mauricio de Porras Pito. Notary of War, the power, in the Spanish language, introduced in evidence, bearing a certificate from such Notary of War, dated at Havana, August 11th, 1821, and reading as follows: "It conforms with its original which remains in the archives of the office of war of my charge, and to which I refer, and at the request of the grantor I issue this." It also bears a certificate of three persons dated August 11th, 1821, that Mauricio de Porras Pito is Notary and Proprietario of War of this place and province, as he styles himself, and that to his acts are, and have always been, given full faith and credit in and out of law. As to this power of attorney the bill of exceptions states: That the plaintiff offered in evidence a certified copy of a power of attorney in the Spanish language. with translation, from Sebastian Vicente Pintado to John de la Rua, copied from records of Escambia county, Florida, Book "A" of papers recorded between 1822 and 1827; and that the defendants each objected to the introduction of said document as irrelevant and because the same was not properly authenticated. It does not appear that there was any ruling on this objection. The copy in Spanish offered in evidence, it may be remarked, is from such record book, and is certified by Mr. de la Rua, as Clerk of the Circuit Court of Escambia county.

The bill of exceptions then states that the plaintiffs offered in evidence certain papers found in the trunk, as stated by the witness Knowles, and translations of them, and the admission of each separate paper was objected to by each defendant as irrelevant, and be-

cause it did not refer, or have any relation to, the property described in the grant, or to the grant itself, but the court overruled the objection and allowed the papers to be read, the defendants severally excepting to such ruling. These papers, the originals of which are before us, purport upon their face to be as follows:

1st. Three papers purporting to be written by Vicente Sebastian Pintado, at Havana, to Senor Don Juan de la Rua, and dated respectively August 18th, 1821, June 28th, 1822, and March 9th, 1823.

*The first letter* acknowledges one of June 19th last from de la Rua, by the hands of Don Juan Morales, and thanks de la Rua, for accepting Pintado's power of attorney for the sale of his lands and waters, and purports to enclose an authentic copy of the power duly legalized, saying that this is all he can do by the present opportunity, which has taken him by surprise, he having just learned of the intended departure of Mr. Ciriaco Lopez "tomorrow in an unknown vessel" bound for Pensacola. That he does not dare or think it prudent to venture sending the original titles unless on some well-known and reliable vessel, and thinks of procuring such authenticated and legalized proof of all of them to transmit to him by some known vessel, trusting in the meantime some vessel of war may be despatched for the artillery or other purpose, by which he may with confidence "forward the originals which you have seen and had in your hands." "In the meantime," it says, "I enclose the order for Balderas to deliver to you the copies of the plans annexed to the titles, which he has in his possession, that you may become familiar with them, and to enable you to begin to realize, as Balderas informs me that there are parties who desire some of the lots, and particularly the

large one which enters the bay adjoining Villaseca,. and that Innerarity wishes to purchase the 19 arpents of the Aquado, which are valuable; and in the interim I send instructions and my ideas respecting prices. Fix prudent prices yourself, as it is impossible for me to do so at the present moment for the want of time and health." It also states: "I have promised my friend Don Enrique Michelet, in consideration of friendship, and without any advantage whatever, a site for a wharf at the foot of Cevallus street of the same width of said street, and following the line of the same, of which I wish you to be advised." It also contains a message to the Father Curate to the effect that the writer is endeavoring to obtain a situation for Benito. That the lot reserved for the church has a front of 60, and depth of 120 feet, with a street on all sides, and that of the parsonage (or Curate House) No. 2, is 50 by 93, and No. 1, reserved for the public school, is of the same dimensions.

*The second letter* purports, at its outset, as being prepared in anticipation of an opportunity for its transmission, of which he hears rumors, and in reply to de la Rua's favor of the "20th April last" by Costa; and expresses thanks for the information given as to the Land Commissioners, "whose arrival was expected there in the early part of the present month, and who probably have already arrived." Speaks of seeing in a newspaper the names of appointees to other Florida offices, but nothing as to Land Commissioners. Asks to be informed if it is absolutely necessary that the original titles to his lands should be produced to prove his claim, and for what date; says that he would not like to expose them by any uncertain opportunity, but had rather wait a safe one by some well-known person to whom he could entrust them. Expresses confidence

that de la Rua will, until the writer is advised of the amount, advance the fees which will have t o be paid "for making proof and recording of titles," which he assures de la Rua he will promptly reimburse. It refers to what de la Rua says respecting "the small houses" belonging to the succession of Mr. Morales, and to two letters of March 16th of the same year, which Pintado had written de la Rua, *via* New Orleans, in charge of Don Vincente Igricis Remas, attorney of Don Bernardo Mariqay, one referring to the sale of the houses, and the other the amount due the estate by Don Eugenio Antonio Sierra, of that place, and asks for information as to the condition of these transactions. It also says: "When I attended to the business of Ramirez it was at the request of Ruiz, and fixed the place according to the instructions you gave him in your letter, and I hastened to complete it, knowing that it concerned yourself and required prompt attention. Consequently there was no special measurement, but only a sketch of the place in accordance with the general certificate of Collins made at the time stated, and which I doubt not was erroneous like many others of his operations to which I could not give attention, but as you have investigated the time, situation, conformation, distance, etc., of the true locality of their disagreement with the plans transmitted, and which certificate leaves soon [room] for correction, it would be important [ imprudent] to expose one's self to difficulties which can now be easily corrected; for although it is certain that in some cases, as for example by the conclusive portion of Article 8 of the Ordinance adopted by the Intendency of Louisiana, the surveyor can add a [not] excessive portion [no exorbitante espacio] of impossible land, etc., which the local authority approves, but the surveyor can not concede if the

transaction does not conform to local circumstances. Knowing that there is ample time to make all corrections, you can cause the request for the 400 arpents to be made in accordance with your desire and your satisfaction; and forward the result to me for correction and to be put in form, returning to me the plan and certificate which I gave to Ruiz to renovate it, you retaining the rest of the original expedient (official papers) in case it should be necessary to have it recorded before the other is forwarded from here; assuring you that so far as I am concerned you will be put to no expense. This will be the most advisable and prudent course saving your better judgment." To this letter there is a postscript which, in effect, tells de la Rua that in case he should sell any lots or lands and the party is made to pay cash for them, he, Pintado, will be willing to accept in payment a young and robust negress, who may be a fair washer, and free from defects, as he is in want of such a servant; provided there is no objection to her transportation "to this place" as the writer's property, as to which de la Rua must ascertain beforehand.

*The third letter* hastens to reply to de la Rua's four favors referred to in the writer's "letter of this date." It also says: "At last I forward to you my original titles which I have entrusted to Don Francisco Palmes, Jr., who has promised to deliver them to you in person. God grant that they may reach you safely. But for the urgency which you have expressed, I would have deferred their transmission to another opportunity less threatened by privateers. There they go, and after you have received them I will thank you to return me the proof, that I may have something in my possession to show. I have thought it advisable, and have been so advised by the Curate,

to deliver them loose to Mr. Palmes, that is not under cover, that they may excite less curiosity in case the vessel should be overhauled, and I shall feel a little uneasy until I learn of his arrival, do not delay to inform me of it by the earliest opportunity." It also remarks: "Ramirez has been placed right in accordance with circumstances, in the Escambia, to avoid contradictions in the future and without further explanation. There has been no time yet to make a fair copy of this concession. Only the general outlines of lands, waters and lots sold in all the province from 1801 up to 1818, has been completed. That of the lots conceded gratuitously in all the province at the same time, and the right of donations of lands to the end of 1805, but there is still wanted all the rest referring to the other Florida. This is all that has been reported, but there is no statement of the houses sold in that place, nor of the grants of Senor Folch, but only such as are incidentally known are mentioned. It also expresses a wish that Don Eugenio Sierra should fulfill his promise, but doubts his doing so, and refers to a letter from "our friend Michelet," which it is impossible to answer by the present oportunity, and notes with pleasure de la Rua's "thoughtful way of thinking of the matter," expresses esteem and desire to serve him "when the matter is just," and regrets his (de la Rua's) failing circumstances. Speaks of Carrera's indebtedness of about $518 to him, and asks de la Rua's opinion of indulgence given him. Requests de la Rua to send him two bottles of good gombo, if at some time he should have a few reals of the writer. Says he has received from Madrid the special power of Don Lorenzo Vetrian for the sale, etc., of his lands, by which he confers on the writer full and ample authority, and expresses the wish that the power had been made di-

rectly to de la Rua, but says it will make no difference as the latter can proceed to act. Also says that Astracho has sent his power from Mueritas to claim the land from Rioboo, saying he had not sold it, and that Thomas Comyns also had forwarded his from Pensacola, claiming a portion of Jose's which belonged to Madam Carson. The last two pieces of news are "reserved," as the writer does not wish to be questioned.

2nd. Six petitions of Pintado to the Board of Commissioners for adjudicating land claims in the Territory of Florida, five being dated October 15th, 1822, and signed by Call & Easter, attorneys for petitioner, one as to the tract of 1181 arpents on the west end of Santa Rosa Island; one as to the 19 arpent tract west of Pensacola; one as to the 5,000 arpent tract on the western margin of the Escambia river; one as to lots 12, 13, 14, 15, 16 and 18 in Pensacola, purchased in A. D. 1813 from the Cabildo of Pensacola; one as to 2288$\frac{1}{2}$ arpent tract, bounded on the west by the Escambia river, and evidently from descriptive words, the same as the 2281$\frac{1}{2}$ arpent tract mentioned in the Pintado title, *supra;* and one dated October 9th, 1822, and signed by the same attorneys, and relating to a grant made November 8th, 1816, of 2180 arpents; each petition praying confirmation of favorable report upon his title, according to the provisions of the treaty; and the last petition being endorsed: "Examined. Recorded in Book A, proceedings, p. 471."

3rd. An open account of the secretary of the Commissioners against John de la Rua; it being for "recording claims." The first item is: "8 claims to lands and lots, $14.50." Then follow the names of 24 persons, and opposite each name is a charge, the first name being that of Vicente S. Pintado, opposite to

Sullivan, Exr., et al. v. Richardson, Trustee.—Statement of Case.

which is an item of $12.21; the whole account amounting to $115.39, and being credited by $75, and stating a balance of $40.39 "due." Among the items is one against John de la Rua. Between the 14th and 15th names the date, "Jany., 1823," appears.

4th. An account of Richard K. Call against Don Vicente Sebastian Pintado, for professional services in presenting to the Board of Commissioners and attending to the adjudication of titles to seven lots in the city of Pensacola, at $5 each............... $ 35
And for filing an answer in chancery to the bill of
    John Heindenburg against the said Pintado,
    and for attending the same in court.......... $ 25

                                     $ 60

It is receipted as follows: "Received one-half payment of John de la Rua. R. K. Call."

5th. A receipted account of W. Hasel Hunt against John de la Rua, Agent for Don Vicente Sebastian Pintado, of $5 for writing deed with extra long description of property and conditions of mortgage to Sebastian Caro. It is dated November 29th, 1823.

6th. An account of Call & Wright for $20, against Don Vicente Sebastian Pintado, for "attending to defense in the case of Henry Michelet against you." It is receipted as follows: "Received the above amount of Col. John de la Rua, Agent for Pintado, Pensacola, the 4th Feby., 1825," and signed "Call & Wright, Atty's.-at-Law."

7th. A printed notice, signed "John Lee Williams, Atty. for mortgagee," and dated "Pensacola, Feby. 28th, 1826,-1-2. a. m. 4 m.," of intention to institute suit in the Superior Court of the Western District of Florida, to be held in Pensacola on the first Monday in "May next," on a certain mortgage bearing date

Sullivan, Exr., et al. v. Richardson, Trustee.—Statement of Case.

January 24th, 1824, given by "Vte. Sebastian Pintado, by his attorney in fact John de la Rua, to Henry Michelet for securing the payment of $2,000 principal, with interest due thereon; the property bound by such mortgage being one tract of land on the Escambia river, containing 2281 1-2 arpents; one tract on the Escambia river, containing 5000 arpents; one tract on the Bay of Pensacola, containing 2180 arpents; one lot on the public square opposite the Seville square; also the lots on the public square numbered 11, 14, 13, 15, 16 and 18." This notice is posted on a paper on which is written an affidavit made May 3rd, 1826, before N. Parmantier, J. P., by W. Hasel Hunt, "editor of the Pensacola Gazette and West Florida Advertiser, a public newspaper published in Pensacola," to the effect that the advertisement of which the annexed is a true copy, "hath been published in said paper twice a month for four months." On the same paper appears: "Printer's fee $24; affidavit .25-$24.25."

8th. A paper in the following words and figures: "In the case of John de la Rua vs. Guellemord. No account of such suit upon my docket. There are two cases by Hy. Michelet vs. V. S. Pintado. There has been a decree in both cases and the cost arranged.

F. Bonal vs. the Heirs of Cazenare, Marshal's cost .................................... $4.62 ½
Margaretta Jordela vs. M. M. Serra, Ex., costs, $1.84 ¼
Bart Elderto vs. Anto. Baldaras, costs, ........ $3.62 ½
Austin vs. M. Lemon, costs, ............... 62½ cents.
Greene Folck vs. T. Comyns not found.
Chalands vs. M. Baure, costs, ............... .62 ½

W. Sebree,
W. Hasel Hunt, Esq.     Marshal."

9th. The following paper:

Hy. Michelet  ⎫
    vs.     ⎬ Fi. fa.
V. S. Pintado ⎭

The undivided half of 19 arpents of land, at .. $150.
800 arpents on the Escambia............... '.. 100.
1181 arpents on St. Rosa.................... 100.

    •                          $350.
This property was bought by Hy. Michelet at $350,
he being the highest bidder.
Costs of suit $26........................... $26.

Leaving the sum of ...................... $324
    Leaves the sum of 324 dollars to be credited on the
execution.               WILLIAM SEBREE,
                            Marshal.
    Jany. 4th, 1827.

    *Wm. A. Blount* for Appellee.

### BRIEF FOR APPELLEE.

The basis of the title of the Appellee, who was plain-tiff below, and consequently in great part the foundation of the suit, is the grant from the King of Spain to V. S. Pintado, and I therefore consider it first, considering in order its authenticity, its validity, the estate created by it and its present efficiency, and the objections thereto. I will thereafter discuss the other questions involved in the cause.

The court below rejected evidence of

1. Judgment, Michelet vs. Pintado in 1826.

2. Deed from U. S. Marshal to Michelet under execution sale upon that judgment.

3. Deed from Michelet to United States.

4. Possession by the United States under said deed of the land (in Certificate A) as Fort Pickens from 1826 to the present time.

Inadvertently overlooking this rejection, I have founded a part of my argument upon the evidence and the court will eliminate such part.

As to its authenticity: There is no objection appearing in the record as having been made in the court below, because of want of proof of execution or authenticity, and of course such objection cannot be made here. I discuss it however, for the sake of completeness of my argument.

The grant is offered as an original ancient grant, it purporting to have been made on Dec. 17, 1817, by Alexander Ramirez, Intendant of Cuba to Vicente Sebastian Pintado.

In order to prove this authenticity it was necessary that

1. It should appear upon its face to be regular.

2. It should be proved to be thirty (30) years old.

3. It should be proved to have come from the proper custody.

According to the following authorities we might stop here and the proof of authenticity would be complete: 7 East, 291; 1 Esp., 275-278; Buller's N. P., 255; 1 Stark. Ev., 332, (6th Am. Ed.); Roscoe's Ev., 70, Gres. Eq. Ev., 124. By many and the best, authorities, however, it is incumbent to prove

4. Circumstances rendering the existence of such a grant probable. Jackson vs. Laroway, 3 John. Cases, 283; 7 Wend., 371; 4 Wheat., 213; 9 Pet., 674; 5 Cow., 221; 9 Pet., 62-72; 1 Green. Ev., 144, n. 3; 2 Phillips on Ev., n. 430; 117 U. S., 266. And this is all that it is incumbent to prove. Some few cases, however, hold that it is necessary

5. That proof be made of possession accompanying the deed.

See English authorities cited by Kent in Jackson vs. Laroway, 3 Johns. Cases, 283.

But even then, the possession need not be for thirty years, nor need it be of the whole premises described in the deed. *Authorities supra.* Applegate vs. Mining Co., 117 U. S.; 2 Phillips on Evidence, 476; 5 Cow., 122. And is required only when it is practicable to take possession. 3 Johns. Cases, 283. A few authorities go still further and seem to require

6. Proof of a possession under the deed for thirty years. Jackson vs. Blanshon, 3 John., 292. But these, as well as those under the preceding head (5), might well be disregarded for they are in conflict with the vast weight of authority and not consistent with reason. The object is to obtain evidence showing the probability that the deed is genuine, and no particular evidence can be essential for this purpose. For example, a continuous assertion openly of his title, a recognition of it by his acquaintances and adversaries and by officials, and acts done about it inconsistent with any other hypothesis than that of its genuineness, must be as good as taking possession of it, especially if there are circumstances explaining the want of possession.

This grant meets all of these tests.

We take them in their order.

1. It is upon its face regular, has the official seal of the Intendant, is in the form and executed with the solemnities usual with Spanish grants (4 American State papers p. 119), and is almost in the exact language of the Arredondo grant, which was made by the same Intendant, about the same time, and is recognized as authentic by the Supreme Court of the United

States. U. S. vs. Arredondo, 6 Pet., 692-721 & 722. The court has the original of the grant before it and can judge of its apparent regularity and authenticity.

2. It is proved to be thirty years old. F. E. de la Rua and Peter Knowles establish the fact that it was in the custody of the former from 1843 to 1859 or 1860, and in the possession of the latter to the present time, the two periods aggregating forty-three years.

3. It comes from the proper custody. It is traced directly to the possession of John de la Rua the agent of Vicente S. Pintado. Peter Knowles obtained the possession of it from F. E. de la Rua, the son of John de la Rua and his wife, Margaretta de la Rua; F. E. de la Rua, the executor of his mother, obtained it from her in 1843; she, the executrix of her husband, obtained it from him in 1832; and he was the agent of V. S. Pintado. This was the proper custody. 8 Q. B., 158; 12 M. & W., 205; 1 Green. Ev., §142. That he was such agent is established by:

1. The power of attorney from Pintado giving him general powers. This is in due form and recorded in the records of Escambia county, Florida, contemporaneously with the giving of it and with the necessity for its use. This power was admissible in evidence. 9 Pet., 663.

2. The possession by him of the receipt to him by W. Hasell Hunt for moneys paid by him as agent of Pintado.

3. The possession by him of letters of Pintado to him for years (from 1821 to 1824), about the affairs of the agency and directing him particularly about this land and speaking particularly of this grant.

4. The possesssion by him of the public advertise-ment in a suit against Pintado by Michelet, in which his agency is recited.

5. The possession by him of bills for professional services rendered to him as agent for V. S. Pintado.

6. The possession by him of applications on behalf of V. S. Pintado to the U. S. Land Commissioners for confirmation of many titles claimed by Pintado.

7. His action as agent of Pintado in compromising the claim of Michelet against Pintado.

8. His action in giving a mortgage to Michelet as agent of Pintado in effectuation of such compromise.

9. His possession of the bill from the Secretary of the Commissioners for recording the title of Pintado.

10. His keeping the above papers in the same box in which he kept his own private papers and the papers of other persons for whom he was agent.

This grant then, being regular on its face, being thirty years old and having been found in the proper custody, the further question is, are there

4. Circumstances showing the assertion of the title by the grantee, the recognition of it by others, acts done by him or others with reference to it, or any other circumstances which would probably be refera-ble to a recognition of its authenticity. These circum-stances are numerous, consisting of:

1. His own assertions made near the time of its exe-cution and afterwards, but before any question was raised about its authenticity:

a. By his letters to John de la Rua, from 1821 to 1824, constantly referring to the grant and his title under it.

b. The power of attorney which mentions the lands embraced in the grants.

c. His assertion of title by presentation before the Commissioners of a duly authenticated copy of the grant. That the copy was duly formal and signed by the proper officers was not denied by the Commissioners.

2. The recognition by others of his title:

a. By Mitchelet in 1826, by levying upon and offering it for sale as the property of Pintado.

b. The confirmation by Congress of the title to part of the lands contained in the grant. Section 1, Act Congress May 23, 1828. (4 Stat. at Large, 284). Of course a confirmation of the title to any part of the property was an assertion of the authenticity of the entire grant.

c. The purchase by the United States of the land on which Fort Pickens stands, which was the 1181 arpents mentioned in the grant, and in certificate "A." (See also U. S. vs. Mitchel, 15 Pet., 61). The U. S. purchased from Mitchelet, who bought at an execution sale against Pintado.

3. The assertion of title by the heirs of Pintado.

a. In the suit by the City of Pensacola in 1867, in the U. S. Circuit Court against Eudaldo G. Pintado.

b. In the conveyance to A. C. Blount in 1867, and in the conveyance by him and his grantees, all depending on this title.

4. The recognition of the signature of Ramirez by Pablo Palmes, 4 Am. State Papers p. 119. This, of course, was not primary evidence (upon this trial) of the execution, but is entitled to weight. The oath of Palmes shows that the original was before the Commissioners and taken, in connection with the remarks of the Commissioners upon the copy, and the letters of Pintado to de la Rua, evidencing the fact that he had sent to him the copy and afterwards the original,

demonstrates that de la Rua filed the copy with the Commissioners and they founded their opinion upon it, and that afterwards he filed the original, but for some reason they did not pass upon it.   The first part of the report is the minutes of the Board and the last part is the opinion.   The opinion has no date and was probably written before the original was procured from Pintado and filed with the Secretary and the execution proved by the witness Palmes, and no further action being taken upon it, afterwards it was withdrawn by de la Rua.

5. The circumstances existing at the time of the making of this grant rendering it probable that it was made.

a. It was customary for the Intendants and Governors of Spanish Provinces to make grants for meritorious services.   This was so usual that they were recognized as a distinct class.   U. S. vs. Clarke, 8 Pet., 454; Wiggins vs. U. S., 14 Pet., 340; U. S. vs. Rodman, 15 Pet., 139; U. S. vs. Segui, 10 Pet., 306; U. S. vs. Arredondo, 6 Pet., 692; U. S. vs. Levy, 13 Pet., 81; 2 Cal. L. L., 275-283.

b. Just before the cession it was usual to make grants of immense tracts of land, the Spanish authorities evidently caring but little, knowing that the cession would shortly be perfected and that large rewards to faithful servants might be made without injury to the Spanish Government.   Of such grants were those to Arredondo (289,645 acres; Dec. 12, 1817) 6 Pet. 692; Levy (14,500 acres, March 24, 1817) 13 Pet. 81; Levi (25,000 acres, Feb. 23, 1817) 8 Pet. 479.

c. Pintado was a man of eminence, and had rendered large services, in surveying and plotting and regulating the town of Pensacola, and otherwise, 4 Am. St.

Papers, 148 to 150; and it was intended by this grant to recompense him.

d. It also appears by his letters that he was a personal friend of Ramirez and attended to his business matters in Pensacola, and under the circumstances before related, it was natural that a munificent grant should be made to him.

Under the authorities before cited these facts establish the authenticity, but we have in addition to all of these:

5. Proof of possession under this grant for more than 30 years, for Michelet bought under an execution sale against Pintado in 1826 the land in Certificate "A," and sold it to the United States, which built Fort Pickens on it in 1829 and have ever since had possession of it. The possession of this part suffices. Applegate vs. Mining Co., 117 U. S.

Such are the facts upon which we rely to prove the authenticity. Nothing is opposed to this, even in argument, except the contention,

1. That the Land Commissioners decided against its authenticity.

2. That the United States refused to confirm certificate "C."

3. That no steps were taken by Pintado or his heirs about this property, and that therefore a suspicion attaches to the grant.

This is equivalent to an assertion that there is a suspicion of fraud, but such a suspicion cannot prevail against the settled rule that fraud must be proved and cannot be presumed. (U. S. vs. Arredondo, 6 Pet., 716). Beyond this, however, the contention is not good. 1. The Commissioners did not decide upon this grant, but upon a copy and upon the fact that it was a copy, they laid great stress. Their inference that Ra-

mirez would not attempt to grant the land in Certificate C, because he had no power to do so, and that therefore the grant was fraudulent, will be shown hereafter, when I show that he had the power, to be unwarranted. 2. There is no evidence anywhere that any confirmation was ever asked for. Joseph M. White, then a delegate to Congress, was the attorney for Michelet, and evidently asked for confirmation only of those portions which Michelet had purchased from Pintado at execution sale. Fort Pickens was not included because it had already become the property of the United States. But besides this, the Act of Congress, instead of being relied upon as a disaffirmance of the authenticity of the grant, is (as I have said before) the strongest affirmance, because it confirms the title to a part of the lands granted and they were all included in the same grant. 3. The absence of action by Pintado or his heirs as to the land embraced in Certificate "C," (which embraces the land in controversy) raises no reasonable argument against the existence of a title. (3 Johns. Cases, 387). V. S. Pintado was in Cuba, he died there, there is no evidence that he ever came to this country after the grant was made, the Land Commissioners had pronounced against the grant and there was an opinion existent that their decision was final (and such opinion has been shared by others at a latter period), Michelet had sold out all that was immediately valuable, and nothing remained but the waterfront, this was not of marketable value or capable of improvement without enormous expense, and thus it lay without improvement or active assertion of title until the growing commerce of the city made it valuable, and the ballast of the incoming vessels furnished the means of improvement, and then the claim was actively asserted.

I think that I have demonstrated beyond question the authenticity of the grant, and that brings me to the second inquiry, viz:

As to its validity, so far as the land and water contained in Certificate C are concerned. And this inquiry sub-divides itself: Was the land under water the subject of grant, i. e., did the King of Spain have the power to grant it to a subject? And if so, was Ramirez the Intendant authorized to represent the King in making such grants?

Can the land under tide water be granted by the King of Spain?

In all countries the title to land under tide water is in the sovereign.

It was and is in the King of England, within his dominions. Martin vs. Waddell, 16 Pet., 423 (dissenting opinion); McKenzie vs. Hewlet, N. C. Term Rep., 182; 8 Cushing, 347; 18 Wall., 66; 8 Mich., 18.

It was and is in the States of the American Union within their boundaries. 6 Wall., 436; 16 Pet., 259; MaCready vs. Virginia, 94 U. S., 391; Weber vs. Board &c., 18 Wall., 57.

And in Spain and its Provinces it was in the King of Spain. Mobile vs. Eslava, 9 Porter, 577; Hagan vs. Campbell, 8 Ib. 9; 2 Ib. 436; 18 Wall., 57; 3 How., 225; 2 Cal. L. L., p. 550.

Not only was the title thus vested, but in each case the sovereign had a right to convey and did convey that title to individuals. Unquestionably this right existed and was exercised in England up to Magna Charta. Martin vs. Waddell, 16 Pet., 410 & 423; 18 Wall., 57; 1 Pick., 182; 3 Kent. Com., [427] [431]; Storer vs. Freeman, 6 Mass., 438; Ward vs. Willis, 6 Jones [Law] 183. And according to some authorities exists and is exercised up to the present time.

But whether it exists in England since Magna Charta is immaterial, for it did exist when the King was unfettered by the constitutional restriction of Magna Charta, and the King of Spain has never thus been fettered.

The power exists in and has been exercised by the States of the American Union, e. g: Massachusetts, which in 1641 granted the use of the flats on the sea shore for 100 rods below high water mark; (Tyler on Boundaries, p. 41); New York, which has granted to the cities of New York and Brooklyn the water fronts of each, (Ibid, p. 47); New Jersey, which has made similar grants, (Ibid, p. 48); and Florida, which by the Act of 1856, (Chap. 791,) granted all of her water front to individuals. If, as was contended in argument and in the Report of the Commissioners (4 American State Papers, p. 119), the King of Spain could not grant this, because he held it as a trustee of the public, then Florida could not grant it, because the property, of course, was vested in her, subject to the trust imposed upon it in the hands of the King of Spain, for not only were private rights protected by Art. VIII of the treaty of 1819, (Thompson's Digest, p. 572), but by the commonest principles of international law individual rights are always protected upon the transfer by cession of one country to the sovereignty of another.

But the power of Florida to do this has never been questioned, although the Act has several times been before this Court. Geiger vs. Filer, 8 Fla; Rivas vs. Koopman & Solary, 18 Fla; Sullivan vs. Moreno, 19 Fla.

And such questioning would be vain in face of the admitted law as to the powers of the States over their navigable waters. Sullivan vs. Moreno, 19 Fla.; Ma-

JANUARY TERM, 1894.        41

Sullivan, Exr., et al. v. Richardson, Trustee.—Argument of Counsel.

Cready vs. Virginia, 94 U. S.; Weber vs. Board, &c., 18 Wall., 57.

The United States recognizes title in individuals to land between high water mark and the channel of navigable tide water, by Sections 1 and 2 of the Act of Congress of May 1, 1824, (4 Statutes at Large, p. 66).

But we are not left to analogy to determine the power of the King of Spain in this respect, for such power was exercised by the Spanish officials and directly sustained by the Courts.    Mobile vs. Eslava, 9 Porter, 577; Hagan vs. Campbell, 8 Ib. 9.    And impliedly sustained in the following cases, in which such grants were passed upon without question as to their validity, even by the learned counsel engaged, who, being contemporaneous, were better acquainted with the Spanish law than we.    Mobile vs. Eslava, 16 Pet., 234.    See also dissenting opinion, pp. 252 & 259; Pollard vs. Hagan, 3 How., 219; Pollard vs. Kibbe, 14 Pet., 253.

Opposed to all this the appellants quote the opinion of the Land Commissioners (Vol. 4 Am. St. Papers, p. 119), in which opinion they committed two grievous errors—perverted a plain construction, and ignored fundamental principles of Spanish law.

The foundation of their opinion was the following from the Partidas. Tit. 5, 1. 15: "Public squares, roads, threshy grounds, rivers and other waters which belong to the King, or the commons of any city, cannot be sold or alienated," which they construed to mean that the "rivers" and "other waters" belonged to the commons of cities and were therefore inalienable by the King, whereas, it is perfectly obvious that the rivers and other waters are not to be inalienable because they belong to the commons of cities, but because they be-

long to the King, and that the true construction is that neither the commons of cities nor the rivers and other waters, &c., which belong to the King shall be alienable.

But, even conceding their construction to be correct, this Partida did not bind the King or his plenary deputies. He was not named in it and laws bind sovereigns only when named. And in Spain it bound him only so long as he chose to be bound. There was no such thing as law, in a constitutional sense, restricting the sovereign power to a given course of action. Spanish law was the expression of the will of the King as to the manner in which subjects should conduct themselves, but, of course had no application to himself. 2 Cal. Land Laws, 502-503; U. S. vs. Arredondo, 6 Pet., 714.

His power was absolute, and the Leyes de Indies, the Partidas and other compilations expressed his mere temporary will subject to change at any time. So that even if the construction of the Partidas given by the Commissioners were correct, the making of a grant inconsistent with it would be simply evidence of a change of will of the sovereign and, being the latest expression, would prevail.

Even if the King was the trustee of the public as to the *use* of the navigable waters, yet the title of the soil was in him and he could grant the soil subject to the use. 8 Porter, 33; 8 Cush., 347; 9 Ib., 591 & 2; 8 Mich., 18. And when the use should cease and the soil be reclaimed, the grantee would be entitled to the sole use and ejectment for the possession. Strong vs. City, 68 N. Y. Or to bring ejectment even while it is subject to the servitude. Wagner vs. Troy, etc., 25 N. Y., 520; Goodtitle vs. Alker, 1 Burr., 133; Cooper vs. Smith, 9 Ser. & R., 26; Wright vs. Carter, 3 Dutcher, 76; Stackpole vs. Healy, 16 Mass., 35.

The true doctrine is that the sovereign is the owner of the soil—that the public has a right to the *use* of the water above the soil—and that the sovereign is the trustee of such use and can regulate it in the manner which he conceives most beneficial to the *cestui que trust*, so that if the abridgment of the right to traverse every foot of water be thought necessary to accomplish a larger benefit in connection with the use of the remainder, such abridgment may be made—through the medium of a power to erect wharves, etc., or of a grant to an individual of the soil for the same, or like purposes. Sullivan vs. Moreno, 19 Fla.; King vs. Montague, 4 B. & C., 598; Moor vs. Veazie, 32 Me., 343; Wilson vs. Blackbird Creek, etc., 2 Pet., 251; Lormer vs. Benson, 8 Mich., 18.

Even if the sovereign held the *soil* in trust, he would have the legal title and could transfer it. Then the grantee would hold subject to the trust of the use of the public. If he trespassed upon that use, no one but the *cestui que trust* could complain, by injunction, indictment for a nuisance or other appropriate legal proceedings. A trespasser upon the rights of both of them—upon the use of the one and the legal title of the other—could not object to a proceeding by either against him, and in a suit by the trustee—holder of the legal title—to obtain possession, he could not complain that the success of the trustee would prejudice the rights of the *cestui que trust* which he himself had violated.

Appellants insist, also, that the King had no power to grant this land, because it had been dedicated to the public, and the case of New Orleans vs. United States, 10 Pet., 663, is relied upon. To this contention we answer:

1. There was no dedication here.

2. That the decision that the King could not grant land which had been dedicated *by him* was *obiter*.

3. That in this case the fee could not have been dedicated to the city, because the city could not take it.

4. That if the fee could not have been dedicated to the city, any dedication of the use to the public, would have left the fee in the King grantable at his pleasure subject to the easement of the public.

1. There has been no dedication here.

In order that there should be a divestiture of any right connected with property, it must be by alienation voluntary or by operation of law. Dedication is but a method of divestiture, and must be either by a voluntary alienation or an alienation by estoppel. There is no question of estoppel here, so that only a voluntary alienation can be relied upon. It is well settled that there must be proof of an intention to dedicate, and that without such intention there can be no dedication (except in case of estoppel). State vs. Trask, 6 Vt.; 2 Smith's L. C., [201]. And such intention may be proved by an express grant or declaration, in which case there is no difficulty; or it may be presumed from circumstances, in which case the proof from the circumstances must be clear and unequivocal. 27 Am. Dec., 554 *n.*, and authorities. And simple acquiescence in user without any act indicative of intention to appropriate would not, in the case of open, uninclosed property like this, be evidence of dedication. Gardnier vs. Tisdale, 2 Wis. 63; Warren vs. Jacksonville, 15 Ill., 236; Harding vs. Jasper, 14 Cal., 648; McWilliams vs. Morgan, 61 Ill., 91; Kyle vs. Town, &c., 87 Ib.,67; Stacey vs. Miller, 14 Mo., 478.

Now, here, there is absolutely no evidence of any intention on the part of the sovereign—the owner—to

dedicate. In the case of New Orleans vs. U. S. relied upon, this essential was present. There was an unequivocal declaration of the owner—the Western Co.—by plotting the city and marking this "Quay," and the intention of the King was clearly deducible from the unequivocal acts set forth in the opinion of the Court.

But here no such circumstances exist. There is no grant or declaration by the sovereign shown, and there is nothing from which an intention to dedicate can be drawn. The property has remained from time immemorial in the same condition. The owner has done no act, but has left it vacant and unenclosed. The use of the public, if any, has never been inconsistent with his right to enclose and improve it. It was of no use to him, then, to enclose it; and it is simply a case of leaving unimproved property open, because not needed, and letting others use it.

Morever, the King allowed the use of it as he allowed the use of all navigable and tide waters, and by a parity of reasoning the appellants could equally contend that all other navigable waters have been dedicated, and, if so, then the right of the sovereign to hold and alienate the lands under water has been supplanted by this supposed right of the public. This, in direct opposition to the authorities which we have heretofore cited, and would prevent the States of the Union to-day from providing for the erection of wharves, or other structures in navigable waters, a power which has been exercised without question in all the States having seaboards and which is directly sustained in this State. Sullivan vs. Moreno, 19 Fla.

By natural law, the public had the use of the water though the sovereign had the title and the right to alienate it, so as to deprive them of this use, and the

exercise of such use being therefore consistent with such right of title and alienation, cannot be evidence of any waiver of such right, nor can the use of the water, which they had a right to use, affect in any way the title to the soil, which they had no right to use.

The use must be referred to the always existing right of the sovereign to cause its cessation. The rule is that the right of the public continues until the owner of the soil shuts out the public by an exclusive appropriation of the soil, which he may make at any time. Austin vs. Carter, 1 Mass., 231; approved, Weston vs. Sampson, 6 Cush., 347. And it is by the application of the same rule, that the sovereign may grant the right to build wharves and piers, &c., in navigable waters, which have from time immemorial been used by the public. Sullivan vs. Moreno, 19 Fla.; Weston vs. Sampson, 6 Cush., 347. And it has never been contended that any dedication to the public prevented the exercise of such power.

2. The decision that the King could not grant land which he had dedicated was not necessary to the decision of the case because the court had already decided it upon the ground that the dedication had taken place while the property belonged to the Western Company, and the King could not divest vested rights.

3. The case holds, and stands alone in holding, that the fee is ever conveyed by an implied dedication, whatever might be done by an express or statutory dedication. But, for the sake of argument, admitting it to be good law, in this case the fee could not vest in the city, for the land was outside the limits of the city, and it could not hold land for public purposes beyond its own boundaries. Gard. Inst., 367-368; Riley vs Rochester, 5 Selden (N. Y.), 64-71.

4. If there was any dedication, then, it must have been to the general public of the use only, and the sovereign, retaining the soil, could grant it to an individual subject to that use, and such individual, upon the cessation or perversion of that use, could reclaim it by ejectment. See authorities *supra* and *infra*.

And this leads to the second subdivision of this branch, viz: Whether or not Ramirez had authority from the King to make this grant?

He was authorized to make grants. U. S. vs. Arredondo, 6 Peters, 691-734 & 746; U. S. vs. Clarke, 8 Pet., 451; 2 Cal. L. L., 185-186-245-478; White's Spanish Law, 157.

And being so authorized, his authority to make a particular grant cannot be questioned. U. S. vs. Arredondo, 6 Pet., 723; U. S. vs. Clarke, 8 Pet., 451; U. S. vs. Percheman, 7 Pet., 95; Strother vs. Lucas, 12 Pet., 409.

Or, if it can be questioned, the want of power must be clearly shown in that particular instance. Mobile vs. Eslava, 9 Porter, 577; authorities just cited.

Not by showing a general lack of power in the particular class of cases, for if inconsistent with his general powers, it will be presumed to be in accord with specific instructions from the King which are unknown to us, U. S. vs. Clarke, 8 Pet., 447-451 & 454; U. S. vs. Percheman, 7 Pet., 95; but by proof that the King not only had the power to disavow, but actually disavowed the grant, U. S. vs. Clarke, 8 Pet., 451; U. S. vs. Arredondo, 6 Pet., 728; and this presumption will be made and this proof required, even though the grant purport to be made under a power which did not authorize it, U. S. vs. Percheman, 7 Pet., 95; for no instance has ever been found in which the King repudi-

ated grants made by his Governors or Intendants. U. vs. Sibbald, 10 Pet., 322; U. S. vs. Clarke, 8 Pet., 458.

The completion of the discussion as to its validity at the time it was made, naturally leads us to the inquiry as to its effect at that time, that is to the inquiry,

What estate was created by it? Appellants contend that a true construction of the instrument shows that there was conceded to V. S. Pintado only a license or privilege to use the land and water for the certain purpose of erecting wharves and bath houses, and did not convey a fee simple estate.

I submit that the terms of the grant itself and the surrounding circumstances emphatically negative any such conclusion.

First, The terms of the grant.

a. Of course a license or privilege necessarily implies a retention of the right or title of property and a concession of the use. In this case all the language of the grant shows a transfer of the title to Pintado.

In the decree itself, the words are: "I *grant* * * * "10,000 arpents royal *lands*" * * .* "and that *title* be delivered for * * * the *lands* immediately."

In the description, the words are: "The *lands* designated by the letter "C." "That part of *land* and beach," "the whole in full property."

In the granting part the words are:
"I grant * * * the 10,000 superficial arpents of *land* and *water*," "and I transfer to him absolute dominion, for that as his own, he may hold to his own use, enjoy or alienate them at his own pleasure."

These things show a clear intention to transfer the land itself and not to concede the use of it, and the Supreme Court of the United States has said that a

grant in form almost identical with this transferred the title in fee. U. S. vs. Arredondo, 6 Pet., 745.

. It will be recollected in this connection that this is not an English, but a Spanish grant, and that there were never any words of perpetuity or heirship in Spanish grants, even when conveying absolute property.

b. Instead of the grantor in this case having retained the title and granted the use to Pintado he has reserved a right to himself—the right to build wharves and bath houses—so that instead of the title being in the King and the use in Pintado, the title is in Pintado and the use for a specific purpose in the King.

The very fact that the reservation is made, demonstrates that there was a need for it because the title had passed.

c. If it were a license or privilege merely it would have been revocable at any time, till executed, and even then except as to the part executed; 1 Cowen, 568; 15 Wend., 380; 24 Pick., 187; and there would have been no reason in making a reservation when the power to reclaim the whole was reserved.

d. The argument of the appellants which I shall notice hereafter, that this was a grant upon condition, is entirely inconsistent with the idea of its being a concession of a use, because a grant made with condition is a grant which shall not vest absolutely until the performance of a condition, or, having vested, may be divested upon the non-performance of the condition, neither of which can be predicated of a use.

e. The grant gives the power of alienation which is not applicable to a mere license or privilege. 1 Foster, 291; 1 Cow., 568.

4

50 SUPREME COURT.

Sullivan, Exr., et al. v. Richardson, Trustee.—Argument of Counsel.

The argument of appellants that this is a privilege or license is based upon,

1. The limit to a depth of ten English feet below the actual bottom.

2. That it was for the purpose of constructing wharves.

3. That the reservation of the rights of His Majesty, which included the ownership of the soil, was inconsistent with the vesting of that soil in another.

4. That it was "without prejudice to a third who holds a better right, nor of the sovereign privileges."

The first three of these are found only in the petition of Pintado and in the description therein, and in the recital of that description preceding the grant. In neither of these does it indicate the intent of the grantor as to the estate to be conveyed. In the petition it was merely a representation of what he wished the land to be granted to him for, and in the latter it was merely the recital of that representation. The reasons which the petition sets forth why land sought for should be given to him, and a statement of the use to which he intends to put it, differs greatly from a limitation to such use, expressed by the grantor himself, in a grant which, in form, is a conveyance of absolute title. There is no such limitation expressed by the grantor here.

1. The limit to ten feet below the bottom is to our minds merely an abundantly cautionary measure to indicate clearly that the *land* was to be conveyed as well as the water, and in order to further show this, it was directed that the property granted should be considered as a solid. The tract had been spoken of as lands having a "superficies of water," and in order to make more certain that the land itself was to be conveyed, the dimensions of the property, expressly in-

cluding the soil, was given.   Why this particularity
if only a license or privilege was intended ?

Whether such license or privilege, or a grant in fee
simple, is extended over the whole surface and ten feet
into the soil in either case, and nothing more was left
to the King in one case than the other, and therefore
no greater argument can be drawn from these expres-
sions in favor of one construction than in favor of the
other.   The expressions simply fixed the quantity
of property, and do not relate to the quantity of the
estate.   If the court is in doubt as to the purpose of
the insertion of the limitation as to the depth, it will
not allow that doubt to control the plain signification
of the words granting the property absolutely.   U. S.
vs. Rodman, 15 Pet., 139.

2. It will be noticed that the grant is not made solely
for the purpose of building the wharves, but "in full
property *and* for the purpose," etc.,   Were it "in full
property for the purpose," etc., it might be contended
that the full property was limited by the purpose for
which it was used.   But in fact the estate is first
vested in full property, and then the purpose for
which the grantee intends to use it is indicated.   An
absolute grant will not be qualified by the recital of
the purpose in making the grant or of the grantee in ac-
cepting it.   U. S. v. Hanson, 16 Pet., 196.

3. The reservation was not of the rights of His Maj-
esty and of those of the public, etc., but of "not only
the *right* of His Majesty, also that of the public   *   *
*   to construct wharves," etc.

This, then, is the reservation of a single right of the
King and the public the exercise of which, considering
the area of the grant, would take but little of the space
granted and would therefore not be inconsistent with
the exercise of full dominion over the great portion of

it.  As to the right of the public, reference of course is had to the right as it then existed, (for this is a reservation and saving, and not a conferring of, a right upon persons not named as grantees), and the public had no right to build at will over this space.  The rights of the public were the rights of transit and fishing, not of building wharves except at the *termini* of *the streets.* The public, considering it as composed of individuals, or as represented by the municipality, could not build a wharf or any thing else upon navigable waters without the permission of the King.  The right of municipalities to build at the ends of streets so as to keep up access to navigable water, is a necessary exception, People vs. Lambier, 5 Denio; Udall vs. Trustees, 19 Johns; 1 Dill. Munic. Corp., §497; and as this was the only right which the public had to build wharves with funds either municipal or common, the reservation must be referred to this right.  This is the reservation which the King intended for himself, too.  The town of Pensacola was then a military post, with a civil government subordinate to the military, who represented the sovereign power of the King, and this reservation was evidently intended to keep open access from the ends of the streets not only for the purposes of the King, but also for the purposes of the citizens of the town as represented by the town.  If these things be so, then the reservation of the right to prolong the streets furnishes no argument against the intention to grant a fee simple title to the whole, subject to the servitude of the public in the prolongation of the streets.

4. The phrase "without prejudice to a third who holds a better right," has no special signification here, as it occurs in all Spanish grants which I have ever seen; e. g., 16 Pet., 196; 15 Pet., 174; 10 Ib., 323; 16 Ib., 154; and was evidently intended to protect the

honor of the King (as Don Luis de Onis said in negoti-
ating the treaty) from allowing one deputy to uninten-
tionally grant, without notice to the grantee, land
which, perhaps, had been already granted to another
by another deputy.

"Nor of the sovereign privileges" contains its mean-
ing within itself, being designed to qualify the "abso-
lute dominion" which might embrace political as well
as proprietary dominion, and is also a very usual
phrase, with no special signification here.

If it had any other signification, that is fixed by the
qualification "according to the annexed decree and the
clauses expressed," to which we have already ad-
verted.

Secondly. The surrounding circumstances (which are
admissible in the construction of the grant—Cavazos
vs. Trevino, 8 Wall., 773), show that this was intended
as a grant in fee simple. Pintado had been an able
and faithful officer, and performed meritorious ser-
vices, had become poor in the service and by a removal
to Havana was in want of means of subsistence. To
meet these needs, the grant was made. It would have
been giving him a stone to give him a license to do an
act which he was in no pecuniary condition to do, a li-
cense which was not transferable, and, if transferable,
of little value, because revokable. Negotiations were
even then upon the eve of commencement between
Spain and the United States for the transfer of Florida
to the latter, Pintado had been transferred to Havana
and was domiciled there as an officer of the Spanish
government, and it would have been a mockery to give
him as a reward, that which he could not personally
avail himself of because of his absence, and which he
could not transfer to another—which he could neither
use nor sell, and which would be revoked by the then

impending act of cession. 6 N. H., 9; 4 M. & W., 538.

Add to this, that the nearness of the cession would make the Spanish authorities less reluctant to part with this property in fee, and more willing to reward its own faithful servants liberally, and we think that the combined circumstances show that the intention was to grant in fee simple, and not to concede a privilege.

But the appellants say that, admitting the authen-ticity of the grant and its capacity in form to convey a fee simple title, yet it is not now efficacious as a foundation of title in this suit. And I thus reach the last question concerning the grant, which is:

Is the title to the land embraced in Certificate "C" now enforceable? Appellants say that it is not because the title never took effect, as

a. It was never completed by a survey; and

b. The building of bath houses and wharves was a condition precedent and was never fulfilled, and that if it did take effect, it has become inoperative, because

c. The building of bath houses and wharves was a condition subsequent and has never been fullfilled.

d. It was annulled by Act of Congress of May 23, 1828, (4 Stat. at Large, 284);

e. It was barred by the limitation contained in said act;

f. It was rejected by the Land Commissioners of West Florida;

g. The land has been dedicated to the public, and

h. It has been abandoned.

d. It is further contended that the said Act of Congress of May 23, 1828, was a distinct and affirmative

JANUARY TERM, 1894. 55

Sullivan. Exr., et al. v. Richardson, Trustee.—Argument of Counsel.

annullment of the title to the land in Certificate "C,"
without reference to any condition subsequent or a
breach thereof.

Beyond the answer already contained in our sugges-
tion that no such intention is indicated in the act, an-
other insuperable obstacle to giving the act any such
effect is that Congress had no power to make such an
annullment, and it will be presumed that it did not at-
tempt to do so.

Lands in Florida held under Spanish titles at the
time of the treaty, were two kinds, perfect and imper-
fect. U. S. vs. Arredondo, 6 Pet., 718; authorities *in-
fra.*

In the former the title had passed to the grantee, in
the latter he had a right to acquire a title by taking cer-
tain required steps. Both of these were provided for
by the treaty, the provision as to the former being that
they should *remain* ratified and confirmed, and there-
fore any grant in which the title had passed to the
grantee before the cession was protected by the treaty,
and Congress could not divest any such vested right.
MaGuire vs. Tyler, 8 Wall., 65; U. S. vs. Arredondo,
6 Pet., 714; U. S. vs. Percheman, 7 Pet., 95; MaGee vs.
Alba, 9 Fla., 392.

The same result would have obtained from the law
of nations. Delassu vs. U. S., 9 Pet., 117; MaGee vs.
Alba, 9 Fla., 392.

The only question then is, was this a perfect grant?
It was a royal title, *in form*, and as such a perfect
grant. U. S. vs. Constant, 12 How., 437; U. S. vs.
Ducros, 15 How., 41; 4 Am. St. Papers, p. 118; U. S.
vs. Pellerin, et al., 13 How., 10.

It conveyed the property absolutely, and even though
there was a condition subsequent, yet it is the settled
doctrine that this was a perfect title though subject to

forfeiture for non-performance of the condition. U. S. vs. Pellerin, 13 How., 10.

e. For the reason given in the preceding sub-division, Congress could not prescribe that a title already vested should be divested by a failure to prosecute it in the courts, and it did not so intend by the Act of May 26, 1824, (4 Stat. at Large, p. 52), or by any of the subsequent Acts conferring jurisdiction upon the District Courts to hear claims for land titles, which Act of 1824 in its limitation of the jurisdiction of the District Judge is expressly adopted by the Act of May 23, 1824 (4 Statutes at Large, p. 284), in its sixth section. And, therefore, that Act has been construed to give the courts jurisdiction only over incipient or imperfect grants. U. S. vs. Lawton, 5 How., 26; U. S. vs. Dauterive, 15 How., 23; U. S. vs. Roselius, 15 How., 34; U. S. vs. Roselius, Ib., 37; U. S. vs. Ducros, Ib., 41; U. S. vs. Constant, 12 How., 437; U. S. vs. Reynes, 9 How., 143.

f. It was never rejected by the Land Commissioners for West Florida. They merely expressed their opinion (which we have shown to have been erroneous), and reported the grant to Congress. Moreover, they had no power to reject, for they were merely a board of inquiry and had no judicial powers. U. S. vs. Perchman, 7 Pet., 95; MaGee, et al. vs. Alba, 7 Fla., 382.

g. There is no evidence of any dedication to the public. (See argument upon dedication by the King.)

If there had been a dedication, it was for purposes of passage and navigation and a change or discontinuance of the use to which it was dedicated, would authorize the resumption of possession or the bringing of ejectment. Strong vs. City of Brooklyn, 68 N. Y., 1; Carpenter vs. Oswego, etc., 24 N. Y., 655; Weis-

brod vs. C. & N., etc., 21 Wis., 602; Gardiner vs. Tisdale, 2 Wis., 153.

Or, the fee still being in the dedicator, he can bring ejectment for a wrongful occupancy, even though the dedication still continues. 65 N. Y., 134; 1 Burrow, 133; 25 N. Y., 526; 9 S. & R., 26; 15 Gratt., 528; 3 Vt., 279; 16 Mass., 35; 2 Smith's L. C., [213.]

And it does not lie in the mouth of a trespasser who appropriates to himself to the exclusion of the public to complain that the rights of the public are violated. Authorities *supra.*

h. There has been no abandonment. This is, as we have shown, a perfect and complete grant, under which title vested in Pintado and his heirs. Such a title cannot be divested by abandonment. 3 Wash. on Real Prop., Chap. 11.

If it could, who could it go to? It is entirely divested from the original grantor, and nobody else has a right to take it. The cases of U. S. vs. Hughes, 13 How., 1-4-7, cited by Appellants, are not analogous in the facts. The grants in those cases were incomplete grants. This is complete. In those the rights were inchoate, and the grantee took no steps to perfect them, and the court presumed an abandonment of his right to perfect the title. In this the title is already perfected, and there can be no presumption of the abandonment of absolute title. In those, manual possession was necessary to perfect the title; in this it was not. U. S. vs. Lawton, 5 How., 29; U. S. vs. Sibbald, 10 Pet., 313; U. S. vs. Arredondo, 6 Pet., 743.

Having thus, as I submit, established the efficacy of the Pintado grant as a basis of title to sustain this suit, I proceed to examine other questions applicable both to the appeal of Louisville & Nashville R. R. Co., and to that of D. F. Sullivan's executors.

Questions applicable to all the Appellants:

Assignments of error 4, 5, 6, 7, 8 and 9, raise questions identical, though relating to different deeds. Each deed was a link in plaintiff's title, and was therefore neither irrelevant nor incompetent. Each described a part of the *locus in quo* described in the declaration. The land described in each was, as we have shown, the subject of a grant, and the objection that when the deed was made the *locus in quo* was in adverse possession, was a point to be made by evidence and not by assertion, and to be passed upon by the jury under instructions from the court.

Assignment of error 10. In addition to foregoing grounds there are special ones urged against the admission of this conveyance from Pintado heirs to A. C. Blount. They are, however, not tenable.

It was offered as a copy of a conveyance valid according to the laws of Louisiana, and therefore, under Chapter 1930, §§1 & 4, of the laws of Florida, valid and effectual to convey title to land in Florida. The original differed from a deed valid when executed in Florida, only in that no seals were attached to the signatures of the grantors. But seals were not necessary either to an authentic act or a private act (either of which this was) under the laws of Louisiana. See Mallory's testimony—Civil Code of Louisiana, Art. 2415-2231-2239-2242.

So it was validly executed in Louisiana, and therefore, valid in Florida.

It was perfectly competent for the Legislature to render the deed valid, though before the passage of the act it was not. Cooley on Cons. Lim., [376-7-8].

The copy was admissible either as a copy duly certified by an official whose duty it was under the law of

Louisiana (See Mallory's testimony) to retain the original, U. S. vs. Percheman, 7 Pet., 52-85; 1 Greenl. Ev., §485 n. 4, citing Bowman vs. Sanborn, 5 Foster (N. H.) 87; or as a copy of the original, which was proven to be beyond the custody and control of the plaintiffs, it being retained by a person out of the State, who refused to surrender it and who was amenable to no process by which he could be compelled to produce it. 2 Phillips on Evidence (4 Am. Ed.), p. 514, n. 446; Ib. p. 520, n. 448; 1 Greenl. Ev., §82 & §84.

Assignment of error 11. I have already discussed the Pintado grant. As to the bare right of introducing it and having it read, I have simply to add that the question of admissibility was for the court and only required a reasonable presumption of its authenticity. 1 Greenl. Ev., §142.

The court could have permitted it to be read in the first place before any proof of its genuineness, because the contents would have to be known in order to determine the relevancy of the proofs offered as to its execution and authenticity. Doe vs. Passingham, 2 C. & P., 440, cited 1 Greenl. on Ev., §144.

There was, moreover, no objection to its introduction because of want of proof of its execution or authenticity. If there had been, the determination of the objection lay with the jury, and they have determined in its favor. The objection that it was a copy and not properly proved is not a fact. It was the original. The word duplicate on Pintado's petition was placed there because he was required to present duplicates, and one of them was attached to the grant.

Assignment of error 12. The papers, the introduction of which is objected to, were introduced for the double purpose of showing that John de la Rua was the agent of V. S. Pintado, as tending to show the authenticity

of the grant. I have already discussed their effect as showing both these things, and it is unnecessary to repeat the discussion. The only question is whether they were admissible to show them. The objections were that they were irrelevant and did not refer to the grant or the property embraced in the grant. In fact the letters, the petitions to the Commissioners, the bills for professional services, etc., did refer to the grant and the lands embraced in it, but it was not necessary that they should have done so. If anything connected with them, or the place in, or circumstances under, which they were found, tended to prove an issue of fact they were relevant. Upon their face they appeared to be papers of V. S. Pintado, or relating to his estate, and such as would naturally be in the possession of an agent of Pintado, and therefore tended to show that de la Rua was the agent of Pintado—in fact several of them recited the agency. They were therefore admissible for this purpose. They were also admissible as tending to prove the authenticity of the grant. It was found among them and the presence of each was an additional argument for the authenticity of the others. An isolated paper might have been forged, but the improbability of forgery and the consequent probability of genuineness is increased with the discovery of each additional paper relating to the same matter, but made at different times and by different persons. These papers were in themselves admissible as ancient documents, being more than thirty years old and being found in the proper custody, for the rule as to ancient documents is not confined to any particular kind of papers—2 Phillips on Evidence, (4 Am. ed..) p. 481; and, tending to prove the authenticity of the grant itself, were admissible. Whether the papers among which a grant alleged to be an ancient

grant, is found related to the business of the person claiming under the grant is always a material question, 7 East, 291; 1 Esp., 278; and the best evidence as to whether they relate to such business, is the exhibition of their contents to the jury.

Assignment of error 13. The objections to Richardson's testimony were as follows:

1. That it is not shown that the lease testified to covered the *locus in quo.*

It is only necessary for the Court to read the interrogatories and answers to see that he is testifying all the time about "the property in controversy," as he speaks of it in the answer to the second interrogatory.

2. That the *locus in quo* was not the subject of private lease or ownership, such as would prevent the Railroad Co. from exercising its rights * * * in the maintenance of a public wharf.

We have already discussed the liability of the property to private appropriation by grant, and will hereafter discuss the alleged relation of the Railroad Company to the public.

3. That the making of the lease and the payment of the rent was not shown to be authorized by the Board of Directors or proper authorities of the Railroad Company.

But Richardson testified that the Pensacola & Louisville R. R. Company paid rent to him. The allegation is that the *Company* paid it, and, if the defendants had desired, they could have shown upon cross-examination, whom he meant by the "Company," or could have affirmatively shown that the Company did not do so. His allegation covered all requisite functionaries of the Company.

4. That it was an effort to establish plaintiff's title by parol. It was not an effort so to do; but merely to

establish a recognition of it. Such recognition is always admissible.

5. That it was not shown that the defendants went into possession as tenants of plaintiff or his grantors. This could make no difference. If they went in as tenants, they would in the absence of fraud, be estopped, but even if they accepted a tenancy while in possession, the acceptance would, if not an estoppel, be evidence against them, to be met by evidence on their part destroying its effect. Bigelow on Estoppel, 469, *et seq.*

Outside of a question of tenancy, it was, in connection with the testimony of Walter Tate and A. C. Blount, admissible for the purpose of meeting the contention of defendants that the R. R. Co. was in adverse possession at the time of the several conveyances made, and that therefore the conveyances were void as to it. The testimony of these three witnesses covers the whole period and show that at no time was its holding adverse.

It was also contended below that, as the Pensacola & Louisville R. R. Co. had made a mortgage of this property prior to their admissions by lease and payment of rent, and as the defendant R. R. Co. held under a foreclosure of this mortgage, no act of the P. & L. R. R. Co. in connection with the property, made subsequent to the making of that mortgage, could be in derogation of the rights of any one claiming under the mortgage.

This is admitted, but this cause was tried against D. F. Sullivan's executors, and the R. R. Co., and any evidence which was admissible against either, would properly go to the jury. Now Sullivan's executors held directly under the P. & L. R. R. Co., without the in-

terposition of the mortgage, and were bound by the acts of their grantors when in possession.

Moreover, even as to the defendant R. R. Co., this evidence in connection with that of the other witnesses, was admissible, not as binding it, but as showing the character of the possession of the P. & L. R. R. Co., after the mortgage, not to have been adverse, and thus to raise the presumption that it was not adverse before. (It may be remarked in passing that the admissions made to A. C. Blount and Walter Tate were before the making of the mortgage). Even if the possession of the P. & L. had been adverse in the beginning, there was no presumption that it continued to be, for it was incumbent upon the defendant to show its continuance. Gay vs. Moffitt, 5 Am. Dec., 633.

Assignment of error 14. Sullivan's proposition to purchase this property from Richardson was admissible, being an admission of the title of Richardson, by a person who had shown no title in himself. Field's Lawyer's Briefs, Title Estoppel.

And would even have been sufficient to base a verdict for the plaintiff upon. Ib.

If so, it was relevant, the property mentioned in it being fixed as the property in controversy by the answer of Richardson to the 7th interrogatory.

Assignments of error 15 and 16. Hyer and Cram were both the highest officers of the company, and were in possession and control of the property and their admissions with respect to the character of that possession were admissible. Dorsey vs. Dorsey, 21 Harris & J., 410; Norton vs. Pettibone, 7 Conn., 319.

Possibly, if the R. R. Co. had had a title it would not have been competent for them to divest the title of the Company by an admission inconsistent therewith,

but in the absence of title, it was competent to prove the admissions respecting the character of the posses- sion. If the Company went into possession by mistake and claimed no title it had nothing to divest. An offi- cer without authority takes possession; the corporation has not acted and has acquired nothing; the same offi- cer or one of the same grade can declare the character of the act of taking possession and it will bind the cor- poration: Suppose the officer had taken a lease with- out authority from the corporation; could it repudiate his act and claim the property as its own, and would not he, having taken possession and still having pos- session, bind the title as against himself or any one claiming through him, by his admission as to the man- ner of taking possession, and the consequent nature of that possession?

At any rate, being in possession and control of the property about which the admission was made and of which it was in evidence, the Company went into pos- session through mistake, their acts, not being incon- sistent with the rights of the Company, would be pre- sumed to be authorized by it, and the burden of show- ing that they were unauthorized would be upon the Company. It did not show it. On the contrary it was shown that these admissions were authorized by Rich- ardson, who owned all the stock.

The equity being entirely with the plaintiff, it will be presumed, after the lapse of six years, during nearly every one of which the officers and directors admitted the title of plaintiff, and during two of which rent was paid, that the corporation was cognizant of the facts and ratified them. Morawetz on Corporations, §§628- 629-631 & 633; cases cited, Abbott's Dig. Corp., §§7-9- 10-21-27-30-33.

The retention of possession was beneficial to the corporation, as their wharf had been built over the land, and an acquiescence and ratification by which an ejectment was avoided can readily be presumed. Mor. on Corp., §629.

Assignment of error 17. This assignment to the whole charge will not be considered by the court.

Assignment of error 18. The part of the charge objected to was correct. Hartley vs. Ferrell, 19 Fla., 374.

Assignment of error 20. I have discussed the questions raised by the assignment, in the argument upon the Pintado grant. If contended, as below, that the court assumed the authenticity, the answer is that no objection was made, when introduced, as to its authenticity, and that therefore the court had a right to assume it.

Assignment of error 21. This involves only questions concerning the Pintado grant and the deeds under which plaintiff claimed, and have already been discussed.

Assignment of error 22. The charge objected to was in exact accordance with the law.

Assignment of error 23. The judge below had already determined the validity within themselves of the deeds mentioned, and nothing remained as to them, except the question of adverse possession by the defendant when they were made. The instruction objected to is in effect that if there was no entry except in subordination to the true title, and that title was afterwards acknowledged, there was no adverse possession, and it was correct.

Assignment of error 24. This part of the charge was unobjectionable. Hart vs. Bostwick, 14 Fla., 178.

Assignment of error 25. As was also the part herein objected to. Ib. Sedgwick and Wait on Trial to Title of Land, §749.

Assignment of error 28. The instruction urged herein was properly refused. L. &. N. R. R. Co. vs. Yniestra, 21 Fla.

Assignment of error 35. This has been covered in the argument heretofore made upon the subject of dedication.

Assignment of error 36. The law as we understand it is that the question involved upon an admission of title in another by a person in possession, is not whether the person in whom it was admitted had title or not, but whether the admission was obtained fraudulently or in derogation of the existing rights of the person making the admission. If the P. & L. R. R. Co. had no title, and Tate used no fraud in procuring the admission from Cram, whether Tate had perfect title himself is immaterial, and Cram's admission would be evidence of title in him against the R. R. Co. Bigelow on Estoppel, 419, et seq.

Assignment of error 39. I think of no question occurring under this head not already discussed, or hereafter to be discussed. This brings us to a consideration of the assignments of error applicable only to the L. & N. R. R. Co.

Assignment of error 1, The surrebutter was intended to set up a presumption of action upon the part of the Directors, and also a want of necessity for it, because of Richardson's ownership of the Company, and was good. Without further discussion of it, however, we go back to the foundation of all the pleadings resulting in it—back to the equitable plea. This was fatally defective in failing to allege any equitable circumstances of estoppel as against A. C. Blount. The

only allegations as to this are that the wharf of the Pensacola & Louisville R. R. Co., was built on and over the property in controversy, "with the knowledge and consent of said Alexander C. Blount and without any objection thereto," the said A. C. Blount being at that time the owner, and the plaintiff deriving through him. It is an equitable plea and should allege all facts sufficient to make out the equity, but it fails to allege any circumstances amounting to an estoppel.

1. It does not allege that A. C. Blount knew that the structures were being erected on his property. True, it is alleged that he knew that it was being erected and upon the property now in controversy, but there is no allegation that he knew that *his* property was being covered by the structure. In order to create an estoppel by an executed license, there must be a permission by the owner to go upon the property, he knowing that it is his property. (2 Smith's L. C., 740.) If there is any ignorance of his rights, there can of course be no estoppel. Perhaps, if, though ignorant of his rights, he, being President, had directed that the wharf be placed where it was, he might have been estopped, but no such case is made in the plea.

2. Nor is there any allegation that the circumstances under which the knowledge or want of objection existed and the consent was given, were otherwise such as to estop. All of these are perfectly consistent with a lease for a term or at will, or with a revokable license; and if so, then a bare allegation of them is not sufficient to stop the owner from asserting his title. This equitable plea is equivalent to a bill for injunction (Walls vs. Endel, 20 Fla., 86), and can it be supposed for a moment that an injunction would be granted upon a bill which stated upon its face facts

which were as consistent with a want of equity as with an equity?

Assignment of error 2. The plaintiff was properly allowed to amend his declaration at the trial. Robinson vs. Hartridge, 13 Fla., 520.

If the defendants had desired a continuance, or other terms, they could have applied therefor.

Assignments of error 27 and 29. The instructions asked contained an assumption of all the facts, and were properly refused. L. & N. R. R. Co. vs. Yniestra, 21 Fla.

Assignments of error 30, 31, 32 and 33. The instructions, the refusal of which is assigned as error, raise but one point other than those which have heretofore been discussed, viz: Whether the defendant R. R. Co. comes within the reservations of the grant to Pintado by virtue of its representation of the rights of the King, or of the public.

It does not represent the rights of the King.

This was a right personal to the King of Spain, and did not pass by the treaty to the United States and thence to the State of Florida.

The Second Article of the Treaty, which is the conveying Article, embraces only "the sovereignty and the territories," which does not include the right here reserved.

If it did pass to the State, it has never passed from it to the defendant R. R. Co.

1. The State would have no right to grant it to an individual or private corporation. There is an "exclusion of particular individuals," and the evident intent was that the reservation should be available only by the King or the public, and not that it should be the subject of grant to a private individual, even though that individual should build upon it in a man-

ner beneficial to the public. If it were so subject, then the reservation was of a right to grant any part or the whole to private individuals or corporations and thus is a right of alienation of the whole and of defeating the grant. This is directly contrary to the language of the grant itself, and especially of the part excluding particular individuals.

2. If the right could be granted, it could only be by legislation. Such grant to the P. & L. R. R. Co. is claimed, but the court will look in vain through its charter and that of the Ala. & Fla. R. R. Co. (p. 1065, McClellan's Digest), which it succeeded, for even the implication of a grant of any rights of, or in connection with property which belonged to the State of Florida. No attribute of sovereignty, save the right of eminent domain, is granted, and upon the exercise of that is placed the limitation of compensation to persons deprived of their property.

It did not represent the public.

It was simply a private corporation, and in no sense the public or any part of it. It was a "particular individual," building railroad and wharves out of its own funds and for its own profit. The reservation was to the public to build only with "municipal or common" funds, and there is no contention that this was with funds of either description.

Assignment of error 34. This has been discussed substantially under the 15th and 16th assignments.

Assignment of error 37. We think that ordinarily the instruction would have been correct, but the circumstances of this case are peculiar. Sullivan was in the possession of the whole property at the beginning of the suit. Thereafter that possession passed to the defendant R. R. Co., and it caused itself to be made a

party. The rights of the plaintiff began with the beginning of the suit, and he was entitled to mesne profits from the time against the original defendants, and, after the substitution, against the substituted defendant, from the property into which such substituted defendant came. In other words the substituted defendant took upon himself, so far as the property was concerned, the burden of the suit from the beginning.

If this be not so, then the judgment as to the mesne profits should be reversed. But it should be reversed only as to them, and affirmed as to the title involved. This can readily be done, because there are really two judgments—one for the property and one for the mesne profits, the former entirely distinct from the latter. The consolidation by statute of the two actions into one trial does not destroy their independence. If the Court finds that the judgment for possession should be affirmed and the judgment for mesne profits reversed, there would seem to be no difficulty in so doing. But if the Court thinks that a judgment is an entirety, and must be reversed in whole, then I suggest that the verdicts in any event are separable, and that the proper order would be to reverse the judgment with directions to the Court below to enter a judgment for the possession, and to have a jury determine the mesne profits. That the judgment is divisible and can be reversed in part and affirmed in part, and that as to the part reversed the Court may have a jury to try the question of damages alone, see the cases cited in the opinion in Hanover Fire Ins. Co. vs. B. C. Lewis' Sons, 22 Fla.

Assignment of error 38. The charge was properly refused, because there was absolutely no evidence that the land had ever been held adversely by the Railroad

Company.   No witness so testified, all of the witnesses for the defendants, testifying to the point at all, (Cobb & Ruter) saying that they had never heard any assertion of title nor any question about it, and that their assumption of adverse possession was because the R. R. Co. had possession of it.   Nor was there any evidence that there was any adverse possession of it at that time, even though there had been previously, and it lay upon the defendant to show a continuance of the adverse possession.   Gay vs. Moffitt, 5 Am. Dec., 633.

Moreover, the instruction was misleading.  While the admissions made afterwards might not have given validity to the *deed* made before, yet they could have established the *title* to be in the grantee of the Pintado heirs, or have furnished evidence of the title.   This was a distinction that the jury could not have made, and as the Court could not make it for them by modifying or altering the instruction, the instruction was properly refused.

This concludes the branch of the argument concerning the L. & N. R. R. Co.

As to the case against D. F. Sullivan's Executors, there is but little to be said.   They had in only two pleas—not guilty, and adverse possession at the time of the making of the several deeds under which plaintiff derived.   There was not a word showing or tending to show such adverse possession, and there was no pretense of title in them, so that, unless the plaintiff had no title, or there were errors made in the course of the trial against their interests, the judgment against them must be affirmed, whatever fate the judgment against the Railroad Company may meet.   There are but few errors alleged to have been committed against

them, and I think that the Court will pronounce them to be in allegation and not in fact.

If the judgment be affirmed, the Court will necessarily pass upon all questions involved, but if it should find reversible errors, outside of the merits of the Pintado grant, it would be within its power to reserve and remand, without passing upon the validity of the grant. I earnestly ask, however, that in such case, the power be not exercised, but that, whatever conclusion may be reached upon the other questions involved, consideration of all the questions affecting that grant may be given, and a determination had by the Court. Not only would such a course be necessary for guidance upon a new trial, but a final settlement by this Court of the question of the enforceability of the grant, would remove a serious obstacle to the growth of the City of Pensacola, which had resulted from an uncertainty as to the title of all the land lying in front of the city, subject to private appropriation.

*R. L. Campbell* and *Gaylord B. Clark*, for Appellants.

BRIEF OF R. L. CAMPBELL FOR APPELLANTS.

This brief is intended to cover only some of the assignments of error; and the order of discussion, will be governed by the relation of the subjects, and not numerically.

XI. This assignment of error, refers to the action of the Circuit Court, in permitting the paper offered in evidence, as an original grant from Ramirez to Pintado, to go to the jury, and afterwards, charging, that it was a valid grant.

That conclusion, and the action based upon it, were wholly unauthorized by the evidence.

No proof was offered, of the execution of the grant.

Aside from its apparent age, there was not one fact, which entitled it to be read to the jury.

But, the mere fact, that a paper bears a date, which, apparently, makes it more than 30 years old, does not entitle it to be read in evidence.

For an ancient manuscript, as well as an antique in art, may be the subject of recent manufacture.

Hence, an ancient writing, can not be received in evidence, until it is shown to have come from the proper custodian; that being the presumptive, which the law has substituted, for the positive proof of authenticity. 1 Wharton Ev., §§194, 732; 2 Greenleaf Ev., §§21, 570.

But the rule is qualified by two conditions.

It must be shown to have been deposited near its alleged date.    Ib.

It must, on its face, and *mode of production*, be free from suspicion.

Hence, age, performs no other office, than to change the character of the testimony, as to authenticity.

There was not a particle of evidence before the court to prove, that the paper in question, came from the proper depositary or custodian.

The first step, in such proof, would be, to establish, who could be the proper depositary or custodian of such document, as the next, would be, to prove, it was obtained from him.

Were it a common law deed, the custodian might be some person interested in the estate, and the depository the place where he kept his valuable papers.

But, as the paper in question, is not such a deed, but purports to be a Spanish grant, the first step in the

proof of its authenticity, should have been, to show, that a private person could be, under Spanish law and usages, the custodian of such a document; for there can be no proof of a proper custody, without first proving, who could be the proper custodian.

The appellants insist, that the fact, that an alleged original Spanish grant, was found in the trunk of a private person, would be an impeachment of its authenticity.

The 2d. Article of the treaty of cession of Florida by Spain, to the United States, provides that "archives and documents, which relate directly to the property and sovereignty of such Province, are included in this article. The said documents and archives, shall be left in the possession of commissaries or officers of the United States, duly authorized to receive them."

From the report of the commissioners, in respect to this alleged grant, it appears, that the fact, that the original thereof, was not in the archives, according to Spanish usage, and the treaty, was one of the grounds upon which Pintado's claim was disallowed.

That it was the usage, under Spanish rule, to retain the originals of grants and concessions, will be seen in United States vs. Percheman, 7 Peters, 85; United States vs. Despline, 12 Peters, 654; 15 Ib., 226; United States vs. Wiggins, 14 Peters, 334; United States vs. Rodman, 15 Peters, 226; United States vs. Acosta, 1 Howard, 24.

That such was the usage, even in respect to private documents, is proved, by the certificate of the power of attorney, from Pintado to John de la Rua. (Record page 133): a usage which has survived in Louisiana, according to the testimony of Messrs. Mallory

and Blount, and a comparison between the act of sale, between Pintado's heirs and Blount, with the above-mentioned power of attorney.

It is manifest, therefore, that neither John de la Rua, could have been the proper custodian of the original grant, if it had any existence, nor could the "old round top trunk, with the top broken in," be its proper depository.

But, even as a common law deed, the proof did not justify the conclusion, that it came "from the custodian, who would have possessed it, if it had been genuine." 1 Wharton Ev., §194.

That custodian, should have been Pintado, one of his heirs, or assigns; and, yet, there was no proof, that any one of them ever possessed the paper.

Pintado was a non-resident of Florida, from 1821, up to his death, as his heirs, have always been. See deposition of Pintado, record pp. 77-88.

The paper was found in 1859 or 1860, in Pensacola, "in an old round top trunk, with the top broken in," containing a number of old letters, and other worthless papers, belonging to F. E. de la Rua.

How worthless, were both the trunk, and its contents, is manifested, by the manner in which de la Rua surrendered, and Knowles obtained possession of them. See record pp. 87-90.

In order to convert F. E. de la Rua, into a custodian, and the old trunk, into a depository, papers are put in evidence to show, that in 1821, Pintado made John de la Rua, father of F. E., his agent (record pp. 132-133), and on 9th March, 1823, sent him what title papers he had, to lands in Florida (record p. 160); but what those papers were, must be left to conjecture, for want of description.

At any rate, the circumstances, only establish an

agency for the occasion, and the purpose named, in the power of attorney; but they by no means, constituted John de la Rua a custodian of Pintado's title deeds, in the sense of the law, where custody is treated as evidence of authenticity.

The fact, that the pretended grant, was found in a trunk, with other worthless papers, contradicts the hypothesis, that he regarded himself as its custodian.

*Noscitur a sociis.* And hence, the presumption that the pretended grant, like its companions, was worthless, and so because not genuine.

As, on 9th March, 1823, Pintado sent his agent whatever papers he had, relating to the Florida lands, he claimed (record p. 160); and as the petitions for confirmation were filed with the commissioners about October, 1822, (record pp. 134-145), it is but a fair presumption, that if the paper now in question, was received by the agent, he caused it to be brought before the commissioners, by Pintado's attorneys.

That course, he would certainly have pursued, if he believed the paper authentic. If he did not so regard it, we have an explanation of the worthless company in which it was found.

If he did cause it to be presented to the commissioners, it is a fair inference, that after they denied its validity, it was returned to him.

And, it is only upon the hypothesis, that he assented to their opinion, that an explanation can be found, for his putting the paper in a trunk, with other rubbish writings, which eventually passed into the possession of his son, to be treated as worthless, and actually so treated, until the antiquarian researches of

Knowles, rescued it from the dust and discredit of two score years.

Can it be said, that the paper came from such a custody, as raises the presumption that it is genuine ?

Can it be said, that the mode of production is free from suspicion?

Custody implies watchfulness and care; and it is, such watchfulness and care, which gives rise to the presumption of authenticity; for a man would hardly guard and care for what is worthless.

And the converse of that proposition, is equally true, that a paper which would be valuable, if genine, which is neglected, and whose preservation is left to the chances and accidents of time, is so treated, because it is not genuine, and therefore worthless.

So far from the Circuit Court having any proof, that. the paper, which it declared to be "a valid grant," came from the proper custody, the evidence was, that. it came from *no custody*, and with a cloud of suspicion resting upon it.

And this suspicion, is intensified, by a comparative examination of the pretended original (record pp. 92–108), and the copy, of the copy thereof (record pp. 109–127), with many circumstances disclosed by the testimony.

The words, "Vicente Sebastian Pintado, filed the following claim, to 10,000 arpents of land," with which the transcript from the archives, is headed. (record p. 109), indicates, that it was upon that copy,. that the claim before the commissioners was based.

The report of the commissioners shows, that it was, partly, because copies, and not the original, were submitted to them, that they rejected the claim.

That the original was not furnished, by the agent of Pintado, to his attorneys, raises a strong presump-

tion that he did not possess it; and that presumption, is made conclusive, by the Spanish usage, in regard to original papers.

These circumstances, raise the suspicion, that what is called the original, and the copy, which was before the commissioners, are the same document, with some slight changes, due to time and accident.

The only lack of correspondence, between the alleged original grant, and the copy, as they appear in the record, is the absence from the former, of the notarial and consular certificates. Record pp. 124–126.

That the last two leaves of the document, as it was presented to the commissioners, might be detached from it, in consequence of the rude treatment, which the old round top trunk, with a hole in the top, received, in the course of 40 years, would not be improbable; and there was no proof, that no such detached leaves, were in the trunk; nor was there any, that the paper, as it was brought before the court, was in the same ʿcondition, as when found in the trunk.

Moreover, the Pintado claimants, themselves, did not believe, as late as 1867, that the paper was an original; for it is not even alluded to, in the agreed statement of facts, in the case of the City of Pensacola vs. Eudaldo Pintado; the only reference therein, to the Pintado title, being the copy in the archives at Pensacola. Record p. 177.

As to the record of that suit, it can have no bearing on this contention, except to intensify suspicion, as to the authenticity of the alleged grant.

That an ancient writing, has successfully stood the test of judicial criticism, has been accepted, as a circumstance in favor of its authenticity.

But, this document, underwent no such ordeal, in Pensacola vs. Pintado.   On the contrary, the proceedings were so ordered, as to shield it from investigation and criticism; and the suit stands self-impeached, as a simulated, and not a real case.

· It was an action of ejectment, which can only be brought against a person in actual possession.   The proof is, that the defendant was born in Havana, and afterwards resided and died in Louisiana.   There is no proof, that he ever was in Florida.   That he was not in Florida, and had no tenant of the *locus in quo*, at the time the suit was brought, is shown by the fact, that he acknowledged service of the writ, in Louisiana.

XX. This assignment of error, refers to the charge of the court, that the grant from Ramirez to Pintado "was, and is, a valid grant, and that it created an estate in fee simple in him, to the land described in it;" referring, of course, to the submerged land embraced in certificate C, of which the *locus in quo* is a part.

This charge was based upon two fallacies: ·

1. That Ramirez had authority to alienate the area, so as to create an absolute estate therein, in Pintado.

2. That the paper submitted to the jury, did create such an estate.

Both propositions are denied by appellants.

1. The only evidence before the court, of Ramirez's power to make the grant, was the presumption, arising from the grant itself.

But the case so made, was one of *prima facie* authority only; for so the Supreme Court of the United States, in New Orleans vs. United States, 10 Peters, 662, construed the ruling in United States vs. Arre-

dondo, 6 Peters, 791, and other cases, in respect to the presumption of authority in officers making grants.

That the city of Pensacola existed long before the grant to Pintado, appears in evidence; and the termination of its streets on the bay, brought its water front within the Spanish definition, of the commons of the town, or city, as we find it, at page 724, in New Orleans vs. United States (*supra*). Geiger vs. Filor, 8, Fla., 325.

Indeed the very terms of certificate C, dispel all doubt upon the subject; for it not only recognizes the common right in that water front, but, by reference to improvements thereon, "with municipal or common funds," fixes the character of that right, as communal, or one vested in the City of Pensacola, as a community.

The existence of such a common or communal right, acknowledged and declared by competent authority, is the highest evidence of a dedication; and dedication has all the force and effect of a conveyance. New Orleans vs. United States (*supra*).

It being thus conclusively established, that the area in question, had become the subject of communal rights, before the grant to Pintado, the question arises, whether Ramirez had the power, if he had so willed, to divest those rights, by bestowing upon Pintado an absolute estate within that area? and the answer to that question, must be made by the Spanish law, then in force.

That law is thus laid down, at page 726, in New Orleans vs. United States (*supra*):

"Our pleasure and will is, to preserve *their rights*, rents and property, to our cities, towns, and places, and not to make any gift of anything of them; where-

fore we command, that the gift or gifts which we may make, or any part of them, to any person whatsoever, are not valid." The italics are substituted.

As, therefore a grant by the King of Spain, of the absolute property in the area embraced in certificate C, would not have been "valid;" so would a like grant, by his viceroy, have been null and void.

2. But the error of the court, in construing the grant to be an absolute grant of the area in question, was still more palpable, than its decision, that Ramirez had power to make an absolute alienation of that area.

As above shown, Ramirez had no such power of alienation. But as the King could give "permission to construct buildings on ground dedicated to the public use, *without injury to the public right*," (New Orleans vs. United States, *supra*, page 726), so presumably, might his viceroy do the like.

Under this limited authority, Ramirez was fully empowered to give Pintado permission to build wharves and bath houses, within the area, "without injury to the public right."

If, therefore, the grant is open to the construction, that in respect to the area in question, it involved nothing more than permission to erect such structures, that construction must overrule the force and effect of the words, "in full property" and "absolute dominion;" for "the general words of a King's grant shall never be so construed as to deprive him of a greater amount of revenue than he intended to grant, or to be deemed to be to his or the prejudice of the commonwealth." U. S. vs. Arredondo (*supra*).

Again, if the area had been, as before shown, previously dedicated by royal authority, as communal

property of the city of Pensacola, that dedication
was equivalent to a grant; and therefore, a construc-
tion of Ramirez's grant inconsistent with that dedica-
tion, cannot be entertained, because, "a government
is never presumed to grant the same land twice." (Ib.)

Moreover, when an instrument is susceptible of two
constructions the court will adopt that one, which is
consistent with justice and good faith. 2 Wharton
Ev., 1240. And surely, a government which would
give to any individual the "full property" and "abso-
lute dominion" of the water front of a seaport, to be
disposed of as his cupidity might dictate, would be
guilty of an act of the greatest injustice and bad faith;
but, happily, such an imputation may be avoided in
this case, by giving the grant a just and fair construc-
tion, in all its parts, instead of fixing our minds im-
movably upon the words "full property," and "abso-
lute dominion."

To make those words decisive of the estate intended
to be granted, would violate the rule:    "The law will
judge of a deed or other instrument, consisting of
diverse parts, or clauses, by looking at the whole, and
will give to each part, its proper office, so as to ascer-
tain the intention of the parties."    Broome's Maxims,
126.

The words, "full property," are controlled and re-
stricted by the declared purpose of the grant, "build-
ing wharves and houses for bathing;" by the saving
and reservation "of not only the rights of His Maj-
esty, but also, the rights of the public at all times,
when it becomes convenient, and it be designed to con-
struct wharves, with whatever funds, municipal or
common;" and by the limitation, "intending only the
exclusion of individuals."

And, they are further controlled, by the restriction of the grantee's right to ten feet below the bottom of the bay; a restriction inconsistent with the principle, that ownership of lands extends *usque ad cælum* and *usque ad orcum;* but strictly consistent with the "purpose" of building "wharves and houses for bathing," which are, on this coast, and ever have been erected on piles driven into the bottom of the bay; a custom of which the court will take judicial notice.

The words, "absolute dominion" occur in the latter part of the instrument, and refer to the several tracts of land granted; and may be taken in the sense of full and unlimited property, in respect to all, except that included in certificate C, which, by its terms shows they were inapplicable to the area embraced in it.

But, not only are these words restrained by certificate C, they are moreover subject to a limitation, which occurs in the very paragraph in which they are employed, "without prejudice to a party who holds a better right." Now, it is only necessary to refer to certificate C, in order to find "a better right," that communal right of the city of Pensacola, to cover the area described in certificate C, with wharves; a right, which being co-extensive with the entire area, left not even so much space as the grantee could cover with the palm of his hand, subject to his "absolute dominion."

Hence, it is obvious, that the expressions, "full property," and "absolute dominion," cannot have the force and effect claimed for them, except by resorting to *argumentum baculinum*, to beat out of the instrument exceptions, limitations, and reservations expressed in the plainest language.

It would be flat contradiction to predicate "full ownership" and "absolute dominion" of the right of

one, whose authority over property is confined to a specific object; to "constructing wharves and houses for bathing;" whose power is declared subordinate, throughout the whole area of the thing, to a superior right—the municipal or communal right of the city of Pensacola; and which is expressly limited by the exclusion, only, of individual interference with the interest bestowed.

A crucial test of the extent of the right conferred upon Pintado, will be, to ascertain what rights are included in the enumerated exceptions, or reservations of the grant; for what is included in the exceptions or reservations, is excluded from the grant. U. S. vs. Arredondo (*supra*).

The exceptions, as above shown, acknowledge a dedication of the area to the common or communal use of building wharves, and except that right from the operation of the grant, as it does also, the King's rights, amongst which, is that of authorizing structures upon the commons of towns and cities, *"without injury to the public riyhts."* Such being the inclusions of the exceptions, what room was left for the operation of the grantee's "full property," and "absolute dominion?" To that question, the instrument gives a clear and unequivocal response—"for the purpose of constructing wharves, and houses for bathing," "intending the exclusion only with respect to individuals." Such was to be his "full property," and such his "absolute dominion," in the privilege of erecting wharves and bath houses.

Such a right, so limited and restricted, by exceptions, reservations and limitations, would, according to common law terminology, be a franchise; which is defined to be a right, or privilege conferred by law. Bank of Augusta vs. Earle, 13 Peters, 595.

Sullivan, Exr., et al. v. Richardson, Trustee.—Argument of Counsel.

It is not a license, because created by deed. Tiedeman on Real Property, §651.

It is not an easement, because it combines individual benefit with advantages to the public. Tiedeman on Real Property, §§597, 633.

But whether Pintado was invested with a license, easement, or franchise, the proof shows that he never attached his right ¨to the *locus in quo*, by building thereon either a wharf or a bath house; and thereby acquiring a possessory right thereto.

Such an abstract right can not be the ground on which an action of ejectment can be maintained; because, it is not a title to land, but merely a privilege to be exercised upon land; much less, can there be based upon it, a right to lay out the area in question, into lots and blocks, or the right of alienating the soil in fee simple, as was attempted by the heirs of Pintado, in the conveyance to Blount.

Again, when the express reservation, of the rights of the King is considered, in connection with the legal status of the Louisville & Nashville Railroad, so far as it lies in the State of Florida, it is impossible to con-ceive, upon what ground, a claimant under the grant, can maintain this suit.

That road exists, in its entire length, from the Alabama line to the end of its pier, by virtue of several legislative enactments, beginning in 1855 and extend-ing to 1877: having been successively known as the Alabama & Florida Railroad, Pensacola & Louisville Railroad, Pensacola Railroad, and Louisville & Nashville Railroad. Laws of Florida, Chaps. 483, 1642, 1915, 3069.

The right of eminent domain, was exercised in build-ing it, and it is one of the public highways of the State. Williams vs. N. Y. Central Railway, 18 Barb.,

222, 246; State vs. Rives, 5 Ired., 297; Bradley vs. N. Y. & N. H. Railway, 21 Conn., 294; Symonds vs. The City of Cincinnatti, 14 Ohio, 147; Olcott vs. Supervisors, 16 Wall., 678.

And as such highway, it is subject to regulation by the Railroad Commission of the State.

To establish highways, has been a duty of sovereign power in every age; and the essential nature and status of the road in question, being that of a public highway, it can not be doubted, that the King of Spain could, without relying on arbitrary power, but upon the express reservation in the grant, have authorized, or permitted such a highway, to be constructed in the Bay, within the area embraced in certificate C.

That right passed to the United States, under the treaty of cession, as did all other sovereign rights, consistent with the principles of our political institutions; and upon the admision of Florida, into the Union, that right, became vested in her. Geiger vs. Filor, (*supra*).

And the authority conferred by her legislation, upon her appointed agents, to construct a highway, from the Alabama line "to some point or points on the Bay of Pensacola," was as clear and potent an act of sovereign power, as would have been an edict of Ferdinand VII, to one of his satraps, for a like purpose, had Florida remained a Spanish Colony.

Nor can any limit, as respects the Bay, be fixed, because of the expression, "on the Bay;" for a legislative act, must be construed with regard to its object, and the object being to establish a highway, from the north boundary of the State to a seaport, with all the advantages involved in the connection of the interior

and the sea; it would be a hypercriticism, involving absurdity, to say, that the authority stopped, at high tide mark.

This assignment of error, relates to the Circuit Court's over-ruling the objection to the admission of the paper, purporting to be an act of sale between the heirs of Pintado and A. C. Blount, and permitting it to go to the jury as evidence.

The main ground of objection, to its admissibility was, that it was upon its face, void, as a conveyance of lands in Florida; because not sealed with the seals of the alleged grantors.

Ever since the introduction of the Common Law, into Florida, in 1822—and not 1829 as stated in McClellan's Digest—a deed, or an instrument of writing, conveying lands, and hence, denominated a conveyance, has never been understood in any other sense, than as an instrument, sealed with the seals of the professed grantors.

Since 1828, that characteristic of a deed, or conveyance of lands, has been fixed by statute.    McClellan's. Dig., 214.

Hence, no writing without that distinguishing feature, can be recognized by the courts of Florida, as a deed, or conveyance of lands.

It follows, therefore, necessarily, that until that definition is changed by legislation, when the terms, deed, or conveyance of land, appear in a statute, they must be construed to mean what they have always been accepted to mean by Florida Courts.

If the foregoing propositions are true, the writing in question is not a conveyance of lands in the sense of the laws of Florida.

But, it is alleged, that the act of 24 Feb'y., 1873, Chap. 1939, has in respect to conveyances, executed

out of the State, worked such a change, that deeds or conveyances of land executed in other states, no longer import instruments sealed with the seals of the grantors.

It would seem to be essential, that a statute intended to do away with a common law definition, confirmed by statute, should express that intention, by repealing or specially amending the statute containing the definition, or at least, that its provisions should be so plainly inconsistent with that definition, as impliedly to repeal so much of the statute in which it is expressed.

"Repeals by implication, are not favored; and the repugnancy between the two statutes, should be very clear, to warrant a court in holding that the latter, in time, repeals the other, where it does not profess in terms to do so." Cooley Con. Lim., 183.

Chapter 1939, professes to repeal nothing. And the only change which it makes, is as to the manner in which deeds and conveyances of land *"may be executed,"* out of the State. It has nothing to say, in respect to any writing, except deeds or conveyances of lands. It only provides how the thing known in the legal terminology of the State of Florida, as such a deed or conveyance, may be brought into existence, in another state, in order to be effectual in Florida.

The provision of the statute, on which the question of construction must be determined, is as follows: "and if any such deed or conveyance of land, shall be executed in any other State, Territory, or District of the United States, such deed may be executed according to the laws of such State, Territory, or District."

That provision, certainly, does not refer to writings, extra, the Florida definition of a deed or conveyance of land; much less, does it undertake to provide, how any other writing is to be executed.

By what rule of construction, it is made equivalent to the declaration, that what is no deed of conveyance in the sense of Florida law, shall have the efficacy of such a deed, is inconceivable !

If it is argued, that the purpose of the statute, was to adopt the conveyancing laws of other states, the answer is, that no such intention is indicated in the only manner in which it can be indicated—by its language.

The controlling expression is, "that *such deed* may be *executed* according to the laws of such State," etc. And surely, that cannot be deemed equivalent to the idea, that any form of transfer of lands, effectual in such State, shall be equally effectual, to pass the title of lands in Florida.

Contrarywise, "such deed," is the subject of the predicate "executed." What is authorized to be done, is to be done in respect to a deed, and not something that is *no deed*, in the sense of Florida law.

How can that provision, by any recognized rule of construction, be forced to apply to a writing like that in question, which is nothing more than the protocol of a verbal agreement between the parties, made by an officer, appointed by law, having no feature of a deed, in the sense of Florida laws.

True, the object of such an act of sale, and a deed of lands, in the Florida sense, may be the same—to effect a transfer of title to land. But, the act of 1873, does not undertake to deal with the form of writing, which is to effect that transfer, but declares only, how the deed, which is the modal instrumentality in Florida,

may be executed—i. e. delivered, witnessed and authenticated, so as to be admitted to record in Florida.

Hence, it necessarily follows, that a transfer of the title to land, executed in another state, where such transfers are made otherwise than by deeds of conveyance, do not fall within the provisions of the act of 1873.

Recurring to the citation from Cooley on Con. Lim., what "very clear" "repugnancy," is there between the act of 1873, and the legislation of 1828, fixing the definition of a deed or conveyance of land?

Not only is there not a word in that act, suggestive of such repugnancy; but its language creates a clear and well defined area for the operation of the provisions of the statute, without trenching on pre-existing legislation—all, in fact, that relates to mere execution and authentication.

Indeed, fairly construed, this statute is a recognition of the time-honored Florida form, by means of which, changes of title are worked, which it preserves; but, as to execution, i. e. delivery, attestation and acknowledgment, they may be regulated by the laws of another state; and why, with this well defined area, for the operation of the words of the act, should it be extended, so as to embrace the form of the conveyance, as well as the mode of execution?

Limited to execution and acknowledgment, effect is given to the act of 1873; and, an implied repeal is only resorted to, to give effect to the later statute. Greeley vs. Jacksonville, 17 Fla., 174.

It is to be borne in mind, too, that deeds of conveyance of land, in the Florida sense, is the method of conveying lands in all the states of the Union, with but

two or three exceptions; but, that the attestations and forms of acknowledgments are variant.

Hence, it is a fair inference, that the act of 1873, was only intended to apply to those states, where deeds of conveyance of lands, are employed in the transfer of the title to realty. And, that inference, as above shown, is made conclusive, by the absence of any reference in the act, to any other mode of conveyance.

I. The facts of the case upon demurrer, which this assignment of error involves, as they appear in the equitable plea, and the pleadings which hinge upon it, are as follows: Record pp. 14-23, inclusive.

The appellant R. R. Co. acquired title to the *locus in quo*, under a decree of foreclosure and sale, under a mortgage, in form a deed of trust to trustees, made 10th December, 1872, embracing all the property of the Pensacola and Louisville Railroad Company, including its pier, on the *locus in quo*, there built without the knowledge or consent of A. C. Blount, or his assigns (see record p. 19); and was in the possession of the latter Railroad Company as a part of its road. Blount, Tate, W. A. Richardson and plaintiff, from 1871 to 1876 obtained recognition of their title to, and payments of rent for the *locus in quo*, by authority of W. A. Richardson, who owned 90 per cent. of the stock of the Pensacola and Louisville R. R. Co., and was the dictator thereof. Blount, Tate and W. A. Richardson were directors of the Pensacola and Louisville Railroad Company at the time they obtained recognition of their title and payment of rent; and said recognition of title or payment of rent were not made by the action or authority of the board of directors of the Pensacola and Louisville Railroad Company; nor did the mortgage trustees ever have any notice of such

recognition of title or payments of rent; nor does it appear that the appellant Railroad Company ever recognized the title of Blount, Tate or either of the Richardsons, by the payment of rent or otherwise. W. A. Richardson conveyed the *locus in quo* to plaintiff, in trust for his wife; but it does not appear that plaintiff or his *cestui* purchased for a valuable consideration, without notice of the trust deed, and the ignorance of the trustees in respect to the attornments.

The foregoing facts, raise an equitable defense, which would entitle the appellant Railroad to relief in equity, and which may be urged in this proceeding.

The Pensacola and Louisville Railroad Company was in possession of its wharf and pier, at the time the trust deed was executed; and as a part of its property, the wharf or pier, was conveyed to the trustees.

Obviously, no attornment or payment of rent, occurring after the date of the trust deed, could impair the rights of the trustees; and to those rights the appellant Railroad was subrogated by purchase.

Nor could a change in the title of the corporate property, before then, be effected by an attornment or payment of rent, any more than by deed, without the action of the board of directors, acting as a board. 1 Morawetz on Corporations, §§531, 540, 335.

That W. A. Richardson owned ninety per cent. of the stock, could not dispense with the necessity for such action; for it was required for the protection of the minority in interest, and the rights of third persons.

Had there been such action by the board, its records might have furnished the trustees with information, as to the defect in the title of the pier, if it existed.

But W. A. Richardson's dictatorship is set up, to obviate the legal consequences, resulting from the want of such directorial action.

But, were he a dictator, and the directors only lay figures, moveable at his will and bidding, when the attornments and payments of rent were made, such was he, and such were they, when the deed was executed; and when, therefore, he tendered it to the trustees, as security for the bonds to be issued upon the faith of it, it was virtually, *his personal act.*

And, the very nature of the transaction, devolved upon him, the trust duty of disclosing his actings and doings, in respect to the *locus in quo*; and his failure to do so, was a fraudulent concealment, and therefore, an actual fraud. 2 Pomeroy's Eq. Jr., §904.

Whilst he was still dictator, he made that fraud fruitful to himself, by purchasing the *locus in quo*; and were he plaintiff in this case, he would be estopped from asserting a title, thus acquired.

But, plaintiff, who is the trustee of W. A. Richardson's wife, stands before the court, as a mere volunteer; and, therefore, stands in no stronger position, than the former would have done. 2 Pom. Eq. Jr., §918; 1 Story, Eq. Jr., §193<sup>a</sup>.

To avoid the equity, which attached to the property, when W. A. Richardson purchased, it devolved upon plaintiff, to allege and prove, that he was a purchaser for a valuable consideration, without notice, of the fraud, practiced upon the trustees, by W. A. Richardson. He has done neither, and, therefore, he stands in the shoes of his grantor.

RANEY, C. J., (after stating the facts):

1. The first point urged in behalf of appellants, defendants below, refers to the action of the Circuit Court in permitting the paper offered in evidence by the plaintiff as an original grant from Ramirez to Pintado to be read to the jury. This point goes to the authenticity of the paper and includes the action of the court in admitting other papers offered with it. It is to be borne in mind that of the several objections made on the trial to the introduction of this instrument, the second, third, fourth, fifth, sixth and eighth concern rather the legal effect of the terms of the grant than the question of the genuineness or authenticity of the paper presented as a grant. The same may also be said of the seventh objection, which is that the grant is not one that the treaty between the United States and Spain recognized or validated; and as these several objections may be more properly dealt with in connection with the question of the nature and effect of the grant purported to be made, and its validity, as an authoritative act, their consideration will be deferred till that feature of the case shall be reached. This course leaves but two of the objections, the first and ninth, made to the introduction of the paper to be considered now; the former of these being that it purports to be a copy, and is not duly certified, and the latter that it is not a duly certified copy made by the lawful custodian of the original. As to the first of these two objections it is sufficient to say that the paper does not purport to be a copy. It and other originals introduced in evidence are before us, they having been transmitted under an order of the Circuit Judge, and there is nothing about it that suggests that it is a copy or other than an original. The intimation, to be found in one of the briefs, that leaves containing the

Sullivan. Exr., et al. v. Richardson, Trustee.—Opinion of Court.

consular and notarial certificates which appear on the certified copy introduced in evidence may have been detached from this alleged original, finds no support in the appearance of the paper, or otherwise. The certificate of registry by Carambot at the conclusion of the paper is not consistent with the idea that it is other than an original, and the signatures of Pintado, Ramirez and Carambot have the appearance of originals, as does the seal; and there is nothing on the face of the paper that tends to create a suspicion that it has been changed or mutilated in any way. The only fair construction that can be placed on Mr. Knowles' testimony is that the paper when he offered it in evidence was in the same condition that he found it in when he obtained the trunk in 1859 from Mr. de la Rua. Admitting, in this connection, that this original was never before the Commissioners appointed under the act of Congress to ascertain claims and titles to lands in the district of West Florida, and conceding that the copy of which a record was made in the book of the clerk's office at Pensacola, was before them, we still do not think it can be inferred from these facts that the paper before us does not purport to be or is not an original, or has been in any wise mutilated. If it be that the Spanish law did not permit Pintado to have the original, then the absence of a presentation of it to the Commissioners, was a circumstance to indicate either that this paper was not then in existence, or that it, if valid, was in the archives at Havana, where it purports to have been executed, and would, if the law was as assumed, naturally have been, unless it had been removed by the Spanish government to Florida. Of such removal by the government there is no evidence; and however all this may be it does not seem to us that either any or all of these considerations have any ap-

preciable weight in establishing the conclusion that the paper before us purports to be a copy.

The remaining objection, that it is not a duly certified copy made by the lawful custodian of the original, involves more than the one just disposed of. It implies that such copy is the only legal evidence of title or due proof of the existence of the original, and the contention is that according to the Spanish law, the original belonged to the official archives, and the grantee's sole evidence of his title was a duly certified copy by the official custodian of such archives. If this be so, then the natural and proper custody of this original would have been the office of the archives at Havana, where it purports to have been executed, at least until a transmissal of it, for convenience, to a similar office at Pensacola, in the then Province of West Florida, had been made by the Spanish authorities; and, according to the theory of the objection, a duly certified copy from such office would have been the proper evidence to adduce before the Circuit Court on this trial. It is true that by the second article of the treaty by which the United States acquired Florida, entered into at Washington on October 22nd, 1819, between the representatives of Spain and the United States, which treaty was ratified by Ferdinand 7th, October 24th, 1820, and by the United States in February, 1821, the "archives and documents, which relate directly to the property and sovereignty of said provinces, are included" in the cession, and the same article provides that "the said archives and documents shall be left in possession of the commissaries or officers of the United States duly authorized to receive them." Had this original been in the archives at Pensacola and been "left" there according to the treaty, the mode of proof would have been clear; but,

as is quite evident, there is no room for assuming that it ever was there, nor is the inference that it was ever deposited for retention in a similar repository at Havana, consistent with the record before us. If, then, it be that the Spanish law required such deposit and that a duly certified copy was the sole legal evidence of a grant to Pintado, the action of the trial judge in overruling the objection was errroneous.

What was the law of Spain on this subject? The authorities relied on by counsel for appellants in support of their objection are: United States vs. Percheman, 7 Peters, 51, 85; United States vs. Delespine, 12 Peters, 654; United States vs. Delespine, 15 Peters, 226; United States vs. Wiggins, 14 Peters, 334; United States vs. Rodman, 15 Peters, 130; United States vs. Acosta, 1 How., 24. In the first of these cases, all of them being appeals from judgments of the Superior Court of the Eastern District of the Territory of Florida, it was decided that a paper writing making a grant by a royal officer of Spain in Florida, addressed to a public officer whose duty it was to keep the original and issue a copy, need not be produced, and that the copy issued by the proper officer is an original. The original decree or grant made by Governor Estrada, December 12th, 1815, and to which Percheman's petition for the same was attached, reads, after certain recitals, as follows: "I do grant him the 2,000 acres of land which he solicits, in absolute property, in the indicated place, to which effect let a certified copy of this petiton and decree be issued to him from the secretary's office, in order that it may be to him in all events an equivalent of a title in form." Afterwards there was a petition to the governor for an order of survey, and a certificate of the surveyor that the sur-

7

vey had been made.   On the trial in the Superior Court
the petitioner offered in evidence a copy, from the
office of the keeper of public archives, of the original
grant, and to its introduction the United States ob-
jected on the ground that the original grant itself
should be procured, and its execution proved, but the
objection was overruled; and it was said by the Su-
preme Court, in sustaining the ruling, that it appeared
from the words of the grant that the original was not
in the possession of the grantee; that the decree,
which constituted the title, appeared to be addressed
to the officer of the government whose duty it was to
keep the originals and to issue a copy; that its lan-
guage, after granting in absolute property, is: "for the
attainment of which let a certified copy of this peti-
tion and decree be issued to him from the secretary's
office, in order that it may be to him in all events an
equivalent of a title in form;" and it is then observed
that "this copy is, in contemplation, of law, an origi-
nal." It is unquestionable that this decision of the
Supreme Court of the United States recognizes the
mode of procedure adopted by Governor Estrada to
to be consonant with Spanish law, and valid, but the
court does not decide, nor does the opinion intimate,
or the judgment, viewed with reference to the facts of
the case, imply that the Spanish law did not recog-
nize any other procedure in making grants of land.
It does not decide what would be the custody of a
title in form if it had been contemplated that one should
issue.    The opinion intimates    that the    original
might, as suggested by the Superior Court Judge, have
been brought into court upon *subpœna duces tecum*,
if such course had been necessary to either of the par-
ties; and it was also held that on general principles of
law, and independent of legislation to that end, a copy

given by a public officer whose duty it is to keep the original ought to be received in evidence. In the second, or Delespine case, a translated copy, made by the secretary of the Board of Land Commissioners, of a copy in Spanish of an original Spanish grant, was received in evidence, the copy in Spanish having been lost, and it being shown that the original had been mutilated, and could not be found. Of the first copy it is said by the court that it "was made from the original filed in the proper office, from which the original could not be removed for any purpose." The other Delespine case is at least of no broader effect than the Wiggins case, now to be noticed. In the fourth, or Wiggins case the evidence received, against objection, in the lower court was a copy of the original petition for land, and of the decree or concession by the governor, such copy being duly certified by the government secretary at St. Augustine on August 6th, 1815, as being "faithfully drawn from the originals which exist in the secretary's office under my charge." Evidence was also received to prove the practice in the government secretary's office; and by the testimony of witnesses, including one who had been a clerk in it from 1807 till the change of government in 1821, it was "established beyond controversy" that persons wishing grants of land from the Spanish government presented a memorial to the governor, and that he decreed on the memorial in the form pursued in this case, and that the decree was filed in the secretary's office, "and constantly retained there unless in cases where a royal title was ordered to be issued, when the decree was transferred to the escribano's office." The papers in the former class, to which that of Mrs. Wiggins belonged, were not recorded in books, but kept in files or bundles. It is said in the opinion that the evidence

of title given to the grantee was a certified copy of the
decree, or of the memorial and decree, by the govern-
ment secretary, and that it was one of the ordinary
duties of the secretary to make such copies for the use
of the parties, and generally the decree directed the
copy to be made for his use, and such copies were re-
ceived as evidence in the Spanish courts of justice, they
being made immediately after the decree, and delivered
to the party when he called for them; no seal being af-
fixed to the secretary's certificate, which was evidence
of the facts to which it certified in a case like this.
And the conclusion of the court was that "in this case,
as in all others where the originals are confined to a
public office and copies are introduced, the copy is
competent evidence by authority of the certificate of
the proper officer, and that it proves, *prima facie*, the
original to be of file in the office when the copy was
made." In Rodman's case certified copies were of-
fered, the decree concluding with a similar direction to
the secretary's office for a certified copy, "which in all
events will serve to him as a title in form," and it was
held that the official certificate of the secretary was evi-
dence of the title papers, the originals of which were, as
indicated, kept in the public archives; and in the last,
or Acosta case where it does not appear that there
was the usual direction in the decree for the delivery
of a copy, and where the originals could not be found
in the archives, a copy of the petition and decree with
the usual certificate from the secretary, dated June
24th, 1816, was received in evidence in the lower court
after hearing testimony as to the manner in which
muniments of title were kept in the archives at St.
Augustine; and this action was affirmed on the author-
ity of the Wiggins case. What we have said above of
the Percheman decision is also true of the subsequently

mentioned cases; yet that of Wiggins expressly indicates that there was another class of cases, namely, where a royal title was ordered to be issued; and that in such class the *decree* was transferred to the escribano's office. What was done with the decree in the escribano's office is not stated, yet the only reasonable inference, in the absence of further light on the subject, is that it remained there, as it certainly can not be inferred that they were not to remain there.

But these decisions do not throw any light upon the nature or disposition of the "Royal title" which, it must be assumed, followed, when issued, the decree or cession and survey thereunder. We are referred by counsel for appellee to authorities which will now be considered. The first is a report made by the same Pintado as Surveyor-General at Havana on September 9th, 1822, as to evidence to be found there of donations of lands in West Florida, he having been Surveyor-General of that province from about the year 1805, and previously deputy in the same since May, 1796, (2 Cal. L. L., 338 *et seq.*); which report seems to have been required by the Spanish authorities to the end of the "acknowledgment by the United States" of such donations. Of such donations it is here said, *inter alia*, that Ramirez, (who as Intendant from 1798, up to September, 1812, saving a period of about one year in 1804 and 1805, had the exclusive power to dispose of land in West Florida), declared on November 17th, 1817, after certain interruptions of this power, that he only had power to grant lands in the Floridas, and that "the records of the lands conceded, and of those asked for, were sent him from the reception of said advice and declaration, for the knowledge and approbation of said authority, and are probably to be found in the secretary, except those which may have been returned

to the parties with the decrees they had petitioned for. The books in which were registered the formal titles, which had been dispatched by order of the same superintendent, and the original records which took place in order to obtain them of the concessions which his lordship made directly in both Floridas, and of these which he confirmed and ratified in the years 1817 and 1818, until he was apprised of the negotiations about the cession of said province, are likewise to be found in said office, and of all of them I have taken note in my office." Ramirez was the "superintendent" and "lordship" referred to. Again in the report of the Land Commissioners for West Florida, to the Secretary of the Treasury, dated November 12th, 1824, it is said: "It was the practice where a grant was made, to deposit the original in the office of finances, to be recorded; and the claimant was given a certified copy. These records were not permitted to remain in this province, but were all removed to Havana several years since. Others were destroyed by the pirates, as is in proof before us, on their passage to that place. Some obtained possession of the originals, but others did not; and, the above causes combined, are alleged by the claimants as a reason to account for the absence of original title papers. Where the office of alcade has contained any important document connected with the claims, we have had it submitted to our inspection, or obtained certified extracts therefrom; but, except as to the *mesne* conveyances, we regret to say that we have been enabled to procure very little information from that quarter, as it was not the office in which originals were recorded." 4 Am. State Papers, 104. And besides, ten or more special cases in which it is claimed that the record of the proceedings of these Commissioners shows the originals to have been presented to the Com-

Sullivan. Exr., et al. v. Richardson, Trustee.—Opinion of Court.

missioners, are cited by appellee.   One of these is the
Maria Garzon grant, claimed by Joseph Bonifay.   4
Am. State Papers, 99.   The report says that this claim
was founded on "a copy of a plat and certificate of
survey by Pintado, Surveyor-General, dated Havana,
May 7th, 1818, stating" that the former had petitioned
in February, 1817, for the land described, and the
proceedings taken thereon; also "an original grant or
title in form made to Maria Garzon by the intendant,
Alexander Ramirez, countersigned by Pedro Caram-
bot, Secretary of War, dated 16th of May, 1818, stat-
ing   *   *   with the annexed authenticated copy of
the proceedings instituted before Governor Masot in
the year 1817   *   * ;"   also a copy of a *mesne* con-
veyance from Maria Garzon to Bonifay; and that in
addition to the foregoing papers Bonifay proved by
parol testimony "the signatures of the Spanish officers
annexed to the grant."   The report of the Commis-
sioners, which submits the claim to the judgment of
Congress, states that the former were "somewhat at a
loss for an opinion," and also uses this language:
"The certified copy of a plat and certificate of the for-
mer Surveyor-General of West Florida, as well as the
the grant of the intendant upon which this claim de-
pends, are dated subsequent to 24th January, 1818.
These officers in regard to Florida no longer existed;
Pintado and Ramirez were irresponsible persons; *and
the former presents us with a copy when we are enti-
tled to the original under the solemn stipulations of
the treaty between Spain and the United States.* How
far such documents are admissible must be decided by
Congress."   Others of these claims, as shown by the
report, are:   Bonal's, where an original grant or title
in form by Masot, Governor and Sub-delegate, dated Oc-
tober 1st, 1817, under the seal of office and counter-

signed by two "assistant witnesses," and an original grant or title in form by Ramirez, Intendant-General, and countersigned by Pedro Carambot, Secretary of War, dated May 2nd, 1818, Pablo Palmes proving the "signature of the intendant, escribano and subscribing witnesses;" Mesa's concession, Grandpre's and Sierra's claims being, the first and original decree of concession by Morales, Intendant-General, countersigned by two witnesses, and dated May 21st, 1812, the authenticity of the title papers being proved by parol testimony, and the second, Grandpre's claim, including an original grant or title in form to him by Morales, countersigned by F. G. Arroyo, and dated March 24th, 1812, the signatures of the officers annexed to the grant being proved by parol testimony, and that of Sierra including an original grant by Morales to Cadet of March 24th, 1812, the signatures of the Spanish officers being likewise proved. An original grant to Orsino Bouligny, made May 2nd, 1811, by Morales, and countersigned by Arroyo, an original decree of concession of April 16th, 1804, by Governor Folch to Martin de Madrid, an original grant or title in form, December 6th, 1817, to Hinard by Governor Masot, countersigned by two witnesses, an original grant of May 9th, 1810, by Morales to Aleck, and countersigned by Arroyo, Secretary, and an original grant or title in form of April 14th, 1810, from same source to De Vegas, and the original grant of November 26th, 1811, from the same source, are shown in the other cases referred to here have been presented to the Commissioners, and the signatures of the Spanish officers proved by parol. 4 Am. State Papers, pp. 123, 124, 126, 129, 132. Appellee also refers to Mr. White's California Land Laws, vol. 2, pp. 353, 354, where the decree of concession of January 10th, 1818, to Jno.

JANUARY TERM, 1894.     105

Sullivan, Exr., et al. v. Richardson, Trustee.—Opinion of Court.

Forbes & Co. uses the expression: "And the Command-
ant of the said city of Pensacola, in virtue of this res-
olution shall put them in quiet and peaceable posses-
sion of the aforesaid land; for which object his excel-
lency orders to give to the said house of Forbes all the
documents necessary—registering the original in the
archives," and where it also appears that Forbes &
Co. having in July, 1819, at Havana, requested that
Pintado, the surveyor, should draw a plat of the land,
he, Pintado, on October 31st, 1823, at Havana, under
an order of July, 1819, so directing, certified or re-
ported that having accepted to form a topograghical
plan of the land according to the data which he had,
and not by actual measure, he accomphished it on the
15th of September of the said year, "annexing the
graphic description or plat which I return in original
to the person as it has been asked and ordered.    After
having taken due notice of it I despatched the plat
under No. 1869, and I registered it with the same num-
ber which belonged to it in the series on the 17th of the
said September    *    *."    The case of United States vs.
Arredondo, 6 Peters, 691, is also referred to in this
connection.    There the original title was held and of-
fered in evidence by the grantee and was received
without objection as to its authenticity, or custody, or
on the score of a certified copy being the proper evi-
dence of title.    There, as here, the title recites the con-
cession and the order for survey and the presentation
of the figurative plans by the Surveyor-General, and
finally there follow the final words of the grant, stat-
ing that a copy of the plat or figurative plan would be
annexed to the title; Arredendo's title being signed
by Ramirez and countersigned by Peter Carambot, the
secretary, the execution of it taking place at Havana,
December 22nd, 1817, and also being endorsed on the

same day by Carambot as follows: "An account of the preceding title has been taken, and registered in the book prepared for that purpose in the secretary's office under my charge." We also find in the above mentioned report of the West Florida Land Commissioners, 4 Am. State Papers, 84, the statement that "grants for land sold and those made gratuitously were required to be recorded in the office of finances." Again, in the general regulations for conceding lands in the provinces of Louisiana and West Florida, issued by the intendant, Morales, July 17th, 1799, to whose office the exclusive power of granting lands had been granted by royal decree made at Santa Lorenzo, October 22nd, 1798, the procedure to be followed in granting lands had been prescribed, the 15th, 16th and 17th articles providing in effect as follows: All concessions were to be in the name of the King, by the General Intendant of the Province, who should also order the Surveyor-General or one named by him, to make the survey of the land asked for; the survey to be done in the presence of the commandant. or syndic of the district and of two neighbors, and "these four shall sign the *proces verbal* which shall be drawn up by the surveyor," which *proces verbal*, with a certified copy of the same were to be "sent" to the intendant by the surveyor to the end that on the original there be delivered, by the consent of the King's. attorney, the necessary title paper, to which title paper such certified copy was to be annexed. The original *proces verbal* was to be deposited in the office of the Secretary of the Treasury, and care was to be taken to make annually a book of all which have been "sent" with an alphabetical list, to the end that at all times and against all accidents, the documents which should be wanted might be found. The surveyor was.

to have another book, mentioned, in which the *proces verbal* should be recorded; and both on the original deposited and on the copy annexed to the title he was to note the folio of the book in which he "had registered the figurative plat of the survey." In the office of the finances there was also to be kept books in which the titles of concession were to be recorded, and in these books also, mention was to be made of the folio of the book in which they, the titles, "are transcribed;" or, in other words, as we understand, these books were to be indexed. There was also to be taken in the chamber of accounts of the army and finances, note of such titles, "under the penalty of being void," a which was to have a like book, and at the time of taking the note was to cite the folio of the book where the title was recorded. The 18th article states, in effect, that a great number of persons erroneously thought themselves to be owners of land, or invested with the title, by the mere order for survey and possession, or by such order and survey, and had neglected to apply for the title, and that the continuation of like abuses for a longer time would augment the confusion and disorder necessarily to result; and then declares that those who have obtained such decrees, can not, notwithstanding that in virtue of them the survey has taken place, and they have been put in possession, be regarded as owners of land until their "real titles are delivered completed with all the formalities before recited." White's Spanish Law (called also White's Compilation), 208 *et seq.*; 2 California Land Laws, 234-44.

Notwithstanding the above statement of the Land Commisioners that it was "the practice where a grant was made to deposit the original in the office of finance to be recorded, and the claimant was given a certified

·copy," we do not think it can be said that an original title in form in possession of the grantee or a claimant was not legal evidence of title. Their report shows the fact to be that in numerous cases the original had not been kept in such office, nor did they make the presence of such original in the hands of the grantee or claimant a ground for rejecting the claim. There is much in the quotations and citations we have given to suggest, and sustain the idea, that when a title in form was made that it was, after being registered and recorded, delivered to the grantee. Granting that the practice of making the decree or order making the grant—or, as it was technically called, the concession—and the survey, the means of investing title, a certified copy thereof proof of the same, was *never* prohibited in East Florida, as it was in West Florida at least for a time under the Intendancy of Morales, still there is evidence that the other practice of using a title in form was in vogue there; and when we see, as we do in Arredondo's case, that such a formal title held by the original grantee is presented in a cause of immense moment for those days, and is received in evidence without objection based on the fact of such possession, and further see that there were many cases of similar possession in West Florida, and find no specific regulation or law which interdicted such possession, we are not justified in presuming that the possession of titles in form was unlawful. Again it cannot be denied that the mode of procedure in making title to land was in fact the subject of regulation by the Intendant, Morales, and there is no law presented that indicates that the power was not incident to the office; and in the absence of such law we may presume in favor of the power. There is, moreover, in view of the evidence of the possession by grantees of such original

royal titles to lands in West Florida, not sufficient evidence to justify us in concluding that the regulations of Morales were ever entirely superseded in that province, or that Ramirez was not acting on them in executing this title to Pintado, nor do we feel justified to say that he as Intendant was without authority to use the form adopted, in the absence of formal regulations to that end. The language of such titles seems to us to imply that it was intended that they should be delivered to the grantees, and the presumption is that the act of the officers in delivering was lawful and regular. Winn vs. Cole's Heirs, Walker's (Miss.) Reports, 119; Arredondo vs. United States, 6 Peters, 691; United States vs. Clarke, 8 Peters, 436; United States vs. Peralta, 19 Howard, 343; Trenier vs. Stewart, 55 Fla., 458; s. c., 101 U. S. 797. *Vide* Menard vs Massey, 8 Howard, 293, 314 *et seq.*, for form of title under Regulations of Morales. That this is the presumption, will more fully appear hereafter in another part of this opinion.

II. The next point to be discussed arises on the objection to the several ancient papers described in the statement, and found by Knowles in the same old trunk in which he found the formal title. The objection urged to the introduction of each is its irrelevancy, or not referring to or having any relation to the property described in the grant. This objection is untenable in so far as it relates to four of the petitions to the Land Commissioners for confirmation, or (2) to the letters of August 18th, 1821, June 28th, 1822, and March 9th, 1822, from Pintado to Mr. John de la Rua, or (3) to the open account of the Secretary of the Commissioners, for recording claims, or to the printed notice of the foreclosure suit, or to that signed alone by the same marshal and apparently relating to sales

of lands under a *fi. fa.* in favor of Henry Michelet. The petitions to the Commissioners, except that relating to the grant of November 8th, 1816, and that as to the six lots, relate obviously to lands covered by this grant and hence to the grant as an evidence of title. This fact and the reference in the first of the three letters to the 19 arpents on the Aguada, as well as other features of the communication, including that of the promise of the wharf site at the foot of a street in Pensacola; the reference in the second letter to Pintado's original titles and to the payment of the costs of proceedings before the Land Commissioners, and in the third to Pintado's original titles; the item as to Pintado's claims in the open account of the Secretary of such Commissioners for recording claims, which claims must, from the nature of the office of the Commissioners, be held to be claims for lands; the mention, in the notice of the Michelet foreclosure suit, of properties included in the title offered; the mention in the paper signed "William Sebree, Marshal," and dated January 4th, 1827, of property which is evidently the same as some of that described in the title papers offered, naturally, if not necessarily, produce the conviction that these several papers refer to more or less of the land covered by the title offered in evidence, and in view of the fact that the purpose for which they are offered is auxilliary to the admission of such title, they must be held to relate not merely "to property described in the grant," but to that document as evidence of the grant of the water front, and in our judgment there was, as against the objection presented, no error in the ruling. Whether there was error in admitting the rest of such papers in evidence, we do not decide. It is rendered at least unnecessary to do so by the conclusion we will be found to reach as to the validity of the grant.

III. A careful consideration of the grounds of the objections made to the introduction of the title, as well as those made to the admission of the alleged ancient papers, will lead to the conclusion that the authenticity of the alleged title is not questioned by such objections. The record does not disclose that proof of the signatures of the officers who signed and countersigned it was called for by the defendants. The same also is true as to the signatures borne by other of the papers referred to above. It is true that the plaintiff seems to have assumed on the trial that the title from Ramirez was an ancient document, and entered upon the task of showing by parol proof the custody from which it was obtained. There are two witnesses on this point, Peter Knowles and F. E. de la Rua. The substance of the testimony of Mr. Knowles is that he found it in an old round top trunk whose top was broken in, which he obtained in the year 1859 or 1860 from F. E. de la Rua, on applying to him for his father's papers, John de la Rua being such father, and quite a number of other papers being in the trunk with the grant, some of which being those considered above; and Knowles having had the custody of the papers ever since obtaining the trunk. Knowles was interested in the property described in the grant, when he obtained the trunk and at the time of testifying. The substance of Mr. de la Rua's testimony is that his father, John de la Rua, died in 1832; his wife, witness' mother, becoming his executor, and she died in 1843, and witness and another became her executors; and the father's papers, on his death, came into the mother's hands, and after her death, into the hands of witness and his co-executor. That the papers in the trunk were a lot of old papers belonging his father's estate. Witness never examined them very particu-

larly, and could not tell what the trunk contained, except papers belonging to his father's estate, and papers and title grants belonging to the estates of others, for many of whom his father was agent in his lifetime. Witness did not at the time of testifying have the trunk, and did not know whether he would recognize any of the papers in the trunk, but knows they were his father's papers, yet not that all of his father's papers were there. Witness was quite young "at the time," and did not consider the papers of any value. That he had no positive recollection of giving the trunk to Knowles. Knowles applied to him for the trunk before the war, but he could not recollect giving it to him, but said he must have, as otherwise Knowles could not have got it. He did not recollect that any one applied to him for the Pintado grant, or for anything connected with it. He did not know Pintado, who, though witness was an old man, was before his time. However deficient this testimony might be, in the face of an objection that it was not sufficient to do away with the necessity of proof of execution, and that therefore the title, its execution not having been proved, should not be read in evidence, it was in fact treated by the defendants as sufficient to the end indicated, or its insufficiency was waived by urging objections to another character of the title paper. In the absence of proper objections in the lower court, the point can not be entertained here, and for the patent reason that had it been made in that court and sustained, the plaintiff might have cured the defect by other testimony. Coker and Scheiffer vs. Hayes, 16 Fla., 368; Willingham vs. State, 21 Fla., 760; Tuten vs. Gazen, 18 Fla., 751; Jenkins vs. Merritt, 17 Fla., 304; Logan vs. Slade & Etheredge, 28 Fla., 699, 10 South. Rep., 25; Summer vs. Mitchell, 29 Fla., 179, 10 South.

Rep., 562; McSwain vs. Howell, 29 Fla., 248, 10 South. Rep., 588. The failure to object to the introduction of the title on the ground stated, was a waiver of any insufficiency in the testimony to excuse proof of its execution; and likewise the restriction of the objection to the other papers to irrelevancy was a waiver of all other possible objections to their being admitted.

There having been no ruling upon the separate objections shown, by the bill of exceptions and preceding statement, to have been made to the admission in evidence of the power of attorney from Pintado to John de la Rua, and the translation thereof, and the record failing to show that a ruling was insisted on, or a refusal to rule, the objections must be deemed to have been abandoned. Jenkins vs. Merritt, 17 Fla., 304; Ortiz vs. State, 30 Fla., 256, 11 South. Rep., 611.

The result of what has been said in this and the preceding subdivision of the opinion is that the alleged title from Ramirez to Pintado is before us for consideration. The effect upon the verdict and judgment of the error pointed out above in admitting certain of the ancient papers will be considered hereafter.

IV. It is urged by counsel for appellants that neither Ramirez, acting in the capacities indicated by the title paper, nor even the King of Spain, had the right to make the grant. The solution of this proposition involves the necessity of ascertaining the meaning and purpose of the grant, for until we determine what was intended to be done, or was the effect of the paper, assuming it to be authoritative, we cannot decide upon the question of the power of the officer to do what it imports. In the Report of the West Florida Land Commissioners, of January 20th, 1835 (4 Am. State Papers, 119), it is said that the space described "in-

cludes almost the whole of the shoal water, etc., in the bay immediately contiguous to the city of Pensacola, and extending, about two miles, from the mouth of Bayou Chico to that of Bayou Texar." The map shows that the space covered not only the entire front of the city, but also reached beyond, east and west, to the mouths of the bayous named, and extended outward southerly from the shore, 95 perches of Paris at the former bayou, and 100 at the latter; the exterior or south boundary, being of rectilinear lines conforming to the general trend of the shore, but not pretending to respond to all of its curves. A perch of Paris is 18 feet. Webster's Dictionary (Goodrich's Edition): Arpent. It is apparent that the grant in question, unlike that of the other five grants included within the title, is not an ordinary grant of land including private waters. The Civil law of Spain after dividing things into those of divine right, and those of human right, subdivides the former into things sacred and religious, and the latter, or things human, into things common, things public, things of a corporation or a university, and things private. Sacred things were those established for the service of God, and, as the consequence of such establishment, the dominion of them was not in man, and they could not be counted property. Burial places were religious. Religion was deemed to occupy churches and cemeteries upon their consecration, and could not be separated from them at any time. Turning to things human, we find things common to have been those which belonged to birds, beasts and to all living creatures, as being able to make use of them, as well as to men; such were the air, the water from heaven, the sea and its shore. By the shore of the sea was understood the part of it covered by water, whether in Winter or Summer. Any one might navigate

Sullivan, Exr., et al. v. Richardson, Trustee.—Opinion of Court.

·on the sea, and on its shore, where also he might build a ·cottage or house for shelter. Things public are those which belong only to mankind. Rivers, ports, harbors and highroads were among things public. Not ·only might the natives or inhabitants, of a place make use of things public, but also strangers could do so. No new mill, nor any other thing could be built on the part of the river by which its navigation might be impeded; and any old building obstructing the common use of things public could be destroyed or pulled ·down; neither could any building or thing be erected by which the common use of high roads, squares or market places, threshing grounds for corn, churches, ·etc., would be obstructed. Things belonging to a corporation or a university were those belonging exclusively to the inhabitants of any city, town or castle, or ·any other place where men reside; and of these things some might be used by any inhabitant of that city, town or place; and others were for the particular use of the corporation, it being its duty to apply the fruits, produce or rents to the·common benefit of the city or town. Fountains or springs, places for holding markets and fairs, and places for the meetings of the corporation, sandy beaches or grounds on the banks of rivers, and commons or pasture ground belonged to the former class, and were for the use of any inhabitant; and flocks, fields and vineyards, also plantations ·and lands producing fruit and rent were of the latter class. White's Spanish Law, 61-63; California Land Laws (by White), Vol. 1, pp. 70-72; Partidas, Part III, Title 28, Law 1-10; Domat's Civil Law, Title III, Section I, Articles 1, 2; Gould on Waters, Sections 3, 30, 168 note. Private things were those which belonged in particular to every individual, and of which he might acquire or lose the dominion. 1 Cal. L. L., 84.

Things were divided into those which were corporeal
and those which were incorporeal; the former being
those which may be seen and touched, and they being
either movable or immovable; and movables being
those which can move naturally by themselves, or be
moved by man, and immovables being those which can
neither move naturally themselves, nor be moved by
men.    Incorporeal things are those which can neither
be seen nor touched, and of this kind are all species of
rights of which the Spanish jurisprudence taught.    A
right was either in the thing or to the thing; a right in
the thing was that which belonged to one over any-
thing without respect to another person; a right to a
thing was that which belongs to any one as against an-
other person to oblige him to give or to do something.
Of the first kind are rights of dominion, of inheritance,
services, and pledge and mortgage; possession as it is
a momentaneous right, and is lost by the loss of the
thing is not a right in the thing.    Of the second kind
were all species of obligations which arise from con-
tract.    *Ibid.*    Again it is said in Domat's Civil Law,
Section 1, Article 1, that the heaven, the stars, the
light, the air and the sea, are all of them things
belonging so much in common to the whole society of
mankind that no one person can make himself master
of them, nor deprive others of the use of them; and the
next article is to the effect that rivers, the banks of
rivers, and highways are things public, the use of
which is common to all particular persons, according
to the respective laws of countries, and these kinds of
things do not appertain to any particular person, nor
do they enter into commerce; but it is the sovereign
that regulates the use of them.    The same author, in
the next article, reckons among the number of public
things and of such as are out of commerce those which

Sullivan, Exr., et al. v. Richardson, Trustee.—Opinion of Court.

belong in common to the inhabitants of a town or other place, and to which particular persons can have no right of property, instancing the walls and ditches of a town, townhouses and public market places.   In Angell on Tidewaters, 18-20, after quoting from Justinian, to the effect that by natural right the air, running water and the sea, and hence the shores of the sea, are common to all, and nobody is therefore prohibited to come to the seashore, and that all rivers and ports are public, so that the right of fishing in a port and in rivers is common to all, and that by the law of nature the use of shore is also public, and in the same manner as the sea itself, it is said that it clearly appears from this passage of the civil law, that the waters of the sea and the shores of the same are subject to be used in common by people generally, every person being equally entitled to the benefits to be derived from fishing, drawing and drying nets and navigation; and it is also said:  They were expressly denominated by the Roman jurists, *res communes*, and considered as *res omnium*, in respect to their use and benefit, but in respect to property as *res nullius.*   *   *   By the common law, the waters of the sea and the shores of the same are as much subject to public use as they are by the civil law, but the essential difference between the two is in the above stated doctrine of the civilians, that such waters are the property of no one; but the policy of the common law, on the contrary, was to assign to everything capable of occupancy and susceptible of ownership a legal and certain proprietor, and accordingly it makes those things which from their nature can not be exclusively occupied and enjoyed, the property of the sovereign.

We of course take judicial notice of the laws which obtained in or were applicable to the province of West

Florida before we acquired it.   United States vs. Tur-
ner, 11 How., 668; United States vs. Perot, 98 U. S.,
430;  Farmer vs. Eslava, 11 Ala., 1041; 22 Am. & Eng.
Enc. of Law, 843, note 4, and 874-5.

Assuming,  for the present, that Ramirez had the
power to grant whatever estate the terms of the water-
front grant can  be construed to create or convey, it is
entirely certain that it does  not  relate to a thing that
it was the policy of the civil law, so long  as that thing
should remain in its  natural  state, should  be held in
severalty by any one person or set of  persons.   It is a
kind of thing, or, assuming that the King,  or Ramirez
as his  representative, had  the  power  to  grant  to
an individual  a  separate and  exclusive interest in it,
it is a subject  of  property, as to which  all  citizens,
if  not also strangers, had  very  material  interests.
There are in the  nature of  the  thing special reasons
why the ordinary rule,  of strict construction of gov-
ernment grants, should  be applied to any  grant of  it.
State vs. Black River  Phosphate Co., 32  Fla., 82,  13,.
South. Rep.,  640; Commonwealth vs.  City of Rox-
bury, 9  Gray,  465.   The rule of strict construction
against the grantee is applicable to Spanish grants.   22
Am. & Eng. Enc. of  Law, 843, citing Joseph vs. United
States, 1 Ct. of Cl., 197.   The most liberal construc-
tion that could  be placed on  this grant would  be that
it vested Pintado, and his heirs,  or assigns, with full
and  absolute  ownership  of  the  land  from  the high
water mark on  the shore between the two  bayous out
into the bay for the distance indicated in the title, and
explained  above,  and  with the water which might at
any or all times  cover the same; the depth  to  which
the grant of  the  soil was  intended  to extend being,
however, only ten feet from the bottom of the  water;
the superficial contents of  the  water surface being.

718½ arpents. The words: "*Marea alta en tempo sereno*," appearing along the shore-tracing of the survey, indicate that the grant was intended to extend to ordinary high water mark. This construction would also secure to the owner the absolute control of the land and water with power to exclude at all times any and all persons from the same, and to use it for all such purposes as might be agreeable to the owner. To our minds such a construction is altogether untenable. It cannot be assumed that even a known willingness, desire or purpose of the Spanish sovereign to dispose of the province to our government made the King, or his representatives, regardless of the welfare of his western subjects. It is true that there had been for some years prior to February 22nd, 1819, the date of the treaty, a manifestation at Madrid of a wish on our part to acquire the Floridas (Curry's Constitutional Government of Spain, Appendix D.), and it is further true that the reason why all grants made on or after January 24th, 1818, by the Spanish authorities were declared null and void by the treaty, was that it was on that day that the first proposal was made by Spain to the United States for the cession; and subsequent grants might justly have been regarded with suspicion, particularly in view of the extensive donations, including almost all unceded lands, made to the Duke of Allegon, the Count of Punonrestro, and to Don Pedro de Vargas, the first and second having been made on February 6th, 1818, and the other on April 9th of the same year; which date of January 24th, 1818, the King in his ratification of the treaty on October 24th, 1820, expressly declared was fixed in the positive understanding that the three grants were annulled by the tenor of the treaty. The fact, however, that the treaty fixed a time terminating the power of the Spanish

authorities to make valid grants, is a recognition of a *prima facie* validity of all prior grants, which recognition concedes *pro tanto* the good purposes of that government as to the welfare of the inhabitants of the province. Construing the grant as vesting in the grantee the extensive rights indicated above, the result would have been that the population of Pensacola, and of the lands east and west to the bayous, would have been deprived of the right of using for any purpose, or even entering upon the water within the described limits of the grant; they would have been entirely cut off from access to the sea over or through the stated space without the consent of Pintado and those who might hold under him. The commercial future of Pensacola, and all the interests of the province and of the parent government dependent upon or incidental to the maintenance and development of that town's maritime commerce would have been dependent upon the will of Pintado and his successors in title, in so far as access from the sea to Pensacola, or to the territory between the two bayous was concerned. Surely a construction entailing such consequences will never be given to a public grant in the absence of conclusive proof of an intention that they shall result; such proof must be manifest by terms expressly stating or necessarily implying the intention. In the absence of such manifestation the proof must be held not to exist. The purposes of any grant are to be ascertained from the terms used, considering them with reference to the subject-matter of the grant. The subject-matter of this grant can not be regarded as merely so much land and water, as in the case of a part of the public domain belonging to the King, and held for the purposes of sale in severalty; but it must be considered as land and water subject to the public uses which the law ob-

taining at the time of the grant attached to the same. These uses were as material elements of the subject of the grant as were the soil and water—in fact much more so—and to separate the land and water from the uses with which they were charged, is to change entirely the nature of the subject as to which the grant speaks, and the official authority was acting. It must not be forgotten either that the Spanish authorities were fully apprised of such law and uses, or that they acted with reference to them when making the same. Moreover, no further encroachment upon the rights of the public in the land and water, and their ordinary use of the same can be held to have been intended by the government than the words of the grant, considered with reference to its subject-matter, expressly make or necessarily imply. Keeping in mind the fact that the uses of the shore between high and low water mark and of the water and of the ground under water in so far as the ground was necessary to the use of the water, we can not reasonably impute to the Spanish authorities a purpose to impair those uses, or in any wise injure the public in their rights, unless such purpose is clearly shown by the words of the grant; on the contrary, in the absence of such showing made in express words or by clear intendment, we must hold that the purpose of the government was to promote the public interests and render the property more available to the uses and ends for which it was intended and held by the public. It is unquestionable that the interests of the people of Pensacola, and of the province of West Florida, and of the entire Spanish government, and even of the strangers of any and all friendly nations who might come to Pensacola, were that the water front covered by this grant, should be maintained in that condition which would best con-

tribute to the maritime commerce of the port. Grand and beneficent as is the gift which Providence has bestowed upon Florida in this noble harbor where the freighted navies of the world now come and go, deep as is its channel, and ample and secure as is its haven, still there was need for human effort to render it more adaptable to commerce; the land sloped from its borders gradually to its channel, and the pages of the appeal transcript now before us, describe, in the language of aged citizens, the time in the early days of the present century when merchandise of other ports was transferred from the ship, whose draft constrained her to the channel, to the flat or small craft, and brought by the latter to the shore, or at least so near that drays or other vehicles could be driven in the water and receive and convey the goods and wares to their consignees in the town. The necessity for the removal of this obstacle to commerce, one usually incident to harbors in their natural state, must have suggested itself to every intelligent citizen who was appreciative of the needs of the community. Wharves are now, as they were in the year 1817 when this grant was made, the ordinary means of overcoming the obstacle to navigation and commerce presented by the shoaler waters intervening between the shore and the channel of navigable waters. Their construction is for the benefit of the chief interest of the public in navigable waters. Their effect is the advancement of the public welfare in so far as that welfare is dependent upon the right of the public to use navigable waters. In construing this grant we must ascertain whether it is one which shows simply an intention to authorize the doing of only that which would naturally promote the public welfare and was necessary to the best uses of the waters of the bay, or whether there is also in the grant

evidence of an intention to give to Pintado rights which were a serious infringement of those of the public, and would entitle him to impair materially the interests and privileges of the citizen, and even the friendly stranger. In our judgment a fair consideration of the grant restrains us beyond doubt to the former conclusion, and excludes the latter.

It is apparent from the title that on December 7th, 1817, prior to the date of the first of the papers constituting this title, there had been a concession of six lots of which the numbers are given, and of another lot of 204 feet and two inches front on the plaza called Seville, all in Pensacola, such concession directing the immediate delivery of the titles for the same, which titles it seems were "dispatched" to Pintado on the 10th of the month; and that at the time the grant was made of the city property aforesaid there was a concession of 10,000 arpents of the royal lands of which plans were to be presented by Pintado, or, in other words, a simple grant in quantity, the titles for the latter to be made immediately upon Pintado's presenting the plans of the *lands he should select* to constitute the 10,000 arpents with a description of the same, which he was to do under his responsibility in that respect as Surveyor-General of the province. There is no evidence that there was any previous description or identification of the land which was to constitute the ten thousand arpents. The six plans accompanying the stated first paper, of which plans copies were subsequently annexed to the title, represent the outlines of the locations made by Pintado of the stated concession in quantity; and after stating that the "aforesaid 10,000 arpents superficial are contained in six different tracts of land and water conforming to the six plans which in duplicate accompany the same,

whose situations, lines, boundaries natural and artificial, extensions and area of each terminus are as follows,'' that paper describes the several tracts represented by the plans A and B, and reaching the plan C, speaks of that which it represents as ''an extension or space of the Bay of Pensacola, whose superfices of water is equal to an area of $718\frac{1}{2}$ arpents superficial between'' the 95-perch western boundary line at Bayou Chico and the 100-perch eastern boundary line at Bayou Texar, each of such lines running into the water in a southeast direction, the plan representing the figure which the said lands forms in the water and the limits within the bay of Pensacola, ''being those of the part of land and shore which makes between the said two points of the mouths of the two mentioned creeks, the curve which makes the edge of the water of the sea at the highest tide in calm weather, and with the depth from the surface of the water of the sea as far as ten feet English below the actual bottom, or toward the centre of the earth, in the whole, the space which the figure represented in said plan C embraces, considering it as a solid, since it has the three dimensions of longitude, latitude and depth.'' It can not be reasonably claimed for this that it is anything more than a designation of the land and water included between the east and west boundaries and the adjoining high tide line as a northerly boundary, and the southerly boundary line drawn, in the manner indicated by the plan, from the southern extremities of the eastern and western boundaries, such description including, however, no land below the depth of ten feet from the bottom or line of contact of water and earth. From this space there is then excepted that part of it then occupied by the wharf of Forbes & Co., which it says they have been in possession of many years, and

Sullivan, Exr., et al. v. Richardson, Trustee.—Opinion of Court.

also the lot referred to above as fronting on the Plaza, and further described as having "a depth as far as the sea and prolongation within the bay as far as the extreme of the place or bank of sand." The paper departing from the course pursued by it in its description of what is represented by the other five plans, does not stop with this mere description by boundaries and quantity, but continuing it says: "The whole in full property and for the purpose of constructing wharves and houses for bathing, reserving and saving not only the right of His Majesty, but also that of the public whenever it becomes convenient and it be designed to construct wharves with whatever funds, municipal or common, intending the exclusion only with respect to particular individuals." That this paper of December 12th, 1817, was presented to Ramirez, and that the title of December 17th, 1817, which with the former and the plans constitute the entire document now before us, was executed by him with reference to it, is apparent from the statement of the paper of the latter date that "with the date of the 12th instant he," meaning Pintado, "presented in duplicate the figurative plans of the 10,000 arpents superficial of land and water designated in six different portions, whose situations, lines, boundaries and confines natural and artificial extensions, and area of each explain themselves after the manner following." Reaching the property in question it says: "The lands designated by the letter C are an extension or tract of the Bay of Pensacola whose superficies of water is equal to an area of 718½ arpents superficial," and then follows a description, the same in substance as that in the paper transmitting the six plans, with the stated exceptions as to the Plaza lot and the Forbes & Company wharf, both of which excepted

portions are stated in both papers to be represented, as they in fact are, on the said plan C, and afterwards are the words: "The whole in full property," etc., the only difference between their appearance here and the other paper being that here they are introduced as a distinct sentence, instead of as a part of another sentence, and have the words "at all times" between the words "public" and "whenever." Having set forth the six descriptions, Ramirez, professing to act under the power given him by the King, and in his royal name, uses the following language in the granting part of the title: "I grant, * * gratuitously," to Pintado "the 10,000 superficial arpents of land and water contained and marked in the six figurative plans which, in duplicate, he presented, and, under the lines, termini and confines natural and artificial, which in them are denominated and set forth; and I transfer to him absolute dominion, for that as his own, he may hold to his own use, enjoy or alienate them at his own pleasure without prejudice to a third, who holds a better right, nor of the sovereign privileges according to what is provided in the annexed decree and the clauses expressed." The paper of the 12th of December, 1817, was a description by Pintado of what he had selected under the concession and desired a formal title for. Had his purpose been to seek an absolute title to the space or body of land and water described by him and outlined by the plan C, he would as in the description of the tracts of land delineated by the other plans, have stopped upon giving the location and boundary lines, dimensions and quantity; but instead of doing this he proceeds to state the interest and estate which he desired in the locus described. He wishes the whole space described "in full property," not for all purposes, but in full property, "and for the purpose of

constructing wharves and houses for bathing.'' The use of the words ''in full property,'' unaccompanied with others, after the preceding description of the 718½ arpents of land and water, would have been a frank exhibition by Pintado of a palpable purpose to exclude the public from all their rights in the space described, but the subsequent words show the sole purposes to which he desired to be permitted to appropriate or use the stated space. The word ''and'' can not be held to overcome the effect which the subsequent words quoted would have without it. Pausing even here, it must be conceded that Pintado declares that he desires the property for a purpose consistent with and promotive of the public interest in, and uses of, the space described, and not for purposes antagonistic to those interests. The remaining words: ''reserving and saving not only the right of His Majesty, but also that of the public, whenever it becomes convenient and it be designed to construct wharves with whatever funds municipal or common, intending exclusion alone with respect to individuals,'' manifests the further purpose that it was not his wish that the grant to him of the stated space for the purpose of building wharves and bath houses should be understood and intended or should have the effect to impair the right of His Majesty, or even of the public to build wharves whenever it should become convenient and be designed to do so with either municipal or common funds, but that only private individuals should be excluded from building wharves in the described limits. Viewing these words in the light of the known rights and privileges of the public in the shore and the water, rights of which both Pintado and Ramirez must be regarded to have been cognizant, it is not reasonable to hold

that Pintado sought any exclusive privileges within the described limits than that of building wharves and bath houses, and, as to the former, neither His Majesty, nor the public acting as a municipal or other body politic, was to be excluded, but only individuals. The substantial privilege and sole property right sought was that of building wharves and bath houses within the the space described, and this privilege was to be exclusive as against individuals, but not as to His Majesty, or any organized body politic as to wharves. The "exclusion," to which it was desired that individuals should be subject was an exclusion from that which Pintado was seeking the right to do, *viz*: to use the stated space for building wharves and bath houses, and from this right in so far as it included wharves he expressly disclaims any intent to exclude the King or the organized public. He was not seeking to use the space in any other manner than by building the stated structures, or claiming any privilege of excluding individuals from that space except in so far as the actual construction of wharves, and warehouses, or, in other words, such erections as constructed or the act of constructing them might do it.

There is in the grant of December 17th nothing to justify the conclusion that any greater right was intended to be given than we have found, from the other paper, it was the purpose of Pintado to request. The purpose of the government to grant no more, becomes apparent when we read the two papers, or even only the formal grant, in the light of the rule referred to above as governing the construction of public grants. The words of the granting part of the formal title do not show any contrary intent; they are general and were intended to vest, to the extent they indicate, the several properties represented by the plans and the de-

scriptions of the same; and the property or subject of ownership represented by plan C and the descriptive words relating thereto to be found in the two papers is not the land and water within the stated limits, but it is the right to use the same for the purpose of constructing wharves and houses for bathing, such right of use being only to the exclusion of any similar right in any individuals, and being subordinate to the right of the King and the public at all times to construct wharves with municipal or common funds within such limits. It is of this right to use the space described by plan C, and no other right of property therein, that the formal title executed by Ramirez "transfers" to Pintado the "absolute dominion for that, as his own, he may hold to his own use, enjoy or alienate at his own pleasure, without prejudice to a third who holds a better right, nor of the sovereign privileges according to what is expressed in the annexed decree and the clauses expressed." That there is no such limitation to a right of use expressed in the descriptions of the subject-matter of any other plan, does not militate against this construction, but, on the contrary, supports it; and the fact that there is in the descriptions of the subjects-matter represented by such other plans no reservation to which the above saving of the granting clause, in favor of the "sovereign privileges" can apply, does not render the other granting terms of the formal title less effective to pass to Pintado, as against the King and public, full and several dominion of the lands represented by them. In our judgment the intent and purpose of the grant was to vest in Pintado and his assigns the right to use the space for the purposes, and with the exceptions, indicated, such right to be exclusive of a similar right in any other individual,

9

but subject to the saving expressed in favor of the King and the public as to wharves; and he was to have a property in the described land and water to the extent necessary to the full exercise of the stated rights, with the stated exceptions and savings, and no other or greater property right therein. The grant is, moreover, not one of the entire soil, or any part thereof beneath the water, subject to the use of the public in the water, but without the right in the grantee to convert the water into land, or to build wharves on the land; on the contrary, as indicated above, it is a grant which gives no right of occupation or use of the land or water except for the purposes stated, and except for use for one or the other of the stated purposes there is no right to exclude even individuals from the ordinary uses which the general law gave them to make of the shore and the waters and of the land under the water, at least in so far as such land was essential to the ordinary use of the waters. Until used for one or the other of the allowed purposes, whatever title was vested in Pintado was to be held by him, and any one claiming under him, subordinate to the ordinary public uses to which such land and water were subject.

This is the only construction which the grant will sustain, unless we eliminate from it language which can not be said to have either an accidental or meaningless presence. The suggestion that if the extension of the grant downwards is to be limited to ten feet, it should be also construed to confine Pintado's rights upwards to the surface of the water, is answered by the known nature of wharves and bath houses as extending above the surface of the water.

Having thus determined the nature and purpose of the grant, we must now inquire as to the power of the

King, and of Ramirez as his representative, to make the same.

Counsel for appellee asserts that in all countries the title to land under tide water is in the sovereign, that it was and is in the King of England, and that that sovereign's right to convey it existed unquestionably up to Magna Charta, and that it is in the States of the American Union, within their boundaries; and that in Spain and its provinces it was in the King of Spain. As to Spain and its provinces he cites Hagan vs. Campbell, 8 Peters, 9; Mobile vs. Eslava, 9 Porter, 577; Bullock vs. Wilson, 2 Porter, 436; Weber vs. Harbor Commissioners, 18 Wall., 57; Pollard's Lessee vs. Hagan, 3 Howard, 212, 225, and 2 Cal. L. L., 550. The first of these cases was decided in 1838, and is one where, in 1767 the British authorities granted to Richardson a tract of land in the district of Mobile, in the then British province of West Florida, the eastern boundary of the land granted being the high water line of Mobile river. In 1774 the firm of Panton, Leslie & Co. purchased the tract of Richardson, and in September, 1807, the Intendant of the Spanish Province of West Florida, upon petition by John Forbes, a partner of said house, then continued under the name of John Forbes & Co., that the English grant should be confirmed, not only confirmed the same to the latter house, but also, on account of an error as to quantity, extended the grant, as its terms were construed by the Supreme Court of Alabama, so as to cover the space, not included in the original grant, between the said eastern boundary and the "channel" of the river and the north and south boundary lines extended to such channel, the Spanish grant reciting that this space had been "left unsurveyed at that period, being impassable, has since been rendered use-

ful by the owners having ditched and drained the
same and which they are to receive in compensation
for the above mentioned error; with the reserve, how-
ever, of leaving a free passage on the bank of the river
without altering the figure of said tract on the other
side." On the copy of the survey corresponding with
the description in the grant, were traced lines showing
the eastern boundary of the British grant, and from
the points where the northern and southern lines strike
this boundary such lines were continued without de-
flection to the channel of the river; and the marsh or
flat lying between the channel and the high water
mark in 1767 was clearly described in the plat. It was
also shown by testimony that at the date of the Span-
ish grant the ground occupied by the defendant with
a wharf, and for the recovery of which the action was
brought, was covered by water of the river or bay of
Mobile, and as to whether it had ever been uncovered
by water, the testimony was contradictory. There was
also evidence to show that Forbes & Co. had reclaimed
by ditching and otherwise a portion of the land un-
covered with water, but it did not show that their re-
clamations extended to the wharf and land in posses-
sion of defendant. The lower court had instructed
the jury that the land between high and low water
mark, that is between the flow and ebb of the tide,
belongs to the sovereign and does not pass by a grant
unless specially given; and, in effect, that such lands
as the jury should find to have been drained and re-
claimed by Forbes & Co. passed by the grant, and that
the land below high water mark and not reclaimed did
not pass. The Supreme Court holding, as indicated
above, that the terms of the Spanish grant included
all the marsh or land between the eastern boundary of
the English grant and the "channel" of the river,

meaning by "channel," as we understand the opinion, the low water mark or water-line outside of the marshy land, said: "It was not essential to the plaintiffs' title to show that all the marsh was drained previous to 1807, or that it had been reclaimed since that period. It is true that all this is described in the Spanish grant as having been rendered useful by the owners having ditched and drained the same, and which they are to receive in compensation for the deficit in the quantity intended to be conveyed by the British' grant. That the Spanish authorities believed that the marsh, or the greater part of it, lying between the river on the east and the original tract on the west had been drained, we think probable from the terms employed. Yet an ignorance of fact in this particular can not be held to control the plain language of the grant, and limit its operation to so much of the land as was actually drained—most certainly not in a controversy with a mere occupant who relies upon no title subsequently acquired from the authorities of Spain. The plat or plan of survey does not trace any ditch as having been cut through the marshes; and the river having been declared to be the eastern boundary of the land covered by the grant, there is no authority for stopping at any point between the channel and high water-mark. * * The instructions, we have shown, can not be sustained, —the grant ascertains its own limits on the east which is not liable to be varied by showing a portion of the marsh, or even all of it, unreclaimed in 1807, or at any time since." Of this decision it may be said that it assumes the power of the Spanish authorities to grant the shore, it being here marsh land, to low water mark; there was, however, no contention to the contrary, but rather a concession of the power by counsel for defendant, whose defense was upon the theory that the

Sullivan, Exr., èt al. v. Richardson, Trustee.—Opinion of Court.

terms of the grant did not include any unreclaimed land. It however can not be held that the Spanish authorities did not understand the land to be reclaimed when they granted it. Whatever may be said in the opinion as to the law in England and the United States, there is no discussion of the question as to the Spanish law. It is not to be forgotten either that the grant of 1807 was void, as to American courts, for the reason that the territory west of the Perdido had been ceded to the United States by France by the treaty of April 30th, 1803, as claimed and asserted by us. Foster vs. Neilson, 2 Peters, 253 (decided in 1829); Garcia vs. Lee, 12 Peters, 511. Still, it can not be denied that in Mobile vs. Eslava (decided in 1839), where counsel had questioned the correctness of Hagan vs. Campbell, as to the power referred to, the same court, constituted of the same judges and speaking through the same justice, expressly affirmed the power of the King of Spain to make such a grant. Without proposing "to consider the general power of the sovereign over the tide waters," it held that the King of Spain, in virtue of the *bulls* of Pope Alexander VI, became the proprietor of the Spanish possessions in America, and could grant the shore of the navigable waters in his American colonies, and that the power possessed by the King in this particular, might be exercised by his viceroys and other subordinates within their respective jurisdictions; and further, that where a grant is made by a public and responsible officer claiming and exercising the right of disposing of the public domain, it will be presumed that he did it by the order and consent of the government he professes to represent and in whose name he acts; and in the absence of proof to the contrary, it will be intended that he disposed of no more property of his

sovereign than the laws of Spain authorized.   The conclusions announced here as to the power of the King and his representatives were wholly unnecessary to a decision of the Eslava case, and in so far as they relate to the power of the sovereign are based upon Robinson's Am. and Prescott's Ferdinand & Isabella. This conclusion adopts the theory that the colonies were vested in the crown, rather than in the state, and that the monarch possessed an unlimited control over the same, that he and not the state was the proprietor of the territories acquired, and from him all grants of land flowed, and being vested with the property it was competent for him to make such disposition of those possessions as caprice or a sense of justice might dictate; that the canons of the civil law or the legislative regulations of Spain were not recognized by the monarch as operating to restrain him in making grants of land in the new world; and it must therefore be immaterial whether according to the civil law, rivers, the sea and its shores are destined by nature to the common use of man and thus withdrawn from commerce; it being also observed that it was true that "when towns were built and formed into bodies corporate, the citizens were allowed to elect their own magistrates, who were authorized to adopt measures for the regulation of their own interior commerce and police.   But no political power originated from the people—all centered in the crown and the officers of its nomination. The viceroys who represented the sovereign possessed his regal prerogatives within the precincts of their own governments in their utmost extent.   Like him they exercised supreme authority in every department of the government, civil, military and criminal.   And as their dominions were too extensive for their personal supervision, they, in turn, were represented by vari-

ous orders of magistrates, some appointed by the King and others by the viceroys, all of whom were amenable to the jurisdiction of the latter, unless they were required to exercise their duties without the limits of either of the viceroyalties.'' The cases of Bullock vs. Wilson, Weber vs. Harbor Commissioners, and Pollard's Lessee vs. Hagan, can not be considered authority as to the Spanish law on this point, neither of them deciding anything as to it, yet it is a fact that in the second case there is an observation to the effect that although the title to the soil under the tide waters of the bay of San Francisco was acquired by the United States by cession from Mexico, equally with the title to the upland, they held it only in trust for the future state, and upon the admission of California into the Union, it passed to the state upon the limitations therein expressed; and in the last of the three cases it appears that it was insisted by counsel that the United States had, under the treaty referred to in the preceding pages of this opinion, succeeded to all the rights and powers of the King of Spain, and that as by the laws and usages of Spain, the King had the right to grant to a subject the soil under navigable waters, therefore the United States had the right to grant the land in controversy, which was in Alabama, and thereby the plaintiffs had acquired it. This contention was answered not only by a statement of the fact that the United States had never claimed any part of Alabama under any treaty with Spain, but also by the statement that if it were true that the United States had acquired the whole of Alabama from Spain, no such consequence as was contended for would result, that it could not be admitted that the King of Spain could impart to the United States any of his royal prerogatives, and much less could it be claimed

that they have capacity to receive or power to exercise them. Every nation acquiring territory, says the opinion, citing Vattel, b. 1, c. 19, Sections 210, 244, 245, and b. 2, c. 7, Section 80, by treaty or otherwise must hold it subject to the constitution and laws of its own government, and not according to those of the government ceding it.

The reference of counsel to page 550 of 2 California Land Laws, *supra*, is a report, dated Havana, May 15th, 1830, to the Supreme Junta by commissioners appointed evidently some time before. Their duties included that of investigating and ascertaining the right of property on the margins of rivers which the royal factory considered as crown lands appropriated to the culture of tobacco. It seems from this report that on March 11th, 1798, there had been issued a royal cedula which declared that all the lands situated on the margins of rivers, to the extent which said rivers cover when they overflow, were to be considered the property of the crown, and not of the land owners. The conclusion of the report on this point is that the principle announced by the cedula was decided without the land owners having a hearing, and by an incompetent authority, a minister, and not by the tribunals and councils of the King; and also against the clearest principles of Spanish jurisprudence, the law, which is cited, declaring positively that the margins of the rivers, as to dominion, belong to those whose possessions are adjacent thereto, and all the trees which are on the banks of the rivers belonging to those who own the possessions, and they can cut the same and do with them what they please, and it being observed that the laws in speaking of rivers do not mean the interior, but the public and navigable streams. And in the connection that the cedula was against the clearest

principles of Spanish jurisprudence, the report reads: "And we may say this without being accused of wanting the respect which is due to a royal order; because there are cases like the present in which there is a presumption that such orders are not the will of the sovereign; for they have been considered possible and have been foreseen by the Spanish sovereigns, as they have declared by an express law that royal orders that may be given against any general or municipal law shall be obeyed but not executed." The report further finds that the cedula was against the simplest notions of reason and justice, the inundations sometimes extending over four or even six leagues from the river, and that it was repealed by a subsequent royal order of January 25th, 1801, and that it was also made under the false impression that the grants of lands which it affected had been made under certain conditions rendering it proper, and that therefore it was null and void. It is stated in this report as to the use of rivers and their banks being common to all: "Besides that the laws speak of public and navigable rivers which cross two different nations and separate their territories (as we have said before), we ask now what is the use meant by the law? None other but the common right to navigate and to fish in them, as it regards the rivers; and with regard to the banks, the laws mean the right to build a house, a cottage for shelter or any other kind of building; provided the use, common to all, is not interrupted; it also means the right of making nets and drying them thereon; the right of repairing the vessels and tying them to the trees; also the right to put there the merchandise and fish and to sell the same with other things of their nature."

The cases of Mobile vs. Eslava, 16 Peters, 234, and dissenting opinion, 252, 259, Pollard vs. Kibbe, 14

Peters, 253, as also Pollard vs. Hagan, *supra*, are also referred to as impliedly sustaining the power, in that grants of land below high water mark were passed upon without question as to their validity, even by the learned counsel engaged in them, who being contemporaneous were better acquainted with the Spanish law than we are. There is nothing in the *opinion* of the court in the first of these cases, decided in 1842, that bears on the question at all, but in the separate opinion of Judge Catron it is said: "That the United States acquired the title to *lands flowed by tides* by the treaty with Spain, is of course admitted. That they had power to grant up to the adoption of the Constitution of Alabama, is also admitted in the opinion under review. That the Spanish King could grant lands under tide water, is free from doubt, and the United States acquired by cession all his powers over the vacant soil." This opinion also holds that the United States had power to grant land in Alabama between high and low water mark of navigable waters, after the admission of that state into the Union, a position which is entirely overthrown by the subsequent decision of Pollard's Lessee vs. Hagan, *supra*, the Supreme Court of Alabama having first in Mayor vs. Eslava, *supra*, the same case as that now under discussion (it having been appealed to the United States Supreme Court), asserted the doctrine affirmed in Pollard's Lessee vs. Hagan. The case of Pollard's Lessee vs. Kibbe is one of a grant in 1809 to Pollard by the Spanish authorities of a lot which was then subject to overflow by ordinary tides. The date of the grant, it will be perceived, intervened the purchase of Louisiana from France by the United States in 1803, and the purchase of the Floridas from Spain. The territory about Mobile, including the lot granted, lay in the dis-

puted limits between the Iberville and the Perdido, and remained in the actual possession of Spain when the grant was made. The lot was filled in 1823, and the decision of the court was, that certain acts of Congress of May 26th, 1824, and July 2nd, 1836, confirmed the grant to Pollard, its view being that even if the grant was originally void on account of the want of legal power in the Spanish authorities to make it, in view of our title to the territory under the purchase from France, still it had been confirmed by act of Congress. It is true that no question seems to have been raised as to want of authority to grant land subject to tidal overflow, but even if it had been, the act of Congress would have been held to be equally curative of any such defect in the grant. It is unnecessary to discuss the effect of Pollard's Lessee vs. Hagan, *supra*. Of course where any lots falling within the terms of either of these acts was at the date of the same subject to tidal overflows, Congress was without power to grant the same, they being the property of the state of Alabama, whose admission into the Union was in the year 1819.

Referring to Law 15, Title 5, of the Partidas, which says: "A free man, a thing religious, sacred or holy, a public place; as squares, roads, threshing grounds, rivers and other waters which belong to the King, or the commons of any city, can not be sold or alienated," it is contended by counsel for appellee that this did not bind the King or his deputies, that he was not named in it, and that laws bind sovereigns only when named, and in Spain it bound him only so long as he chose to be bound, there being no such thing as law in a constitutional sense restricting sovereign power to a given course of action; Spanish law being the expression of the will of the King as to the manner in which

subjects should conduct themselves, but having no application to himself.

In support of this proposition, 2 Cal. Land Laws, 502, 503, and United States vs. Arredondo, 6 Peters, 714, are cited. The document referred to in the former of these citations is what is termed, An Exposition of the Florida Treaty, by the Hon. Joseph M. White, the learned compiler of such land laws, who in his day here, was among the most distinguished of Florida's citizens. This "exposition" seems to be an argument, made subsequently to 1830 at least, in some cause involving the title to land which had been granted by the Spanish authorities. It is true that in answer to the assertion that the royal governors of the Spanish colonies had no power to make sales or donations of the public lands, except in very limited quantities and under numerous restrictions, it is said, that every fair presumption is against these supposed limitations, and that legal or constitutional restrictions upon the power of the King or his officers, according to our ideas of them, are inconsistent with the character of the Spanish monarchy, and hardly comprehensible by a native of that country, and "have been rejected, together with the constitutional monarchy by the people of Spain;" and it is asked how it is possible to reconcile limitations of power with the fundamental maxim: The will of a prince has the force of a law. And it is also said that portions of the royal authority as arbitrary as that of the King himself, were entrusted to the several governors of provinces; each of whom within the limits of his own government was the image of his sovereign, and, in practice at least and in popular opinion also, absolute; and that the only restraint upon his acts were his instructions and accountability to the King, but that the royal instruc-

tions, and the *residentia* or account of his transactions, which the governor was obliged to give, were not properly legal limitations upon his power, but rather directions for the exercise of his discretion and securities for his good behavior; and, again, that even the laws of the Indies, obscured, perplexed and sometimes even unintelligible as they are, hardly reached across the ocean, and that the doctrine of the Spanish, like that of the Roman empire, was marked by the absolutism of the distant prefects. These assertions are very broad, but they are not authority; they are the free language of the advocate, and have no relation to the subject of a grant like that now under consideration. Moreover, the very paper in which they occur contains evidence that the Spanish government of the time of this grant was one of laws, and not of mere arbitrary discretion upon the part of the King or governor; it shows that in the opinion of Don Luis de Onis, who negotiated, on the part of Spain, the Florida treaty, which was signed February 22nd, 1819, the right of the King to annul the grants to the Duke of Allegon, to De Vargas, and Punon restro, was upon the ground that they were made upon essential conditions which had not been complied with by the grantees, and were consequently not binding on the King according to the Spanish law; and further that the understanding and intent of the parties to the treaty were that all grants should have no other or further effect here than they would have had if there had been no cession of the territory, saving however to the grantees (other than the three named), who had been prevented from perfecting the conditions of the same by the recited circumstances of Spain, the periods specified in the grants reckoned from the *ratification* (6 Peters, 315) of the treaty. The other citation, Ar-

redondo's case is, as already stated, a decision of the Supreme Court on a grant of land in East Florida. It is said in the opinion that "the laws of an absolute monarchy are not its legislative acts—they are the will and pleasure of the monarch expressed in various ways, if expressed in any—it is a law; there is no other law-making, law-repealing power, call it by whatever name; a royal order, and ordinance, a cedula, a decree of council, or an act of an authorized officer; if made or promulgated by the King, by his consent or authority, it becomes, as to the person or subject-matter as to which it relates, a law of the kingdom. It is emphatically so in Spain and all its dominions. Such, too, is the law of a Spanish province conquered by England. The instructions of the King to his governors are the supreme law of the conquered colony; Magna Charta, still less the common law, does not extend its principles to it. King vs. Picton, 30 St. Tr., 866. A royal order emanating from the King is a supreme law, superseding and repealing all other preceding ones inconsistent with it. The laws of the Indies have not their force as such, by any legislative authority vested in the council; their authority is by the express or implied expression of the royal will and pleasure; they must necessarily yield to an order prescribing a new rule, conferring new powers, abrogating or modifying previous ones." Observing that the principle, that the acts of a King are in subordination to the laws of the country, applies only where there is any law of higher obligation than his will, it is, however, expressly affirmed in this decision that there is another source of law in all governments, *viz*: usage or custom—which is always presumed to have been adopted with the consent of those who may be affected by it, and that a general custom is a general law and

forms the law of a contract on the subject-matter, and though at variance with its terms, it enters into and controls its stipulations as an act of parliament or state legislature, and the court is bound to notice and respect general customs and usage as the law of the land, equally with the written law, and when clearly proved they will control the general law; and it is held that under the acts of Congress as covering the grants there in question, such would be the duty of the court even if that act did not name usage and customs as a part of the law or ordinances of Spain. "We might," says the opinion "as well exclude a royal order because it was not called a law." This decision in discussing the validity of the Arredondo grant, and after having referred to the fact that no objection was made to the admission of the title paper in evidence, and that its genuineness seemed not to have been contested, and that no attempt had been made to impeach it as antedated or forged, and having observed that it was therefore at least *prima facie* evidence of a grant of the land it describes to the complainant, the rules of of evidence and principles of law giving it this effect, observes that here the important question arises whether the several acts of Congress relating to Spanish grants do not give all such grants that are perfect in their forms legally and fully executed, a greater and more conclusive effect as evidence of a grant by proper authority. In considering this question it is noted by the court that in all the laws of the United States on the subject of Spanish grants in the three territories acquired since 1802, no requirement has been made that the authority on which any grant has been made under the Spanish government should be filed or proved by the claimant, but, on the contrary, Congress has been content that the rights of the United States

should be surrendered and confirmed by patent to the claimant under a grant purporting to have emanated under all the official forms and sanctions of the local government, this being "deemed evidence of their having been issued by lawful, proper and legitimate authority, when unimpeached by proof to the contrary." In speaking in this connection of the legislation as to Spanish grants in the territory west of the Chattahoochee river, acquired by the United States from Georgia, it is said: "The fact which gave to the recorded certificate of the commissioners the effect of a patent, was the existence of a grant, the legality and fullness of its execution only was required to be made to appear. No inquiry was directed to be made as to the authority by which it was required to be done; the United States were too just to exact from the grantees of land under an absolute colonial government what no court requires from one who holds lands under the grant of the United States or of a state, fully executed; or, if inchoate, never compels a claimant to produce the authority of an officer who issues or executes a warrant or order of survey; it is always presumed to be done regularly till the contrary appears, or such reasons are offered for doubting its authenticity as are sufficient in law to rebut the legal presumption." Reference is also made to the fact of the express grant in at least some of the legislation of authority to inquire whether or not grants may have been antedated, as also evidencing the purpose of Congress that the claimants need not show the authority of the officers executing the grants; and in conclusion it is said: "It is thus clearly evidenced by the acts, the words and intentions of the legislature that in considering these claims, by the special tribunals, the authority of the officer mak-

146 SUPREME COURT.

Sullivan, Exr., et al. v. Richardson, Trustee.—Opinion of Court.

ing the grant, or evidence of claim to lands formed no item in the title it conferred; that the United States never made that a point in issue between them and the claimants to be even considered, much less adjudicated. They have submitted to the principle which prevails as to all public grants of land, or acts of public officers, in issuing warrants, orders of survey, permission to cultivate or improve, as evidence of occupation and nascent title, which is that the public acts of public officers purporting to be exercised in an official capacity and by public authority shall not be presumed to be an usurped, but a legitimate authority previously given, or subsequently ratified, which is equivalent." It is further said that it is true that a grant made without authority is void under all governments, but in all the question is on whom the law throws the burden of proof, of its existence or non-existence; a grant is void unless the grantor has the power to make it, but it is not void because the grantee does not prove or produce the power; the law supplies the proof by legal presumption arising from the full, legal and complete execution of the official grant under all the solemnities known or proved to exist or to be required by the law of the country where it is made and the land is situated.

We fail to find in these citations evidence that the Partidas (Title 5, L. 1b), referred to should not be held binding on the colonial authorities. Granting that the partida was subject to repeal or modification by royal order or other authentic action of the King, there is nothing to justify the conclusion that it was not applicable to his representatives in the colonies, or that any such question as that now before us was in the mind of either Mr. White or the Supreme Court. It should not be forgotten that both were dealing with

something that was the ordinary subject of grant by such authorities, and as to which nothing negativing the power of the King's authorities is to be found in the Partidas or elsewhere in the Spanish laws; and it is true not only that the opinion of the court expressly recognizes the laws of the Indies, including Spanish usages and customs, as having been operative here, but also that Mr. White, in addition to a similar recognition in his Spanish Law, and his Land Laws of California, had expressly decided against the validity of this identical grant in the report on the same by the Land Commissioners for West Florida (4 Am. St. Papers, 118, 120), which report will be noticed more fully hereafter.

If it be that the colonial government was not one of law, prescribed by the King, but rather one of the mere occasional will of the sovereign, and of which will the only necessary evidence was to be found in any formal act of his official representatives here, then of course the law is to be found in the act, and proof of the latter establishes the former. We do not find that such was the nature of the colonial government, or the character of the King's disposition towards or interest in his western subjects. We think that other authorities at hand also show this.

In 1828 the Attorney-General of the United States became convinced of its being indispensable to a just decision by the Supreme Court of the land claim cases under the act of May 23rd, 1828, that a complete collection of all the "Spanish and French ordinances, etc.," affecting the land titles in Florida and the other territories which had belonged to France and Spain; and Mr. White was selected to prepare the compilation. In his communication of February 4th, 1829, to the Secretary of State, submitting his work, that re-

Sullivan. Exr., et al. v. Richardson, Trustee.—Opinion of Court.

ferred to above as White's Spanish Law, he speaks
of it as a collection of laws, ordinances, and local reg-
ulations adopted from time to time by the government
of Spain, touching the disposition of her public lands,
in her colonies, and makes, among others, the obser-
vation:    That for the period from the appointment of
the first Viceroy of New Spain to the year 1701, he
had found no specification of that officer's powers, or
authentic detail of his subordinate authorities, nor
any code of laws or systems of regulations relative to
concessions of the royal domain, and says that in
Cuba there are a Captain-General, Intendant, and Su-
perintendent-General, and eighteen governors of dis-
tricts, all authorized in some form and to some extent
to make grants or allotments of land, their powers in
many cases depending on instructions, official letters
and decrees of the King, Captain-General, or Intend-
ant-General, addressed to these respective subordinate
departments.    In this work of Mr. White we find that
as early as September, 1571, the King, expressing him-
self as desirous to devise suitable means by which his
western dominions, the Indies, should be governed in
a proper manner, provided by royal order, that the
Council of the Indies, whose function it was to assist
the King in the government of these provinces, should
to that end reside in the court and near the person of
the King; and that in 1682, he, by another order de-
clared that a stated and recent compilation of the laws
applicable to such provinces or dominions should be
obeyed, fulfilled and executed as such, and that they
should regulate and determinate all suits and differ-
ences which might arise, such order also referring to
former compilations of a similar character, pp. 13–17.
There were also subsequent compilations extending
up to the end of the year 1816, pp. 82, 126–7,.

Sullivan, Exr., et al. v. Richardson, Trustee.—Opinion of Court.

131. In the compilation of 1682 it is ordained: "And as regards what is not determined by the laws contained in this compilation, with respect to the decisions of causes, the laws in the compilation and Partidas of the Kingdom of Castile shall be observed in the manner set forth in the following law." Such "following law," providing that "the laws of the Kingdom of Castile shall be observed conformably to the laws of Toro, with respect as well to the substance, determination and decision of cases, transactions and suits, as to the form of proceedings."

In this work of Mr. White, we not only find the law as to things common, and things public as set out above, but there is in it, nor in his more enlarged compilation, made ten years subsequently, of the laws, charters and local ordinances of the governments of Great Britain, France and Spain, relating to the concession of land in their respective colonies. which compilation is referred to above as the Land Laws of California, nothing sustaining the idea that the laws therein contained were not to be binding on the King's representatives here, or that waters, like that which is the subject of this grant, or the land beneath it, were intended to be the subject of grant like the vacant or crown lands. On the contrary, we find it expressly declared: "We have ordained that pastures, mountains and waters shall be common in the Indies (Spanish Law 44); and further, that no one can establish or publish the law but the King, and that the Prince ought to obey the law, although he can not be compelled to do so (*Ibid*, 59, 60). The first of these declarations seems to have been necessitated not by any deficiency in the law as it stood at the time. but by the fact that persons without any title had occupied ex-

tensive tracts of land and would not permit any one to establish pens and herdmen's huts thereon and to drive their cattle thither, and it is accompanied by a present "command that all pastures, mountains and waters in the provinces of the Indies be common to all the inhabitants thereof, present and to come, and that they may freely enjoy and use them and construct their huts near their pens, drive thereon their cattle either in herds or separately at their option, all ordinances to the contrary notwithstanding; which, if necessary for this object are hereby so far repealed and declared to be of no force or value." It is true that there is in this compilation mention of waters in connection with private titles, but nowhere is the conclusion justified that it refers to what may be deemed public waters, like the subject of this grant. A careful consideration of the many laws, ordinances and regulations as to the disposition of lands satisfies us that wherever there is mention of waters in them the meaning is those waters which pass as part of the land, and not those which the general law made public or common. There is nothing in the entire system of laws that countenances the idea that the reduction of waters of the character covered by this grant to permanent ownership in severalty was intended or even contemplated. There is much evidence of the unlawful interference by officials with the commons of towns, and of the royal disapprobation of such invasions of the rights of those communities, and it can not be doubted that the equal evidence would be extant of disapproval of trespassing upon the public waters had official usurpation been equally held as to them.

In New Orleans vs. United States, 10 Peters, 662, decided by the United States Supreme Court in the

year 1836, a case involving the right of the Spanish governors to alienate the quay of the mentioned city, it being a space lying between the front row of houses and the Mississippi river, and held to to have been dedicated to the public at that place, it is said that "the fundamental laws of the Spanish nation, and which are understood to be alike binding on the King and the people, are found in the Partidas and the Recopilacion;" and the decision in Arredondo's case having been invoked by counsel as sanctioning the principle that a grant issued by a Spanish functionary is not only evidence of title but also that the officer had the power to issue it, it is also said: "In that case this court did hold, and the same principle has been sanctioned in numerous cases since, that a grant should be considered as *prima facie* evidence that it was rightfully issued, but that it might be impeached by any one who sets up an adverse claim.     *     * From a careful examination of the jurisdiction exercised over this common by the governments of France and Spain, and the laws which regulated this description of property in both countries, the conclusion seems not to be authorized that it was considered as a part of the public domain or crown lands which the King could sell and convey. This power was not exercised by the King of France, and the exercise of the power by the Spanish governor, in the instances stated, was in violation of the laws of Spain and equally against its usages. The land having been dedicated to public use was withdrawn from commerce, and so long as it continued to be thus used could not become the property of any individual. So careful was the King of Spain to guard against the alienation of property which had been dedicated to public use that in a law cited all such conveyances are declared to be void.

It would be a dangerous doctrine to consider the issuing of a grant as conclusive evidence of right in the power which issued it. On its face it is conclusive and can not be controverted; but if the thing granted was not in the grantor no right passes to the grantee." It is also observed in the same case that a faithful observance of the laws mentioned would have preserved the rights of the city as to the common, free from invasion, and that no law that showed the power of the King of Spain to alienate land which had been dedicated to the public use had been cited in the argument, and that it was clear that the exercise of such a power would have violated the public law which was understood to have limited the exercise of the sovereign power in this respect. In this case the Spanish law was held to control in determining the extent of the right of the public as to the New Orleans quay, parts of which had been granted in fee by Spanish officials, and the opinion shows that such grants were contrary to that law, as contained in the Partidas and the Recopilacion, the former of which compilations was promulgated about the year 1343, though perhaps not going into full operation till 1505, and the latter about 1567. *Vide* Preface to Morean & Carleton's Partidas. Spain had in September, 1769, established the Spanish laws over the territory of Louisiana, and there was never any suspension of these laws there until the United States acquired the country, not even during the brief period of Napoleon's title. The opinion shows that by the Spanish law the things which belong separately or severally to the commons of cities or towns are places where the fairs or other mentioned things, including the alluvions or sand deposits on the banks of rivers and all other uncultivated lands immediately contiguous to cities, and race grounds and forests and

Sullivan, Exr., et al. v. Richardson, Trustee.—Opinion of Court.

pastures and "all such other places which are established for the common use" (Partida 3, Law 9, Tit. 20); and that no one ought to erect a house or other building or works in the squares or commons, nor in roads which belong to the commons of cities or towns or other places, nor take possession of them for his own particular benefit, these things being for the advantage or convenience and common use of all, and that such works must be pulled down and destroyed, unless the corporation or place see fit to retain them for its own use, and use the revenue from the same; it being declared that no man who has erected such works can acquire a right thereto by prescription (Partida 3, Law 23, Tit. 32); and further, that "our pleasure and will is to preserve their rights, rents and property to our cities, towns and places, and not to make any gift of anything of them, wherefore we command that the gift or gifts which we may make, or any part of them, to any person whatsoever, are not valid." N. Rec., 6, 7, Tit. 16, Law 1. It was, however, held that the King of Spain, like the King of France, had the power to give permission to construct buildings on grounds dedicated to public use, without injury to the public rights, the buildings to be so constructed that no one should be injured in his right thereby (Partida 3, Law 3, Tit. 32; Rodriquez, 15 16); this Partida reading: "If a man begin to erect a new edifice, in the public places or street, or common threshing grounds (*exidos*) of any place, without the permission of the King, or of the council, upon whose ground he builds it, then any one of the inhabitants may forbid him to continue the work; unless the person forbidding be an orphan, a minor of fourteen years of age, or a woman, for they can not do it, except where some new work is constructing upon their own property." And it is ob-

served by the court that as the power was given to the
King, by law, to grant permission to build on public
places, it would seem to follow that such places were
not only withdrawn from commerce, but that the King
could not alien them, for if he had the power to do so
in an unlimited manner as over the crown lands, it
would include the exercise of every minor authority
over them ; and further, that the permission to build
on the quay, specified in the opinion, given by the
Governor and Intendant, under the law cited, was not
considered inconsistent with the public use as the
power was not to be exercised to the prejudice of third
parties, but as to the three lots, to which grants were
issued, it must be admitted they were such a final dis-
position of the property as was wholly incompatible
with the public right, both the fee and the use being
granted.  That there was no difference in principle
between ground dedicated as a quay to public use, and
streets and alleys of a town, and that as to streets it
would not be pretended by any one that the King
could have rightfully granted them, and it was be-
lieved that a public right to a common was equally be-
yond the power of the sovereign unless he disposed of
it under the power to appropriate property to the nat-
ural use and then compensation must be paid.  It is
also declared that the Kings of France and Spain could
exercise a jurisdiction in the nature of police regula-
tion over this common and other places similarly situ-
ated, but it was rightfully exercised in such manner
as not to encroach upon the public use, and there is
instanced the fact that in 1770 the Spanish governor,
O'Reilly, established a regulation, "*to continue during
the pleasure of His Majesty*, requiring a payment of
six dollars by each boat of two hundred tons for right
of anchorage, established and destined to the keeping

in repair of the levee or dyke which does contain the river within its limits in the whole front of the city * * "

That the King of Spain in the exercise of his great power might have made a grant of this kind, is not denied, nor need it be. That such a grant by him would have been contrary to his laws then in force here, and have been, *pro tanto*, a repeal of the same, or a case of special exception from their effect, is clear; and evidence, to be sufficient to show authority in another for such a departure from the fundamental law, recognized by him as operative here, must, in the presence of such fundamental law, establish his action in the premises. Surely an isolated act of a subordinate, that is in conflict with a general rule representing the expressed will of the superior, can not be held to be evidence of a change of that will. There is in the many authorities in which the power of Intendants to make grants of land is discussed, nothing inconsistent with this view. In none of them is the exact question, presented here, involved. It is true that in them there is assertion that the King and his Governor and Intendants had power to grant the shore or land which was land subject to tidal overflow, yet there is not to be found anywhere anything that justifies the conclusion that it was the purpose of the King to confer upon Intendants the power to make a grant like this not of land subject to the public use of the waters above, but a permanent monopoly of the right to build wharves over the entire front of his only city on the Gulf of Mexico east of the Perdido, and covering what, under the most favorable conditions for growth, might be deemed its possible prospective growth for many years. As stated above, a careful review of the royal ordinances and the regulations as to the sale and

other disposition of land (of the more modern of which ordinances an instructive statement by Judge Marshall will be found in the case of the United States vs. Clarke, 8 Pet., 436, the ordinances and regulations themselves being in White's Spanish Law and his Land Laws of California), will satisfy any one that they were not intended to authorize a grant like this or the reduction of public waters, or even the land under them, into several ownership, or to confer upon Intendants the power to do so. There can be found in these ordinances and regulations nothing that can reasonably be construed to indicate an intent upon the part of the King in making such ordinances to modify the general law applicable to public waters, nor a purpose upon the part of the colonial officials promulgating the regulations to extend them beyond those lands which were intended to be reduced to individual ownership and constituted the crown lands or royal domain. The purposes of settlement, cultivation and pasture are prominent in all these ordinances and regulations, and they are altogether inapplicable as a system for improving a port by granting rights to build wharves or promoting the health and comfort of the inhabitants through bath houses, or even to a system for the reduction of public waters and the lands covered by them, into several ownership and exclusive individual property. Such improvement of a port and promotion of the health and comfort of the population would have called for regulations protective of commerce and navigation, in addition to dealing with a domain of an entirely different character from that to which the ordinances and regulations referred to relate. We fail to find a line in any American adjudication that has been formulated with reference to, or can be regarded as an authority in favor of the exer-

Sullivan, Exr., et al. v. Richardson, Trustee.—Opinion of Court.

cise of the power asserted here by Ramirez, or
a provision of Spanish law general or special that sup-
ports his exercise of the power.    It is a power which,
in its nature, is not incident to mere authority to dis-
pose of crown lands, or that part of the royal domain,
which under the Spanish law were well understood to
be intended for reduction to several ownership, and
which such ordinances show an earnest desire upon
the part of the King to settle and dispose of.    Con-
ceding that the King had the power to *regulate* the use
of such waters, yet there is nothing which has been
brought to our attention that tends to prove that he
had confided this power of regulation to the
Intendant.    Had it been the purpose of the King that
such important rights as are attempted here to be con-
ferred upon Pintado should be at the disposal of the
Intendant or other subordinate, it seems reasonable, if
not certain, that some ordinance or other law regulat-
ing the subject would have been made, and be extant
with the many others made specially applicable to the
provinces.    Their absence is strong evidence that it
was the royal purpose to keep so important a function
as that of granting away to individuals the right to
build wharves and bath houses and interfering with
well understood public rights guaranteed by the gen-
eral law within his own immediate control.    In the ab-
sence sf some ordinance changing the general law, that
law, as it is set forth above, defined the rights of the
public in the shore and such waters, and was binding
on the Intendant as it was on the citizen.    In those
cases in which the power of officials to make larger
grants of land have been sustained (as they have been
even where the title recited inaptly royal orders
which authorized only more limited grants),
the courts have been able to resort to the gen-

eral power given them to dispose of the crown lands, and the frequent or usual exercise of the same, but here there is no grant of general authority, nor any instance of an exercise of it, nor any special authorization of the kind. That this grant, taking from the King, as it did, the right to avail himself of the capital or enterprise of any citizen at any time to improve the port in this manner, if His Majesty should deem it wise to change the law to that end, would have been binding on the King, we find nothing to support; nor anything to encourage a belief that it could have received his royal sanction as an act of grace; on the contrary, everything having any application to the subject, that has fallen under our view tends to the conclusion that it was not only without authority of law, but contrary to the public welfare, the rights of the King, and to the consideratian which his laws and ordinances evince for his subjects.

In addition to this absence of any law or rule authorizing such a grant by the Intendant or other local officer, the solitary character of this grant is strong evidence of its illegality. The labors of counsel and the investigations of the court have failed to find in the pretensions of numerous claimants developed by the acquisition of Louisiana, Florida and California, any claim like this. Though we see that the old mercantile house of Jno. Forbes & Co. kept a wharf at Pensacola, which was excepted from the calls of this grant, yet there is no evidence that there was ever any such grant of a wharf right by the Spanish authorities. If it be said that the absence of similar grants finds explanation in the absence of a necessity for wharfs, then the absence of such necessity also explains the want of any special law or rule changing the

general law as to the public right in and use of the
shore and the waters.   The natural conclusion result-
ing from such absence is that the conditions existing
here dictated that the use of the shores and waters
secured to the public by the general law should be
maintained.   No such grant or exercise of authority
is to be found elsewhere in the history of the colonies
referred to, and that it was made without authority,
we do not feel any doubt.   We do not think that
Law 3 of Title 32 of the 3rd Partida, quoted above,
authorized this grant.  It was not the purpose of that law
to permit subordinates to take from the King for all
time the right to permit persons to build houses in
public places, or to grant to one individual a perpetual
monopoly like this; nor are we satisfied that it applies
to public waters or shores as to which the general law
gave the rights indicated in the previous pages of
this opinion, including that of building huts on the
shore.

There is moreover in the history of this grant noth-
ing that favors its validity.   We find that it was re-
jected by the Commissioners appointed under the act of
Congress to investigate land claims in West Florida
(3 Am. St. Papers, 118–120) ; their conclusion being
that the grant was invalid, both on account of the
rights of commerce appertaining to the city, and the
property rights incident to riparian ownership whether
of urban or rural lands, and the rights of the public
in the use of the waters.   A further conclusion of the
Commissioners also was that there had never been any
actual survey of any of the premises granted or repre-
sented by either of the accompanying plans.   The re-
jection by the Commissioners of this water grant was
sustained by the Congress of the United States, which
excepted it, and the grant of the western end of Santa

Rosa island, from its confirmation in the act of May 23rd, 1828, 4 U. S. Stats. at Large, 284, of the grants. represented by the other plans. It may be here observed that of plan A, the report of the Commissioners says: It "embraces the point on which Fort Arruinado stood, on the western side of the island, opposite to Fort Carlos de Barrancas, and upon which it is believed, the Spanish government always had batteries erected for the defense of the entrance into the bay of Pensacola. This position seems to have been an indispensable auxilliary to that of Barrancas, and could not be appropriated to any other purposes but those of defense. It is an 'arid and barren space,' as described in the certificate, and entirely unfit for cultivation; under such circumstances, it is difficult to believe that the Spanish authorities would make such a grant as long as they expected to retain possession of the country."

The confirmation by Congress was necessarily a recognition by the United States of the authenticity or genuineness of the paper title held by Pintado; and an explanation of such recognition, in the absence of any from the opinion of the Commissioners, is doubtless to be found in the fact of the production of the original, which evidently had not been seen by the Commissioners when they prepared their opinion, though it is not improbable, in view of what appears in their statement of the evidence adduced before them, that it was subsequently presented to them, and that there was an unintentional omission to correct the stated feature of their opinion. It is certain, however, that both Commissioners and Congress concurred in the view that this water grant was invalid, and although no judicial effect can be given to the finding of either body as concluding the claimant, it must be taken as.

the expression of their best judgment carefully formed when these matters were fresh, under a sense of great responsibility, and we have yet to find anything that, to our judgment, seems to render their rejection of the grant questionable.

In the absence of the reasons upon which the District Judge of the United States Court for the Northern District of Florida based his judgment in favor of the defendant in the ejectment suit between the city of Pensacola vs. Eudaldo Pintado, we can not assent that it was upon grounds inconsistent with the views we have advanced in this opinion.

It is unnecessary to review specially the rulings of the Circuit Judge as to the effect and validity of this grant, or to pass upon any qustion not already disposed of. These rulings are irreconcilable to the conclusions we have reached; and the judgment must be reversed, a new trial granted, and the cause remanded for proceedings consistent herewith. There will be judgment accordingly.

MABRY, J. (concurring):

That Ramirez, the Intendant, had no authority to make the grant, as construed by the opinion filed, of the land and water involved in this suit, and that to this extent his act was contrary to all Spanish law and the rules for the government of the King's subjects, known to us and in force in the Floridas at the time, I am satisfied are correct conclusions.

I do not feel satisfied that the grant did not undertake to vest in Pintado a greater estate than that shown by the construction adopted, but I am satisfied that the

grant did invest him with the estate to the extent the construction gives, and that Ramirez had no authority to make it.